**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**HARTFORD DIVISION**

_____

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **CARLA'S PASTA, INC., and** | **Case No. 21-20111 (JJT)** |
| **SURI REALTY, LLC,** | **Case No. 20-21270 (JJT)** |
| **Debtors.** | **(Jointly Administered)** |

_____

### UNITED STATES TRUSTEE'S STATEMENT CONCERNING SURI REALTY, LLC'S AND CARLA'S PASTA, INC.'S APPLICATIONS TO RETAIN LOCKE LORD LLP AS THEIR BANKRUPTCY COUNSEL

William K. Harrington, United States Trustee for Region 2 ("United States Trustee"), in furtherance of his duties and responsibilities set forth in 28 U.S.C. § 586(a)(3) and (5), respectfully files this Statement, through his undersigned counsel, concerning Carla's Pasta, Inc.'s ("Carla's") and Suri Realty, LLC's ("Suri") (collectively "Debtors") Applications to Retain Locke Lord, LLP as its bankruptcy counsel.  In support of his Statement, the United States Trustee, through his undersigned counsel, states the following:

### I.        GENERAL BACKGROUND

1.        On October 29, 2020, a Chapter 7 involuntary petition for relief was failed against Suri. Case No. 20-21270, ECF 1.  On November 24, 2020, Suri filed a "Response to the Involuntary Petition and Request to Convert . . . to a Voluntary Chapter 11 Case." Case No. 20-21270, ECF 9.  On December 17, 2020, the Bankruptcy Court entered an Order converting Suri's alleged involuntary Chapter 7 case to a voluntary case under Chapter 11. Case No. 20-21270, ECF 30.  On January 22, 2021, Suri filed its Application to Retain Locke Lord, LLP as its bankruptcy counsel. Case No. 20-21270, ECF 48.

2.      On February 8, 2021, Carla's filed a "bare-bones" voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  ECF 1.  On February 24, 2021, Carla's filed its bankruptcy schedules and Statement of Financial Affairs. ECF 161 and 162, respectively. Carla's Meeting of Creditors was held on March 5, 2021 and was continued to March 26, 2021 at 2:00 p.m. to allow for the filing of amendments and for further testimony. ECF 234.

3.      On February 12, 2021, the Court entered an Order granting the Debtors respective bankruptcy cases joint administration under Case No. 21-20111. ECF 91.  On February 18, 2021, the United States Trustee appointed an Official Committee of Unsecured Creditors ("Committee") in the Carla's case. ECF 131.  The Committee has proposed the law firm of Green & Sklarz, LLC as its bankruptcy counsel. ECF 214 and 215.

4.      The United States Trustee's instant statement addresses the two Applications filed by the Debtors:  (a) Suri's Application to Retain Locke Lord, LLP ("Locke Lord") Case No. 20-21270, ECF 48, and (b) Carla's Application to Retain Locke Lord. ECF 122.

5.      Suri is a wholly owned subsidiary of Carla's.  Suri is the fee simple owner of the two real estate parcels upon which Carla's conducts its manufacturing and sales operation. Until approximately 2017, the real property now owned by Suri was owned in fee simple by the majority shareholder of Carla's – Carla Squatrito.  Suri was created in or around 2017 to hold the real property which Carla Squatrito transferred to it in or around 2017 and which it now owns in fee simple.

6.      Up until approximately the time Carla Squatrito transferred her ownership interest in the two real property parcels where Carla's presently conducts business to Suri, one or more leases existed between Carla Squatrito, as landlord and Carla's as tenant existed.  Carla's

employees have testified, and Carla's proposed counsel has represented that those leases are no longer in effect and have not been in effect for "years,"

7.    Also, according to the testimony of Carla's employees and the representation of Carla's proposed counsel, Suri has not "paid" traditional rent at least since the time of the expiration of the former leases.

## II.    SPECIFIC FACTS AND ISSUES

**Intercompany Claims:**

8.    Carla's employees have testified, and it has been represented by Carla's proposed counsel that Suri did not pay its obligations when such became due but depended upon Carla's to pay Suri's obligations.  It has been suggested, but not established that payments made by Carla's on behalf of Suri were or should be treated as "in lieu of rent" payments.  Debtors' employees testified and Debtors' proposed counsel suggest that there is a "use and occupancy" agreement between Suri and Carla's; however, the United States Trustee has not been given a copy of such an agreement. ECF 122, ¶ 19.  The United States Trustee has no evidence of how long such a "use and occupancy" agreement, whether oral or written, has been in place.

9.    There has been no determination, or the United States Trustee is unaware of such, as to what an appropriate "market rate" of rent which should have or should be paid to Suri by Carla's since the last payment made under the former leases between Suri and Carla's.

10.    Suri's and Carla's creditor bodies, except for secured creditors BMO Harris Bank ("BMO Harris") and Peoples United Bank "PUB") (collectively "Banks"), are not the same with, for example, Dennis Engineering ("Dennis") has a claim of more than $13 million against Suri but not Carla's and Carla's listed over $14 million in trade, service and professional claims on its Schedule E/F which are not shared by Suri.

11.    The Banks, jointly, assert a pre-petition claim of more than $37 million against both Suri and Carla's which is secured by all the Debtors' assets with the possible statutory exception of purchase-money security interests on individual assets.  As debtor-in-possession lenders, the Banks may claim that they have a super-priority administrative claim and secured claim superior even to any such purchase-money security interests. As part of the Bank's "super-priority" claims for providing debtor-in-possession financing, the Banks claim a lien on Chapter 5 claims to the extent of their $800 Thousand post-petition lending. ECF 189.

12.    At the present time, it does not seem likely that the total value of Debtors' assets including Suri's real property and Carla's business assets and good-will reach beyond the Bank's pre-petition claims.

13.    The Debtors, with the Bank's consent, are presently seeking to market and sell substantially all the Debtors' assets on or before April 30, 2021 which sale process, if approved by the Court, will test the combined value of Debtors' bankruptcy estates' assets. ECF 28.

**Possible Claims Against Debtors' Insiders**

14.    It has not yet been established when the Debtors' became "insolvent."  The Debtors' employees have testified that at least three members of the Squatrito family, all significant shareholders of Carla's, received salaries of $500 Thousand per annum for serving as managers of Carla's prior to taking reductions in salary as the bankruptcy filings approached.  There has been no analysis, or the United States Trustee is unaware of one, of whether the any portion of the $1.5 Million annual salaries of the owner/managers may be subject to avoidance by the Debtors' or more likely by the Committee should the Committee request and the Court approve such authority.

**Possible Conflicts of Interest**

15.    Locke Lord admits to past and present representation of secured creditor PUB. ECF 122, ¶ 15.  Locke Lord states that it has conflict waivers from both PUB and the Debtors; however, Locke Lord has neither filed those conflict waivers for inspection nor otherwise made them available to the Court, Committee, United States Trustee, creditors, or other parties in interest. ECF 122, ¶ 16.

16.    Locke Lord states that it has "built" a "wall" between those employees representing the Debtors and those representing other clients with interests adverse to the Debtors which Locke Lord calls "screened employees." ECF 122, ¶ 17.  Locke Lord, however, has neither supplied a list of which of its employees have either recently worked for a client with an interest adverse to the Debtors, including but not limited to PUB, nor which of its employees have recently worked, are presently working, or are expected to work for the Debtors in their bankruptcy cases which will allow the Court, Committee, United States Trustee, creditors and other parties in interest to determine, independent of Locke Lord's assurances to the contrary, that such a "wall" has not, is not and will not be breached.

17.    Although, Locke Lord states that it has implemented "procedures" to block its screened employees from accessing Debtors-related materials stored in its electronic document management system, there is no description as to how that is being accomplished. ECF 122, ¶ 18.

18.    The Debtors' state that to the best of their knowledge, there were no crossclaims between the Debtors as of the petition date. ECF 122, ¶ 19.  As stated in paragraphs 8 and 9 above, there is reason to believe that a possible crossclaim for rent due Suri from Carla's may exist, at least during the period of Debtors' pre-petition insolvency, which has yet to be vetted

either by the Debtors or the Committee.  The Debtors have not filed an amendment to their

respective schedules to acknowledge this possible claim.  *See* Case Dockets, respectively.

19.    Contrary to the Debtors' statement in paragraph 18 above that they know of no

crossclaims between them, the Debtors then admit that "intercorporate obligations" between an

affiliated landlord and affiliated business operating tenant "are common." ECF 122, ¶ 19(c).

The Debtors go further and acknowledge that "use and occupancy obligations" are an issue in

Debtors' cases but do not consider such issues to be material. *Id*.

20.    The United States Trustee, and hopefully the Committee, does see the possible

"use and occupancy obligation" of Carla's to Suri, at least during the time of the Debtors' pre-

petition insolvency, to be an issue especially in a case where any dividend to general unsecured

creditors in either of the Debtors' Chapter 11 cases will largely, if not wholly, depend upon

potential Chapter 5 or other recoveries against "insiders."

**Locke Lord's Pre-petition Receipt of Fees from the Debtors**

21.    Locke Lord has filed a Rule 2016(b) form which states that it has received and

has expended the sum of $209,149.50 from the two Debtors "as of the petition date." ECF 122-

2, page 22.  The Rule 2016(b) form also states that Locke Lord is not holding any retainer

given by the Debtors. *Id*.

22.    In Locke Lord's Rule 2016(b) statement in Carla's case, it states that it did not

accept (or receive) a retainer. ECF 122-2, page 22.  In Locke Lord's Rule 2016(b) statement in

Suri's case, it states that it did not accept (or receive) a retainer. Case No. 20-21270, ECF 48-1,

page 12.  Locke Lord's statements that it has not received a retainer from either of the Debtors

must be questioned as upon the "transfer" of one or both Debtor's representation from Mintz

Levin Cohn Ferris Glovsky and Popeo, P.C. to Locke Lord, a "retainer balance" of approximately $68 Thousand was transferred to Locke Lord. ECF 122, page 9, fn 3.

23.    Locke Lord has filed its retention agreement with the Debtors dated January 27, 2021 which confirms its attorney/clients relationship. ECF 122-2, pages 25 – 33.  It appears that Carla's principal shareholder and manager Carla Squatrito signed the "acceptance" of the Locke Lord retention on January 19, 2021. *Id*. at page 33.

24.    The United States Trustee has not yet requested or otherwise received the pre-petition hourly billing and support thereof from Locke Lord but expects to do so to examine whether Locke Lord's pre-petition billings and receipt of $209,149.50 was appropriate and not subject to recapture by the Debtors or the Committee for the benefit of the Debtors' respective bankruptcy estates.

**Locke Lord's Range of Hourly Fees:**

25.    Locke Lord discloses that its "current hourly rates for professionals anticipated to dedicate material time to this engagement range from $570 - $620 for associates and $690 - $765 for partners." ECF 122, ¶ 22.  The Locke Lord Application does not identify which partners and associates are either presently assigned or are anticipated to be assigned to work on the Debtors' bankruptcy cases or states the hourly rates of those attorneys.  In a footnote, Locke Lord states that as a courtesy to the Debtors, it is giving Debtors a "discount" of 10 percent.  It is not at all clear whether the hourly rates noted above include the Locke Lord "discount" or not.

26.    The United States Trustee suggests that the hourly fees for professionals by Locke Lord far exceed those charged for a similarly experienced firm for the work that is required by the Debtors which is simply the sale of substantially all their assets in approximately 90 days at

the "request" of the Banks utilizing the additional services of an investment banker, a financial analyst, and an outside Chief Restructuring Officer.

27.    It appears that the hourly fee range requested for Locke Lord's associates exceeds that normally charged in the District of Connecticut by law firm partners with decades of experience in complex Chapter 11 bankruptcy practice[1]. Thus far in the Debtors' cases, the United States Trustee has not observed the necessity of a skill level above that regularly practiced in this Court by firms representing other middle-market Chapter 11 bankruptcy debtors especially given that the "plan" here is just to effectuate a liquidation of substantially all the Debtors' assets through an asset sale.

28.    Although the reasonableness of a law firm's range of hourly fees is often left until the time of the interim or final applications for compensation, the United States Trustee believes that it is only fair to raise the issue at the time of retention so that all parties, especially

---

[1] The *In re Armaos Property Holding LLC/Olympic Hotel Corp.* cases, Case Nos.19-20134 and 35, closely resembles the facts and situations in the present cases whereby one debtor holds the real property while the other affiliated debtor operates an active business thereupon and where substantially all both Debtors property is to be sold with the assistance of a national-known professional and where it is expected that there will be no proceeds for general unsecured creditors.  In the Armaos/Olympic cases, the law firm of Zeisler & Zeisler P.C.'s partner fees top out at $500 per hour and the associate hourly fee top out at $395.

The *In re Donna Barnes* case, 19-20400, involves the sale of Debtor's Rhode Island resort property with several contests with admitted secured creditors and with those claiming a security interest. With the assistance of a nationally known auctioneer and an extensive marketing campaign, that property sold for $10,403,000.00.  In the Barnes case,  the law firm of Reid and Riege, PC partner and of counsel hourly fees top out at $495 and $465, respectively.

The *Mystic Transportation, Ltd*. case, 20-20531 involved the development, filing and confirmation of a plan of reorganization involving millions of dollars of wrongful death claims, trade debt, personal injury claims, and insufficient liability insurance coverage for a debtor which had woefully insufficient asset value to satisfy even a small portion of the claims against it.  Through the efforts of debtor's counsel and the SubChapter V trustee after intensive negotiations utilizing local mediators, the debtor was able to reach a consensual plan of reorganization which treated all constituencies fairly, extended dividends to creditors far beyond the bankruptcy estate's asset value and allowed the debtor to continue its business to make plan payments and keep its employees working.  The law firm of Coan, Lewendon, Gulliver & Miltenberger's hourly fees for partners topped out at $430.

the  professionals involved, are made aware of the issue and can address it with the Bankruptcy Court early in the case.

29.    "There is an inherent public interest that must be considered in awarding fees in a bankruptcy case.  Accordingly, the Code imposes upon [the] Court a supervisory obligation not only to approve the employment of professionals, but also to ensure that the fees sought by those professionals in a bankruptcy case are reasonable."  *In re Fibermark, Inc.*, 349 B.R. 385, 393 (Bankr. D.Vt. 2006) (internal citations omitted).

30.    "The reasonableness of the hour rate is determined by considering that fee which is customarily charged in the local community by someone who possesses similar skill, experience, expertise, stature and reputation who is faced with similarly novel and complex issues and who procures comparable results."  *In re Korea Chosun Daily Times, Inc.*, 337 B.R. 758, 767 (Bankr. E.D.N.Y. 2005) (citations omitted).  *See also In re Relativity Fashion, LLC*, 565 B.R. 50, 67 (Bankr. S.D.N.Y. 2017) ("The reasonableness of an hourly rate . . .is established through comparison with prevailing rates in the legal community for similar services by lawyers of reasonably comparable skill, experience, and reputation.")

31.    The reasonableness of a law firm's hourly rates can be affected by the "complexity and importance of the matter being handled.  A complicated, fast-paced, 'bet the company' litigation requires counsel of higher caliber (and expense) than a routine case that has little at stake."  *In re Relatively Fashion, LLC*, 565 B.R. at 68.  The United States Trustee sees the Debtors' cases as ones in which success will be determined by simply liquidating substantially all the Debtors' assets in a short three-month time frame and paying back as much of the Banks' claims as possible before the sale proceeds run out by utilizing either a "Stalking Horse" and a possible auction or by holding an auction without the participation of a Stalking

Horse and by closing the sale no later than April 30, 2021.  Such should not be considered "rocket science" to an experienced Chapter 11 bankruptcy firm in the District of Connecticut.

### Conclusion on Locke Lord's Retention Applications

32.    Locke Lord has several potential conflicts of interest in that it currently actively represents several of Debtors' unsecured creditors and a "participant" in its largest secured claim where that secured claimant (PUB) is insisting on actions which are likely to harm the chances of its unsecured creditors to receive a dividend in Debtors' cases by pushing the Debtors into a very quick sale of substantially all their assets.

33.    To the public, there will appear to be a conflict of interest when Locke Lord represents both the Debtors and their primary "antagonist" PUB.  Such appearances, even if managed and minimized to the extent possible, undermines the public's faith in the fairness and objectivity of their Courts.

34.    The "wall" which Locke Lord has "built" to keep its employees working for PUB away from its employees working for the Debtors does not seem to extend to those Locke Lord employees doing work for Debtors' unsecured creditors which hold claims against the Debtors.

35.    While it does appear that the Debtors and PUB have allegedly executed waivers of any conflict of interest in favor of Locke Lord.  It does not appear that waivers of conflicts of interest have been solicited or received from the other Locke Lord active clients who hold claims against the Debtors.

36.    Conflicts of interest may not be mature at the time the retention of Debtors' counsel is being considered; however, if such potential conflicts ripen into active conflicts, Locke Lord risks losing all or a portion of its compensation depending on the circumstances arising from any active conflicts.

37.   It appears that Debtors' bankruptcy cases will be short-lived but could generate a million dollars or more in professional fees to attorneys, financial analysts, the CFO, and the investment banker.  All those parties should have equal access to payment for services both during the pendency of the case from the Debtors' budgeted funds and from the Banks' $500 Thousand "carve out" for professionals as contained in the DIP Financing and Cash Collateral Order.  By favoring Locke Lord with an enhanced range of hourly fees over those charged by other counsel, those other professionals will suffer reduced availability of both budgeted funds and carve-out funds to fund their respective compensation requests.

38.   The United States Trustee suggests that the Bankruptcy Court place a cap on the range of hourly fees charged by Locke Lord which more accurately reflects the hourly rates charged by law firms providing similar services at a similar level of expertise for the range of services required by the Debtors and suggests that the allowed "range" top out at $600 per hour for partners and $500 for associates which still provides a premium over the hourly fees charged by equally competent counsel regularly in the Courts of the District of Connecticut.

Dated: February 10, 2021                    Respectfully submitted,


                                         WILLIAM K. HARRINGTON
                                         UNITED STATES TRUSTEE FOR REGION 2

                         By:    /s/ Steven E. Mackey
                                Steven E. Mackey/ct09932
                                USDOJ Trial Attorney
                                Office of the United States Trustee
                                Giaimo Federal Building, Room 302
                                150 Court Street
                                New Haven, CT 06510
                                (202) 934-4049