# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## HARTFORD DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| CARLA'S PASTA, INC., *et al.* | Case No. 21-20111 JJT |
| Debtors.[1] | Jointly Administered |
| | Related Docket Nos. 28, 247, 313 |

## ORDER (A) APPROVING THE SALE OF THE DEBTORS' ASSETS, (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING CERTAIN RELATED RELIEF

Upon the motion (the "Motion")[2] [Docket No. 28], dated February 8, 2021, of Carla's Pasta, Inc. and Suri Realty, LLC, affiliated debtors and debtors in possession in the above-captioned cases (each, a "Debtor" and, collectively, the "Debtors") seeking, *inter alia*, entry of an order (this "Order") (A) approving the Asset Purchase Agreement Between Debtors and Successful Bidder, (B) Authorizing the Free and Clear Sale of Substantially All of Debtors' Assets and (C) Authorizing the Assumption and Assignment of Contracts; and pursuant to this Court's Order (the "Bid Procedures Order") [Docket No. 247] (A) Approving Bidding Procedures and Bid Protections in Connection with the Sale of Substantially All of the Debtors' Assets, (B) Approving the Form and Manner of Notice Thereof, (C) Approving Procedures for the Assumption and Assignment of Contracts, (D) Scheduling an Auction and a Sale Hearing, and (E) Granting Related

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Carla's Pasta, Inc. (5847) and Suri Realty, LLC (5847). The Debtors' corporate headquarters and service address is 50 Talbot Lane, South Windsor, Connecticut 06074.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the *Motion of Debtors For Entry of (I) an Order (A) Approving Bidding Procedures for the Sale of Substantially all of Debtors' Assets, (B) Approving Notice Procedures Thereof, (C) Approving Procedures for the Assumption and Assignment of Contracts, and (D) Scheduling an Auction and Sale Hearing; and (II) an Order (A) Approving the Asset Purchase Agreement Between Debtors and Successful Bidder, (B) Authorizing the Free and Clear Sale of Substantially all of Debtors' Assets and (C) Authorizing the Assumption and Assignment of Contracts* [ECF 28], or the Asset Purchase Agreement, as applicable.

Relief approving the auction and bidding procedures annexed thereto as Exhibit 1 (the "Bidding Procedures"); and the Debtors, pursuant to the Bid Procedures Order and the Bidding Procedures, having designated Tribe 9 Foods LLC, a Wisconsin limited liability company, or its designee as Stalking Horse Bidder, on the terms set forth in that certain Asset Purchase Agreement, dated as of March 26, 2021 (as amended and restated on April 20, 2021) in substantially the form attached hereto as **Exhibit A** (the "Asset Purchase Agreement"), by and among the Debtors, CP Foods LLC, a Wisconsin limited liability company ("CP Foods") and NFP Real Estate LLC, a Wisconsin limited liability company ("NFP Real Estate" and together with CP Foods, collectively, the "Purchasers" as assignees of Natural Food Partners, LLC); and the Debtors having determined at the conclusion of the Auction that the highest and otherwise best offer for the Sale of the Purchased Assets was made by the Purchasers and having named the Purchasers as the Successful Bidder; and having named KB Partners, LLC as the Back-Up Bidder (the "Back-Up Bidder"); and the Court having held a hearing on April 19, 2021 (the "Sale Hearing") to approve the Motion and authorize the consummation of the transactions contemplated by the Bidding Procedures Order and Asset Purchase Agreement (including, without limitation, its related documents, exhibits, and schedules); and the Court having reviewed and considered (i) the Motion, (ii) the objections thereto, if any, (iii) the arguments of counsel made and the evidence proffered or adduced at the Sale Hearing, and (iv) the record of these Chapter 11 Cases; and the Court finding that the relief requested in the Motion is in the best interests of the Debtors, their estates and creditors and other parties in interest; and after due deliberation thereon; and good cause appearing therefor, it is hereby

**FOUND AND DETERMINED THAT:**

A.      **Jurisdiction and Venue**.  The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(a).  Venue of these Chapter 11 Cases and the Motion in this Court is proper under 28 U.S.C. §§ 1408 and 1409.  The Court may enter a final order with respect to the Motion, the Sale, the transactions contemplated thereby, and all related relief, in each case, consistent with Article III of the United States Constitution.

B.      **Statutory Predicates**.  The statutory predicates for the relief sought in the Motion and granted by this Order are sections 105(a), 363, 365, 503 and 507 of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004, 6006 and 9014, and Local Rules 6004-1 and 6004-2.

C.      **Petition Date**.  On October 29, 2020, an involuntary petition for relief under chapter 7 of the Bankruptcy Code was filed against Suri Realty, LLC.  An order converting the involuntary chapter 7 bankruptcy case to a voluntary case under chapter 11 of the Bankruptcy Code was entered on December 17, 2020.  On February 8, 2021 (the "Petition Date"), Carla's Pasta, Inc. filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

D.      **Entry of Bid Procedures Order**.  On March 9, 2021, this Court entered the Bid Procedures Order.

E.      **Designation of Stalking Horse Bidder**.  On March 19, 2021, the Debtors filed a Notice of Designation of Stalking Horse Bidder [Docket No. 313].

F.      **Filing of Asset Purchase Agreement**. On March 26, 2021, the Debtors filed a Notice of Filing Asset Purchase Agreement Between Debtors and Designated Stalking Horse Bidder [Docket No. 336].  On April 20, 2021, the Debtors filed an Amended and Restated Asset Purchase Agreement Between the Debtors and Purchasers [Docket No. 430].

3

G. **Compliance with Bid Procedures Order**.  As demonstrated by the (i) testimony and other evidence proffered or adduced at the Sale Hearing, (ii) representations made in the Motion and on the record at the Sale Hearing and the hearing to approve the Bid Procedures Order, and (iii) record in these Chapter 11 Cases, the Debtors have marketed their Assets and conducted the sale process in compliance with the Bid Procedures Order.  The Debtors and their professionals have actively and sufficiently marketed the Assets, both prior to and after the Petition Date, and have afforded all potential purchasers a full, fair, and reasonable opportunity to perform due diligence on the Debtors and their Assets and make higher and better offers than the Asset Purchase Agreement.

H. **Notice**.  As evidenced by the affidavits of service previously filed with the Court, and based on the representations of counsel made at the Sale Hearing, (i) proper, timely, adequate, and sufficient notice of the Motion, the Bid Deadline, the Auction, the Sale Hearing, the Sale, and the assumption and assignment procedures for the Contracts (including the objection deadline with respect to any Cure Amount and the ability of the Purchasers to provide adequate assurance of future performance) has been provided in accordance with sections 105(a), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, Local Rules 6004-1 and 6004-2 and in compliance with the Bid Procedures Order, (ii) such notice was sufficient and appropriate under the particular circumstances,  and (iii) no other or further notice of the Motion, the Bid Deadline, the Auction, the Sale Hearing, the Sale, or the potential assumption and assignment of the Contracts or the related Cure Amounts was necessary under the particular circumstances.

I. **Corporate Authority**.  Subject to entry of this Order, (i) each of the Debtors has full corporate power and authority to execute, deliver, and perform all obligations under the Asset Purchase Agreement and all other documents contemplated thereby, and the Sale of the Purchased

91654057v.11

Assets to the Purchasers has been duly and validly authorized by all necessary corporate action of each of the Debtors, (ii) each of the Debtors has all of the corporate power and authority necessary to enter into and consummate the transactions contemplated by the Asset Purchase Agreement, (iii) each of the Debtors has taken all corporate action necessary to authorize and approve the Asset Purchase Agreement and the consummation by the Debtors of the transactions contemplated thereby, and (iv) no consents or approvals, other than those expressly provided for in the Asset Purchase Agreement, are required for the Debtors to consummate such transactions.

J.    **Opportunity to Object; Objections Overruled**.   A fair and reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded to all interested persons and entities as reflected on the certificates of service filed in connection with the Motion, including: (i) the United States Trustee for the District of Connecticut, (ii) the creditors listed on the Debtors' creditor matrix, (iii) the Committee, (iv) any parties asserting a security interest in the Purchased Assets, including holders of Claims and Interests (as defined below) in the Purchased Assets to the extent reasonably known to the Debtors, (v) applicable federal, state, and city tax and regulatory authorities, (vi) each counterparty to the Debtors' executory contracts and unexpired leases, (vii) the Securities and Exchange Commission; (viii) the Office of the United States Attorney for the District of Connecticut; (ix) Connecticut State Treasury, (x) the Secretary of State of Connecticut, and (xi) all parties requesting notice pursuant to Bankruptcy Rule 2002. All objections to the entry of this Order have been withdrawn or overruled.

K.    **Sale in Best Interest**.  Consummation of the Sale at this time is in the best interests of the Debtors, their creditors, their estates, and other parties in interest.

L.   **Business Justification**.  Sound business reasons exist for the Sale.  Entry into the Asset Purchase Agreement constitutes the exercise of sound business judgment by each of the Debtors.  The Court finds that each Debtor has articulated good and sufficient business reasons justifying the Sale.  Such business reasons include, but are not limited to, the following: (i) the Asset Purchase Agreement constitutes the highest and best offer for the Purchased Assets, (ii) the Asset Purchase Agreement and the closing thereof presents the best opportunity to realize the value of the Purchased Assets and avoid decline and devaluation of the Purchased Assets, and (iii) the Asset Purchase Agreement and closing thereof will provide the highest recovery for the Debtors, their respective estates, and other parties in interest.

M.   **Arm's-Length Sale**.  The Asset Purchase Agreement was negotiated, proposed, and entered into by the Debtors and the Purchasers without collusion, in good faith, and from arm's-length bargaining positions.  Neither the Debtors nor the Purchasers has engaged in any conduct that would cause or permit the Asset Purchase Agreement to be avoided under section 363(n) of the Bankruptcy Code or any other remedy for rescission or avoidance under law or equity.

N.   **Good Faith Purchaser**.  Each of the  Purchasers is a good faith purchaser for value and, as such, is entitled to all of the protections afforded under section 363(m) of the Bankruptcy Code and any other applicable or similar bankruptcy and non-bankruptcy law.   The Purchasers have been and will be acting in good faith within the meaning of section 363(m) of the Bankruptcy Code in closing the transactions contemplated by the Asset Purchase Agreement.

O.   **Consideration**.  The consideration provided by the Purchasers for the Purchased Assets pursuant to the Asset Purchase Agreement (i) is fair and reasonable, (ii) is the highest and best offer for the Purchased Assets, (iii) will provide a greater recovery for the Debtors' creditors

6

91654057v.11

than would be provided by any other practical available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable non-bankruptcy law.

P.      **Assumption of Assumed Contracts**.      The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign the Assumed Contracts to the Purchasers in connection with the consummation of the Sale, and the assumption and assignment of the Assumed Contracts is in the best interests of the Debtors, their estates, and their creditors. The Assumed Contracts are an integral part of the Purchased Assets being purchased by the Purchasers, and, accordingly, such assumption and assignment of the Assumed Contracts to the Purchasers is reasonable.  Except as expressly assumed by the Purchasers under the Asset Purchase Agreement, the transfer of the Purchased Assets to the Purchasers and the assignment to the applicable Purchasers of the Assumed Contracts will not subject the Purchasers to any liability whatsoever which was due or owing under the Assumed Contracts prior to the Closing Date (other than the Cure Amounts), or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, or foreign jurisdiction, based, in whole or in part, directly or indirectly, on any theory of law or equity, including any Successor or Other Liabilities (as defined herein).

Q.      **Cure/Adequate Assurance**.  The Debtors or the Purchasers, in accordance with the Asset Purchase Agreement, have (i) cured, or have provided adequate assurance of cure, of any default existing prior to the date hereof under any of the Assumed Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code, and (ii) provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof under any of the Assumed Contracts within the

meaning of section 365(b)(1)(B) of the Bankruptcy Code. The Purchasers have provided adequate assurance of future performance under the Assumed Contracts within the meaning of section 365(f)(2) of the Bankruptcy Code.

R. **Prompt Consummation**. The Sale of the Purchased Assets must be approved and consummated promptly in order to preserve the value of the Purchased Assets. Therefore, time is of the essence in consummating the Sale, and the Debtors and the Purchasers intend to close the Sale as soon as possible.

S. **No Intentional Fraudulent Transfer**. The Asset Purchase Agreement was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or applicable non-bankruptcy law.

T. **No Merger; Purchaser Not an Insider; No Successor Liability**. Neither Purchaser is holding itself out to the public as a successor to or a continuation of the Debtors or their estates. The Purchasers are not and shall not be, considered a successor in interest to any of the Debtors or their estates, by reason of any theory of law or equity, and the Sale does not amount to a consolidation, succession, merger, or *de facto* merger of the Purchasers and the Debtors. At all times prior to the Closing Date, neither Purchaser was an "insider" or "affiliate" of the Debtors, as those terms are defined in the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stockholders existed between the Debtors and any Purchaser. To the greatest extent permitted by law, the transfer of the Purchased Assets to the Purchasers, and the assumption of the Assumed Liabilities, except as otherwise explicitly set forth in the Asset Purchase Agreement or this Order, does not, and will not, subject any Purchaser to any liability whatsoever, with respect to claims arising from the Debtors operation of the Debtors' businesses prior to the Closing Date or by reason of such transfer, including under the laws of the United

91654057v.11

States, any state, territory, or possession thereof, or the District of Columbia, or any foreign jurisdiction, based, in whole or in part, directly or indirectly, on any theory of liability, including successor, vicarious, antitrust, environmental, fraudulent transfer or avoidance, revenue, pension, ERISA, tax, labor (including the federal Occupational Safety and Health Act of 1970 or any similar state or local analog (collectively, "OSHA") or the federal Worker Adjustment and Retraining Act of 1988 or any similar state or local analog (collectively, (each, a "WARN Act")), employment or benefits, *de facto* merger, business continuation, substantial continuity, alter ego, derivative, transferee, veil piercing, escheat, continuity of enterprise, mere continuation, product line, or products liability or law, bulk sales or similar laws, or other applicable law, rule, or regulation (including filing requirements under any such law, rule, or regulation), or other theory of liability whatsoever, whether legal, equitable, or otherwise (collectively, the "Successor or Other Liabilities"). This finding and the use of the term Successor or Other Liabilities is limited to claims against the Debtors prior to the Closing Date and does not release, nullify or enjoin the enforcement of any liability that the Purchasers would be subject to after the Closing Date relating to the Purchasers independent ownership or operation of the Purchased Assets after the Closing Date. Pursuant to the Asset Purchase Agreement, the Purchasers are not purchasing all of the Debtors' assets in that the Purchasers are not purchasing any of the Excluded Assets or assuming the Excluded Liabilities, and thus shall have no liability for the Excluded Liabilities.

U.    **Legal, Valid Transfer**.  The transfer of the Purchased Assets to the Purchasers will be a legal, valid, enforceable, and effective sale and transfer of the Purchased Assets and will vest the applicable Purchaser with all legal, equitable, and beneficial right, title, and interest of the Debtors to the Purchased Assets free and clear of all Claims and Interests, other than the Assumed Liabilities, of any kind or nature whatsoever, including, without limitation, rights or claims that

9

are Successor or Other Liabilities (including *de facto* merger), or that are based on any Successor or Other Liabilities.

V. **Asset Purchase Agreement Not Modified Except as Set forth Herein**. The terms of the Asset Purchase Agreement, including any exhibits, amendments, supplements, and modifications thereto, are fair and reasonable in all respects. Section 2.1.1(n) of the Asset Purchase Agreement includes within the definition of Purchased Assets "all avoidance actions or similar causes of action arising under sections 544 through 553 of the Bankruptcy Code, including any proceeds thereof, related to the Purchased Assets or the Business including, but not limited to, all claims arising under section 547 of the Bankruptcy Code related to payments for goods or services delivered or provided to the Facility ("Avoidance Actions")." For avoidance of doubt, the Avoidance Actions do not include causes of action that do not arise under Section 544 through 553 of the Bankruptcy Code and such causes of action are Excluded Assets.

W. **Not a *Sub Rosa* Plan**. The Sale does not constitute a *sub rosa* chapter 11 plan for which approval has been sought without the protections that a disclosure statement would afford. The Sale neither impermissibly restructures the rights of the Debtors' creditors, nor impermissibly dictates a plan of reorganization or liquidation for the Debtors.

X. **Sale Free and Clear**. The Purchased Assets constitute property of the Debtors' estates and good title thereto is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code. The Debtors have (except to the extent otherwise provided in the Asset Purchase Agreement) all right, title, and interest in the Purchased Assets. Except as expressly set forth in the Asset Purchase Agreement, the transfer of the Purchased Assets to the Purchasers will be, as of the Closing Date, a legal, valid, and effective transfer of the Purchased Assets, which transfer vests or will vest the applicable Purchaser with all right, title, and interest of the Debtors

10

to the Purchased Assets free and clear of any and all (i) liens (including any liens as that term is defined in section 101(37) of the Bankruptcy Code) or other encumbrances relating to, accruing, or arising any time prior to the Closing Date (collectively, the "Liens"), and (ii) all (a) debts (as that term is defined in section 101(12) of the Bankruptcy Code) arising under, relating to, or in connection with any act of the Debtors or (b) claims (as that term is defined in section 101(5) of the Bankruptcy Code), liabilities, obligations, demands, guaranties, options in favor of third parties, rights, contractual commitments, restrictions, interests, mortgages, hypothecations, charges, indentures, loan agreements, instruments, collective bargaining agreements, OSHA, WARN Act liability (including substantial continuity claims arising thereunder), workers' compensation ratings, leases, licenses, deeds of trust, security interests or similar interests, conditional sale or other title retention agreements and other similar impositions, imperfections or restrictions on transfer or use, pledges, judgments, claims for reimbursement, contribution, indemnity, exoneration, infringement, products liability, alter ego liability, suits, credits, allowances, options, limitations, action, causes of action, choses in action, rights of first refusal or first offer, rebate, chargeback, credit, or return, proxy, voting trust or agreement or transfer restriction under any shareholder or similar agreement or encumbrance, Liability, and matters of any kind and nature, whether arising prior to or subsequent to the commencement of these Chapter 11 Cases, whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, and whether imposed by agreement, understanding, law, equity, or otherwise (including, without limitation, rights with respect to Claims (as defined below) and Liens (x) that purport to give to any party a right or option to effect a postpetition setoff against, or a right or option to effect any forfeiture, modification, profit sharing interest, right of first refusal, purchase, or repurchase right or option, or termination

of, any of the Debtors' or any of the Purchaser's interests in the Purchased Assets, or any similar rights, if any, or (y) in respect of taxes, restrictions, rights of first refusal, charges, or interests of any kind or nature, if any, including, without limitation, any restriction of use, voting, transfer, receipt of income, or other exercise of any attributes of ownership) (the items in this clause (ii), collectively, and together with any "claims" against the Debtors as defined section 101(5) of the Bankruptcy Code, the "Claims", and together with the Liens and other interests of any kind or nature whatsoever, the "Claims and Interests"), relating to, accruing, or arising any time prior to the Closing Date with the exception of the Assumed Liabilities or as provided in this Order. Notwithstanding anything herein to the contrary, the term "Claims and Interests" used in this Order shall be read expressly to be subject to the Assumed Liabilities, Permitted Encumbrances (including as set forth on Schedule 4.7.1 to the Asset Purchase Agreement), or as expressly provided in this Order.

Y.     **Section 363(f) Satisfied**.  The Debtors may sell the Purchased Assets free and clear of all Claims and Interests because, with respect to each creditor asserting any Claims and Interests against the Debtors or the Purchased Assets, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  Those holders of Claims and Interests who did not object or withdrew objections to the Sale are deemed to have consented to the Sale pursuant to section 363(f)(2) of the Bankruptcy Code.  Those holders of Claims and Interests who did object fall within one or more of the other subsections of section 363(f) Bankruptcy Code.  The Purchasers would not have entered into the Asset Purchase Agreement and would not consummate the transactions contemplated thereby if the Sale of the Purchased Assets to the Purchasers, and the assumption and assignment of the Assumed Contracts to the applicable Purchasers, were not free and clear of all Claims and Interests of any kind or nature whatsoever, or if the Purchasers

would, or in the future could, be liable for any of such Claims and Interests. The total consideration to be provided under the Asset Purchase Agreement reflects the Purchasers' reliance on this Order to provide it to the greatest extent possible pursuant to sections 105(a) and 363 of the Bankruptcy Code, with title to and possession of the Purchased Assets free and clear of all Claims and Interests of any kind or nature whatsoever (including, without limitation, any potential Successor or Other Liabilities).

Z.      **Back-Up Bidder.**  In the event of a termination of the Asset Purchase Agreement: (i) this Order, including each of the findings of fact and conclusions of law set forth herein, shall apply to the Back-Up Bidder and the asset purchase agreement between the Debtors and the Back-Up Bidder (the "Back-Up Bidder APA") with equal force as if the Back-Up Bidder were the Purchasers, and the Debtors may consummate a transaction with the Back-Up Bidder on the terms set forth in the Back-Up Bidder APA, subject to the Bid Procedures Order and this Order, and (ii) to the extent required under the Asset Purchase Agreement and the Bid Procedures Order, the Purchaser shall be entitled to the payment of the Break-Up Fee in the amount of $450,000.

It is therefore **ORDERED, ADJUDGED, AND DECREED EFFECTIVE IMMEDIATELY THAT:**

**General Provisions**

1.      The Motion is GRANTED and APPROVED as set forth herein.

2.      All objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are overruled on the merits and denied with prejudice. Provided, however, notwithstanding the foregoing or anything in this Order to the contrary, the Committee's right to seek a valuation of the Avoidance Actions and to seek an allocation of the Cash Purchase Price to the Avoidance Actions is preserved.

91654057v.11

**Approval of the Sale of the Purchased Assets to the Purchasers**

3.      The Asset Purchase Agreement, attached hereto as Exhibit A, including any exhibits, amendments, supplements, and modifications thereto, is hereby approved.

4.      Pursuant to section 363(b) of the Bankruptcy Code, the Sale of the Purchased Assets (including without limitation the Real Property) to the Purchasers free and clear of all Claims and Interests, and the transactions contemplated thereby, are approved.

5.      Upon the Closing Date, except as otherwise specifically provided in the Asset Purchase Agreement or this Order, to the greatest extent permitted under applicable law, (a) the Purchased Assets shall be transferred to the Purchasers free and clear of all Claims and Interests, and all Claims and Interests shall attach to the  proceeds of the Sale in the order of their priority, with the same validity, force and effect which they now have as against the respective Purchased Assets, subject to any claims and defenses, setoffs or rights of recoupment the Debtors may possess with respect thereto, and (b) the Purchasers shall not be liable for any Claims against the Debtors or any of their predecessors or Affiliates, and the Purchasers shall have no successor or vicarious liabilities of any kind or character (including, without limitation, any Successor or Other Liabilities (including *de facto* merger)), whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtors or any obligations of or Claims against the Debtors arising at any time,.  For the avoidance of doubt and without limiting the foregoing, the alleged mechanic's liens asserted by The Dennis Engineering Group, LLC and Elm Electrical with respect to the Real Property shall not be, and shall not be deemed to be, Permitted Encumbrances, and the Sale shall be free and clear of any Claim or Interest with respect thereto.

91654057v.11

6.      The transactions contemplated by the Asset Purchase Agreement are undertaken by the Purchasers in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein by this Order to consummate the Sale shall not affect the validity of the Sale to the Purchasers.  Each Purchaser is a purchaser in good faith of the Purchased Assets, and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

7.      As a good faith purchaser of the Purchased Assets, the Purchasers have not entered into an agreement with any other potential bidders for the Purchased Assets, and have not colluded with any of the other bidders, potential bidders, or any other parties interested in the Purchased Assets, and therefore neither the Debtors nor any successor in interest to the Debtors' estates shall be entitled to bring an action against the Purchasers, and the Sale may not be avoided pursuant to section 363(n) of the Bankruptcy Code.

8.      The Successful Bid, as contemplated under the Asset Purchase Agreement, was and is a valid and proper bid under section 363(b) of the Bankruptcy Code and a Qualified Bid pursuant to the Bid Procedures Order.  The Purchase Price to be paid by the Purchasers under the Asset Purchase Agreement, including the Cash Purchase Price, the Cure Amounts, and the other amounts to be paid by the Purchasers thereunder, constitutes consideration for the Purchased Assets.

**Sale and Transfer of Assets**

9.      Pursuant to section 363(b) of the Bankruptcy Code, the Debtors are hereby authorized to sell the Purchased Assets to the Purchasers and consummate the Sale in accordance with the Asset Purchase Agreement and its related documents, exhibits, and schedules, and to transfer and assign all rights, title, and interests (including common law rights) to all property, licenses, and rights to be conveyed in accordance with the Asset Purchase Agreement.  The

91654057v.11

Debtors are further authorized to execute and deliver, and are empowered to perform under, consummate and implement, the Asset Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Asset Purchase Agreement, including, without limitation, the related documents, exhibits, and schedules, and to take all further actions as may be reasonably requested by the Purchasers for the purposes of assigning, transferring, granting, conveying, and conferring to the Purchasers or reducing the Purchased Assets to possession, as may be necessary or appropriate to the performance of the Debtors' obligations under the Asset Purchase Agreement.

10.     On the Closing Date, this Order shall be construed as and shall constitute (i) a full and complete general assignment, conveyance, and transfer of the Purchased Assets, and (ii) a bill of sale transferring good and marketable title in such Assets to the applicable Purchasers. On the Closing Date, this Order shall also be construed as and shall constitute a complete and general assignment of all rights, title, and interests of the Debtors' rights in the Assumed Contracts to the applicable Purchasers.

11.     All entities that are, on the Closing Date or thereafter, in possession of some or all of the Purchased Assets are hereby directed to surrender possession of the Purchased Assets, including the Real Property, to the Purchasers on the Closing Date or upon any subsequent demand by Purchasers.

12.     Except as expressly permitted by this Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, and creditors holding Claims and Interests of any kind or nature whatsoever against or in the Debtors or the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated, now existing or

91654057v.11

hereinafter arising), arising under or out of, in connection with, or in any way relating to, the Debtors, the Purchased Assets, or the transfer of the Purchased Assets to the Purchasers, are hereby forever barred, estopped, and permanently enjoined from asserting any such Claims and Interests against any Purchaser and its successors, assigns, or the Purchased Assets.

13.    On the Closing Date, the Debtors' creditors are authorized to execute such documents and take all other actions as may be necessary to release their Claims and Interests in the Purchased Assets.

14.    The transfer of the Purchased Assets to the Purchasers pursuant to the Asset Purchase Agreement constitutes a legal, valid, and effective transfer of the Purchased Assets, and shall vest the applicable Purchasers with all rights, title, and interests of the Debtors in and to the Purchased Assets free and clear of all Claims and Interests of any kind or nature whatsoever..

15.    To the greatest extent available under applicable law, the Purchasers shall be authorized, as of the Closing Date, to operate under any license, permit, registration, and governmental authorization or approval of the Debtors with respect to the Purchased Assets, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been transferred to the Purchasers as of the Closing Date.

16.    To the extent section 525 of the Bankruptcy Code is applicable, no governmental unit may deny, revoke or suspend, or refuse to renew or honor, any permit, license, agreement or similar grant relating to the operation of the Purchased Assets on account of the filing or pendency of the Chapter 11 Cases or the consummation of the transactions contemplated by the Asset Purchase Agreement, including the Sale and the assumption and assignment of the Assumed Contracts.

91654057v.11

**Assumption and Assignment of Assumed Contracts**

17.     Pursuant to sections 105(a) and 365 of the Bankruptcy Code, and subject to and conditioned upon the closing of the Sale, the Debtors' assumption and assignment to the applicable Purchasers, and the applicable Purchaser's payment of the Cure Amounts and assumption on the terms set forth in the Asset Purchase Agreement, of the Assumed Contracts is hereby approved, and the requirements of section 365(b)(1) of the Bankruptcy Code with respect thereto  are hereby deemed satisfied.

18.     Subject to paragraph 17 of this Order, the Debtors are hereby authorized and directed in accordance with sections 105(a), 363, and 365 of the Bankruptcy Code to (i) assume and assign the Assumed Contracts to the applicable Purchaser free and clear of all Claims and Interests of any kind or nature whatsoever and (ii) execute and deliver such documents or other instruments as may be necessary to assign and transfer the Assumed Contracts to the applicable Purchasers.

19.     The Assumed Contracts shall be transferred to, and remain in full force and effect for the benefit of, the applicable Purchaser upon assumption and assignment in accordance with their respective terms, notwithstanding any provision in any such Assumed Contract (including those of the type described in section 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer, and, pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability with respect to the Assumed Contracts after the Closing Date.

20.     All amounts that must be paid and obligations that must be otherwise satisfied, if any, including pursuant to sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption and assignment of the Assumed Contracts, including costs to obtain any

consents or cure any defaults thereunder that are required to be cured pursuant to the Bankruptcy Code to effect the assignment and obtain this Order (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be cured by the applicable Purchaser upon assumption and assignment of the Assumed Contracts.

21.     Upon the Closing Date and payment of the applicable Cure Amount by the applicable Purchaser, in accordance with sections 105(a), 363, and 365 of the Bankruptcy Code, the applicable Purchaser shall be fully and irrevocably vested with all right, title, and interest of the Debtors in and under the Assumed Contracts, and each such Assumed Contract shall be fully enforceable by the applicable Purchaser in accordance with its respective terms and conditions, except as limited by this Order.  To the extent provided in the Asset Purchase Agreement, the Debtors shall cooperate with, and take all actions reasonably requested by, the Purchasers to effectuate the foregoing.

22.     To the extent a counterparty to an Assumed Contract failed to timely object to a Cure Amount (as defined in the Bid Procedures and Bid Procedures Order), such Cure Amount shall be deemed to be finally determined as set forth in the Cure Notice, and any such counterparty shall be prohibited from challenging, objecting to, or denying the validity and finality of the Cure Amount as set forth in the Cure Notice at any time, and such Cure Amount, when paid, shall completely cure the default(s) under any Assumed Contract to which it relates.  For the avoidance of doubt, the Agreement Regarding Real Property Tax Assessment, dated October 3, 2019 and between the Town of South Windsor and the Debtors is an Assumed Contract (the "Abatement Agreement").  The Town of South Windsor having received due and proper notice of: (a) the Motion; (b) the notice of potential assumption and assignment of, among others, the Abatement

Agreement [Docket Nos. 277 and 300]; and (c) the notice of proposed assignment of, among others, the Abatement Agreement [Docket No. 414] and having failed to file or make an objection to the entry of this Order, including the assumption and assignment of the Abatement Agreement shall be deemed to constitute such party's consent to the assumption and assignment of the Abatement Agreement to the Purchasers with a Cure Amount of $0.00.

23. The *Objection by Sodexo Operations, LLC to Proposed Cure Amount in Connection with the Assumption and Assignment of Contracts and Reservation of Rights with Respect to Proposed Purchaser of Assets* (Docket No. 408) is resolved as between the Debtors, the Purchasers and Sodexo Operations, LLC ("Sodexo") pursuant to the terms and conditions of that certain side letter dated as of April 19, 2021, a copy of which is attached hereto at **Exhibit B** and incorporated herein, which sets forth, among other terms, the Cure Payment to be paid to Sodexo at the Closing of the sale in the amount of $830,744.93.

24. Sprague Operating Resources LLC ("Sprague") is hereby authorized to provide immediate notice to Eversource that the Debtors no longer wish to have Sprague supply natural gas to Debtors under the terms of the three natural gas supply agreements between Sprague and debtor Carla's Pasta Inc. (collectively, the "Natural Gas Agreements"). The intent of the foregoing is to ensure that Sprague's supply of natural gas pursuant to the Natural Gas Agreements ceases by no later than June 1, 2021. If the Purchasers consume any natural gas provided by Sprague (as opposed to gas supplied by another provider, such as Eversource) post-Closing Date pursuant to the Natural Gas Agreements, then the Purchasers shall pay on demand from the Debtors (which demand shall be accompanied by copies of the applicable Sprague invoices) the amount due for all natural gas supplied to them by Sprague from the Closing Date through the date on which Sprague no longer supplies natural gas pursuant to the Natural Gas Agreements ("Sprague

20

Gas"). Debtors shall promptly remit to Sprague all amounts it receives from the Purchasers for Sprague Gas. Sprague shall send a detailed invoice to the Debtors showing all charges incurred on a daily basis to enable the Debtors to allocate natural gas usage between the Debtors and the Purchasers for the period prior to, on and after the Closing Date, if any. Debtors shall promptly make demand on Purchasers for all amounts due to Sprague for Sprague Gas. Nothing contained herein shall excuse the Debtors from timely performing their obligations to Sprague pursuant to the terms of the Natural Gas Agreements prior to the Closing Date. This Court shall retain jurisdiction over the Purchasers to enforce the terms of this paragraph.

25.    This Order does not authorize the Debtors to assume to assume and assign to any Purchaser or Back-up Bidder any of the insurance policies or any related agreements (collectively, the "Chubb Insurance Contracts") issued at any time by any of ACE American Insurance Company, Westchester Surplus Lines Insurance Company, Federal Insurance Company, Pacific Indemnity Company, Vigilant Insurance Company, Great Northern Insurance Company or any other their respective U.S.-based affiliates or successors. Except as expressly provided herein, all parties in interest reserve all other rights, claims and arguments concerning the Chubb Insurance Contracts.

**No Successor Liability; Prohibition of Actions against Purchasers**

26.    Neither Purchaser is a "successor" to, continuation of, or alter ego of, any of the Debtors or their estates by reason of any theory of law or equity. Except for the Assumed Liabilities, Permitted Encumbrances (including as set forth on Schedule 4.7.1 to the Asset Purchase Agreement), or as provided in this Order, no Purchaser shall have, assume, or be deemed to have or to assume, or in any way be responsible for, any liability or obligation of any of the Debtors or their estates, or any of the Debtors' predecessors or Affiliates with respect to the

91654057v.11

Purchased Assets or claims against the Debtors arising prior to the Closing Date. Without limiting the generality of the foregoing, and except as otherwise specifically provided in the Asset Purchase Agreement or this Order, the Purchasers shall not be liable for any Claims and Interests against, or with respect to, the Debtors, their estates, or any of the Debtors' predecessors, or Affiliates, including but not limited to, any Successor or Other Liabilities. Neither the purchase of the Purchased Assets by the Purchasers nor the fact that the Purchasers is using any of the Purchased Assets previously operated by the Debtors will cause any Purchaser to be deemed a successor to, combination of, or alter ego of, in any respect, any of the Debtors or the Debtors' businesses, or incur any liability derived therefrom within the meaning of any foreign, federal, state, or local revenue, pension, ERISA, tax, antitrust, environmental, labor law (including without limitation under OSHA or any WARN Act), employment or benefits law, *de facto* merger, business continuation, substantial continuity, successor, vicarious, alter ego, derivative, or transferee liability, fraudulent transfer or avoidance, veil piercing, escheat, continuity of enterprise, mere continuation, product line, or other law, rule, regulation (including filing requirements under any such laws, rules, or regulations), or under any products liability law or doctrine, or any bulk sales or similar laws, with respect to the Debtors' liability under such law, rule, or regulation or doctrine, whether now known or unknown, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether matured or unmatured, whether contingent or noncontingent, whether liquidated or unliquidated, whether arising prior to or subsequent to the Petition Date, whether imposed by agreement, understanding, law, equity, or otherwise, including, but not limited to, liabilities on account of warranties, intercompany loans, and receivables among the Debtors, and any taxes, arising, accruing, or payable under, out of, in connection with, or in any way relating to the cancellation of debt of the Debtors or their Affiliates,

91654057v.11

or in any way relating to the operation of any of the Purchased Assets prior to the Closing Date. Nothing in this Order or in the Asset Purchase Agreement releases, nullifies or enjoins the enforcement of any liability that the Purchasers would be subject to after the Closing Date relating to the Purchasers independent ownership or operation of the Purchased Assets after the Closing Date.

27.    Neither Purchaser shall have any liability, responsibility, or obligation for any Claims and Interests of the Debtors or their estates, including any claims, Liabilities, or other obligations arising under or related to any of the Purchased Assets which may become due or owing (i) prior to the Closing Date or (ii) from and after the Closing Date but which arise out of relate to any act, omission, circumstances, breach, default, or other event occurring prior to the Closing Date.

28.    Except with respect to Assumed Liabilities, Permitted Encumbrances, including as set forth on Schedule 4.7.1 to the Asset Purchase Agreement, or as otherwise permitted by the Asset Purchase Agreement or this Order, all Persons, including, but not limited to, all debt holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade creditors, litigation claimants, Contract counterparties, customers, landlords, licensors, employees, and other creditors and holders of Claims and Interests of any kind or nature whatsoever against or in any of the Debtors or any portion of the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, known or unknown, liquidated or unliquidated, senior or subordinate, asserted or unasserted, whether arising prior to or subsequent to the Petition Date, whether imposed by agreement, understanding, law, equity, or otherwise), arising under or out of, in connection with, or in any way relating to, the Debtors, the Purchased Assets, the operation of the Debtors' business prior to the Closing Date, or the transfer of the Purchased Assets to the

91654057v.11

Purchasers (including without limitation any Successor or Other Liabilities or rights or claims based thereon) shall be, and hereby are forever barred, estopped, and permanently enjoined from asserting against any Purchaser, any of its Affiliates, or any of their respective officers, directors, members, managers, partners, principals, shareholders, professionals, or representatives, successors, assigns, or their respective assets or properties, including, without limitation, the Purchased Assets, the Claims and Interests of any kind or nature whatsoever such Person had, has, or may have against or in the Debtors, their estates, officers, directors, shareholders, or the Purchased Assets, such Persons' Claims and Interests or any other interests in and to the Purchased Assets, including, without limitation, the following actions: (i) commencing or continuing in any manner any action or other proceeding, the employment of process, or any act (whether in law or equity, in any judicial, administrative, arbitral, or other proceeding) against any Purchaser, any of its Affiliates, or any of their respective officers, directors, partners, principals, shareholders, professionals, or representatives, or any of the foregoing's successors, assigns, or their respective assets or properties, including the Purchased Assets; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against any Purchaser, any of its Affiliates, or any of their respective officers, directors, partners, principals, shareholders, professionals, or representatives, or any of the foregoing's successors, assigns, or their respective assets or properties, including the Purchased Assets; (iii) creating, perfecting, or enforcing any Claims and Interests against any Purchaser, any of its Affiliates, or any of their respective officers, directors, partners, principals, shareholders, professionals, or representatives, or any of the foregoing's successors, assigns, or their respective assets or properties, including the Purchased Assets; (iv) asserting any postpetition setoff, or right of subrogation of any kind against any obligation due to any Purchaser, any of its Affiliates, or any of their respective officers, directors,

91654057v.11

partners, principals, shareholders, professionals, or representatives, or any of the foregoing's successors, assigns, or their respective assets or properties, including the Purchased Assets; (v) commencing or continuing any action, in any manner or place, that does not comply with or is inconsistent with the provisions of this Order, other orders of the Court, or the Asset Purchase Agreement or the agreements or actions contemplated or taken in respect thereof; or (vi) revoking, terminating, or failing or refusing to transfer any license, permit, or authorization to operate any of the Purchased Assets or conduct any of the businesses operated with the Purchased Assets in connection with the Sale.

29.    This Order (i) shall be effective as a determination that, as of the Closing Date, all Claims and Interests of any kind or nature whatsoever existing as to the Purchased Assets prior to the Closing Date  have been unconditionally released, discharged, and terminated, that any Claims or Interests have attached to the proceeds of the Sale in the order of their priority, with the same validity, force and effect, and that the conveyances described herein have been effected;  and (ii) shall be binding upon and shall govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Purchased Assets.  Each and every federal, state, and local governmental agency or department is hereby directed to accept for filing and/or recording any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement.  The Purchasers and the Debtors shall take such

further steps and execute such further documents, assignments, and instruments as reasonably requested by the other party to implement and effectuate the transactions contemplated in this paragraph and in the Asset Purchase Agreement. All Claims and Interests existing as of the date of this Order shall be forthwith removed and stricken as against the Purchased Assets effective upon the Closing Date.

30.     Except with respect to Assumed Liabilities and Permitted Encumbrances, including as set forth on Schedule 4.7.1 to the Asset Purchase Agreement, if any person or entity that has filed financing statements, mortgages, mechanic's liens, tax liens, *lis pendens,* or other documents or agreements evidencing Claims and Interests with respect to the Debtors and/or any of the Purchased Assets does not deliver valid, duly-executed termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Claims and Interests to the Purchasers and the Debtors prior the Closing Date, (a) the Debtors and/or the Purchasers are hereby authorized to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to any of the Purchased Assets, and/or (b) the Purchasers and/or the Debtors are hereby authorized to file, register, or otherwise record a certified copy of this Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all interests and liens in, solely against and solely with respect to the Purchased Assets. This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, and local governmental agency, department, or office.

31.     Except as expressly set forth in the Asset Purchase Agreement or this Order, to the greatest extent permitted under applicable law, the Purchasers shall have no liability or responsibility for any liability or other obligation of the Debtors arising under or related to the

Purchased Assets other than the Assumed Liabilities, Permitted Encumbrances (including as set forth on Schedule 4.7.1 to the Asset Purchase Agreement), or as provided in this Order. Without limiting the generality of the foregoing, and except as otherwise specifically provided in the Asset Purchase Agreement or this Order, the Purchasers shall not be liable for any claims against the Debtors or any of their predecessors or Affiliates, and the Purchasers shall have no successor liabilities to the greatest extent permitted under applicable law of any kind or character whether known or unknown as of the Closing Date, now existing or hereinafter arising, whether fixed or contingent, with respect to the Debtors or any obligations of the Debtors arising prior to the Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, or in connection with, or in any way relating to the operation of the business prior to the Closing Date except as otherwise provided in the Asset Purchase Agreement or this Order, and all parties are hereby forever barred, estopped, and permanently enjoined from asserting any such claims against any Purchaser, its successors and assigns or against the Purchased Assets.

32.     Following the Closing Date, no holder of any Claim or Interest in the Debtors shall interfere with the applicable Purchaser's title to or use and enjoyment of the Purchased Assets and the Assumed Contracts based on or related to such Claim or Interest or any actions that the Debtors have taken, or may take, in these Cases.

**Back-Up Bidder**

33.     In the event the of a termination of the Asset Purchase Agreement, (i) the Back-Up Bidder APA, including any exhibits, amendments, supplements, and modifications thereto, shall be approved, and pursuant to section 363(b) of the Bankruptcy Code, the sale of the applicable assets to the Back-Up Bidder free and clear of all Claims and Interests, and the transactions contemplated thereby, shall hereby be approved, and this Order shall, with no further order

27

required from this Court apply to the Back-Up Bidder and the Back-Up Bidder APA with equal force as it does to the Purchaser; and (ii) to the extent required by the Asset Purchase Agreement, the Bid Procedures Order, and herein, the Purchaser shall be entitled to the payment of the Break-Up Fee in the amount of $450,000.

34.     The Qualified Overbidder reserves its rights pertaining to the sale of the Assets to the extent the Asset Purchase Agreement has been modified by the Sellers and Buyer subsequent to the closing of the auction conducted on April 15, 2021. To the extent the Qualified Overbidder becomes the Buyer under the Asset Purchase Agreement due to the uncured default of the Successful Bidder, the Qualified Overbidder reserves its rights as to payment of the Purchase Price to the extent the Break Up Fee is not otherwise payable to the Successful Bidder.

35.     The Debtors' obligation, if any, to pay the Break-Up Fee shall survive the termination of the Asset Purchase Agreement and shall be payable by the Debtors upon the terms set forth in the Asset Purchase Agreement.

**Additional Provisions**

36.     The consideration provided by the Purchasers for the Purchased Assets under the Asset Purchase Agreement constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and applicable non-bankruptcy law.

37.     As specifically provided in the Asset Purchase Agreement, the Debtors will cooperate with the Purchasers, and the Purchasers will cooperate with the Debtors, in a commercially reasonable manner, in each case to ensure that the transaction contemplated in the Asset Purchase Agreement is consummated, and the Debtors will make such modifications or supplements to any bill of sale or other document executed in connection with the closing to facilitate such consummation as contemplated by the Asset Purchase Agreement.

38.     This Court shall retain jurisdiction to enforce and implement the terms and provisions of this Order and the Asset Purchase Agreement, including all amendments thereto, any waivers and consents thereunder, except as otherwise provided therein, and of each of the agreements executed in connections therewith in all respects, including, but not limited to, retaining jurisdiction to (i) compel delivery of the Purchased Assets to the Purchasers free and clear of all Claims and Interests, or compel the performance of other obligations owed by the Debtors to the Purchasers, (ii) compel performance of any obligations owed to the Debtors, (iii) resolve any disputes arising under or related to the Asset Purchase Agreement, except as otherwise provided therein, (iv) interpret, implement, and enforce the provisions of this Order, and (v) protect the Purchasers against claims made related to any of the Excluded Liabilities or Excluded Assets, any Successor or Other Liabilities related to the Purchased Assets or the Assumed Contracts, or any Claims and Interests asserted in the Debtors or the Purchased Assets, and (vi) require delivery of any Assets or proceeds thereof by the Debtors to the Purchasers.

39.     To the greatest extent permitted at law, the terms and provisions of the Asset Purchase Agreement and this Order shall be binding in all respects upon (i) the Debtors, (ii) the Debtors' estates, (iii) all creditors of, and holders of equity interests in, the Debtors, (iv) all holders of Liens or other Claims and Interests in, against, or on all or any portion of the Purchased Assets, (v) all Contract counterparties, (vi) the Purchasers and all successors and assigns of the Purchasers, (vii) the Purchased Assets, and (viii) all successors and assigns of each of the foregoing, including, without limitation, any trustee subsequently appointed in the Chapter 11 Cases, or a Chapter 7 trustee appointed upon a conversion of one or more of these Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code.  This Order shall inure to the benefit of the Debtors, their estates and creditors, the Purchasers, and the respective successors and assigns of each of the

91654057v.11

foregoing, including, without limitation, any trustee subsequently appointed in these Chapter 11 Cases or upon conversion to Chapter 7 under the Bankruptcy Code, and any Person seeking to assert rights on behalf of any of the foregoing or that belong to the Debtors' estates.  The Asset Purchase Agreement shall be binding in all respects upon the Debtors.

40.    The failure specifically to include any particular provisions of the Asset Purchase Agreement or its exhibits, schedules, or amendments in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Asset Purchase Agreement and its exhibits, schedules, or amendments be authorized and approved in its entirety.

41.    The Asset Purchase Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented in a writing signed by both parties, and in accordance with the terms thereof, without further order of the Court, provided that such modifications or amendments are non-material.

42.    Nothing contained in any order entered in these Chapter 11 Cases subsequent to entry of this Order, nor in any chapter 11 plans confirmed in these Cases, shall conflict with or derogate from the provisions of the Asset Purchase Agreement or the terms of this Order.

43.    The provisions of this Order are non-severable and mutually dependent.

44.    To the extent applicable, the automatic stay pursuant to section 362 of the Bankruptcy Code is hereby lifted with respect to the Debtors to the extent necessary, without further order of the Court (i) to allow the Purchasers to give the Debtors any notice provided for in the Asset Purchase Agreement, and (ii) to allow the Purchasers to take any and all actions permitted by the Asset Purchase Agreement.

45.    The Sale shall not be subject to any bulk sales laws or any similar laws of any state or jurisdiction.

46.     The Debtors and each other person having duties or responsibilities under the Asset Purchase Agreement or this Order, and their respective agents, representatives, and attorneys, are authorized and empowered to carry out all of the provisions of the Asset Purchase Agreement, to take any action contemplated by the Asset Purchase Agreement or this Order, and to issue, execute, deliver, file and record, as appropriate, such other contracts, instruments, releases, deeds, bills of sale, assignments, or other agreements, and to perform such other acts as are consistent with, and necessary or appropriate to, implement, effectuate and consummate the Asset Purchase Agreement and this Order and the transactions contemplated thereby and hereby, all without further application to, or order of, the Court.  Without limiting the generality of the foregoing, this Order shall constitute all approvals and consents, if any, required by applicable business corporation law with respect to the implementation and consummation of the Asset Purchase Agreement and this Order and the transactions contemplated thereby and hereby.

47.     To the extent that any provision of this Order conflicts with the Asset Purchase Agreement, this Order shall control.

48.     After the Closing Date, the Debtors shall reasonably cooperate with the Purchasers and the Purchases are authorized to file appropriate documentation with governmental authorities reflecting a change in its name from Carla's Pasta, Inc. to Old CP, Inc., and file a notice with this Court reflecting the same, and thereafter the caption of these cases shall be

91654057v.11

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## HARTFORD DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| OLD CP, INC., *et al.*,[1] | ) | |
| | ) | Case No. 21-20111 JJT |
| Debtors. | ) | |
| | ) | (Jointly Administered) |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Old CP, Inc. (5847) and Suri Realty, LLC (5847). The Debtors' corporate headquarters and service address is 50 Talbot Lane, South Windsor, Connecticut 06074.

49.     This Order does not provide for a distribution of the Cash Purchase Price (net of closing costs) or a determination of the rights of any parties asserting an interest in the net Cash Purchase Price. Any distribution or use of the Cash Purchase Price will be subject to further order of this Court. The Cash Purchase Price shall be held by the Debtors in a segregated, interest-bearing debtor in possession account. This Order is without prejudice to  the rights of the parties claiming any interest in the net Cash Purchase Price, including with respect to adversary proceedings and contested matters pending before this Court (the "Ongoing Litigation"), that relate to the pre-petition conduct of the Debtors, the senior secured lenders and other secured and  unsecured creditors who are plaintiffs and defendants in any such litigation (the "Litigation Parties"), all of such rights being expressly reserved to the Litigation Parties.

50.     Notwithstanding the possible applicability of Bankruptcy Rule 4001(a)(3), Bankruptcy Rule 6004(h), Bankruptcy Rule 6006(d) or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry and the requirements of Bankruptcy Rule 4001(a)(3), Bankruptcy Rule 6004(h) and Bankruptcy Rule 6006(d) are hereby waived and the parties may consummate the transactions contemplated under the Asset Purchase Agreement immediately upon entry.

91654057v.11

51.    This Order constitutes a final order for purposes of Bankruptcy Rules 5003 and 9021.

IT IS SO ORDERED.

DATED this _____ day of _____, 2021

_____
JAMES J. TANCREDI
UNITED STATES BANKRUPTCY JUDGE

91654057v.11

## **Exhibit A**

Asset Purchase Agreement

91654057v.11

*Execution Version*

# AMENDED AND RESTATED ASSET PURCHASE AGREEMENT

**by and among**

**CARLA'S PASTA, INC.**
**a Connecticut corporation,**

**and**

**SURI REALTY, LLC,**
**a Connecticut limited liability company,**

**as Sellers,**

**and**

**CP FOODS LLC,**
**a Wisconsin limited liability company,**

**and**

**NFP REAL ESTATE LLC,**
**a Wisconsin limited liability company,**

**as Buyers and Assignees**

**and**

**Natural Foods Partners, LLC,**
**a Wisconsin limited liability company,**

**as Assignor**

**Dated as of March 26, 2021**

**(as amended and restated on April 19, 2021)**

# TABLE OF CONTENTS

I.   DEFINITIONS; CERTAIN INTERPRETIVE MATTERS. .............................................. 2

    1.1   Definitions............................................................................................................ 2
    1.2   Interpretive Matters............................................................................................ 10
    1.3   No Presumption Against Drafting Party ............................................................. 11

II.   PURCHASE AND SALE. ................................................................................................. 11

    2.1   Purchase and Sale of Assets................................................................................ 11
    2.2   Purchase and Sale of Real Property .................................................................... 17
    2.3   Purchase Price ..................................................................................................... 17
    2.4   Deposit ................................................................................................................ 18

III.  CLOSING. ........................................................................................................................ 19

    3.1   Closing Date........................................................................................................ 19
    3.2   Payments on the Closing Date ............................................................................ 19
    3.3   Closing Date Prorations ...................................................................................... 19
    3.4   Transfer Taxes .................................................................................................... 19
    3.5   Allocation of Purchase Price .............................................................................. 20

IV.   REPRESENTATIONS AND WARRANTIES OF SELLERS.......................................... 21

    4.1   Existence; Power................................................................................................. 21
    4.2   Authorization; Enforceability ............................................................................. 21
    4.3   Governmental Authorization; No Conflict ......................................................... 21
    4.4   Permits ................................................................................................................ 21
    4.5   Intellectual Property............................................................................................ 21
    4.6   Plans and Material Documents ............................................................................ 22
    4.7   Real Property ....................................................................................................... 22
    4.8   Employees and Contractors ................................................................................ 23
    4.9   Finders' Fees ....................................................................................................... 23
    4.10  Title to and Condition of Assets ......................................................................... 23
    4.11  Taxes ................................................................................................................... 24
    4.12  Compliance with Laws ....................................................................................... 24
    4.13  Certain Material Contracts.................................................................................. 24
    4.14  Financial Statements ........................................................................................... 24
    4.15  Inventory ............................................................................................................. 24
    4.16  Regulatory Events ............................................................................................... 24
    4.17  Customers ............................................................................................................ 25
    4.18  Proceedings ......................................................................................................... 25

V.   REPRESENTATIONS AND WARRANTIES OF BUYERS........................................... 25

    5.1   Existence; Power................................................................................................. 25
    5.2   Authorization; Enforceability ............................................................................. 25
    5.3   Governmental Authorization; No Conflict ......................................................... 25
    5.4   Adequate Funds .................................................................................................. 26
    5.5   Finders' Fees ....................................................................................................... 26
    5.6   Bankruptcy.......................................................................................................... 26

91659665v.5

|  | 5.7 | Condition of Assets: Disclaimers | 26 |
|---|---|---|---|
| VI. | | BANKRUPTCY MATTERS | 28 |
| | 6.1 | Bankruptcy Court Approval | 28 |
| | 6.2 | Bidding Procedures | 28 |
| | 6.3 | Backup Bidder | 28 |
| | 6.4 | Sale Order | 29 |
| VII. | | ADDITIONAL AGREEMENTS | 29 |
| | 7.1 | Employee Matters | 29 |
| | 7.2 | Use of Name | 30 |
| | 7.3 | Open Purchase Orders | 30 |
| | 7.4 | Collection of Accounts Receivable | 30 |
| | 7.5 | Conduct of Business | 30 |
| | 7.6 | Efforts; Cooperation | 31 |
| | 7.7 | Access to Information; Reporting | 31 |
| | 7.8 | Further Assurances | 32 |
| | 7.9 | Avoidance Actions | 32 |
| VIII. | | CLOSING DELIVERABLES. | 32 |
| | 8.1 | Closing Deliverables of Sellers | 32 |
| | 8.2 | Closing Deliverables of Buyers | 33 |
| IX. | | CONDITIONS PRECEDENT TO SELLERS' OBLIGATION TO CLOSE. | 33 |
| | 9.1 | Accuracy of Representations | 33 |
| | 9.2 | Buyers' Performance | 34 |
| | 9.3 | Buyers' Deliveries | 34 |
| | 9.4 | Government Orders | 34 |
| | 9.5 | No Injunction | 34 |
| | 9.6 | Entry of Sale Order | 34 |
| X. | | CONDITIONS PRECEDENT TO BUYERS' OBLIGATION TO CLOSE. | 34 |
| | 10.1 | Accuracy of Representations | 34 |
| | 10.2 | Sellers' Performance | 34 |
| | 10.3 | Sellers' Deliveries | 34 |
| | 10.4 | Government Orders | 35 |
| | 10.5 | No Injunction | 35 |
| | 10.6 | Entry of Sale Order | 35 |
| | 10.7 | Title | 35 |
| | 10.8 | Funding of Customer Rebates | 35 |
| | 10.9 | No Material Adverse Effect | 35 |
| XI. | | TERMINATION. | 35 |
| | 11.1 | Termination Events | 35 |
| | 11.2 | Effect of Termination | 36 |
| XII. | | MISCELLANEOUS. | 37 |

ii

12.1    Survival ............................................................................................................ 37
12.2    Notices ............................................................................................................. 37
12.3    Amendments and Waivers ................................................................................ 38
12.4    Expenses ........................................................................................................... 38
12.5    Bulk Sales or Transfer Laws ............................................................................ 39
12.6    Successors and Assigns .................................................................................... 39
12.7    Entire Agreement ............................................................................................. 39
12.8    Severability ...................................................................................................... 39
12.9    No Third-Party Beneficiaries ........................................................................... 40
12.10   Governing Law ................................................................................................. 40
12.11   Consent to Jurisdiction .................................................................................... 40
12.12   WAIVER OF JURY ......................................................................................... 40
12.13   Counterparts ..................................................................................................... 40
12.14   Time of the Essence ......................................................................................... 41

91659665v.5

## LIST OF EXHIBITS

Exhibit A      Legal Description of Owned Real Property
Exhibit B      Form of Escrow Agreement

## LIST OF SCHEDULES

| | |
|---|---|
| 1.1 | February 2021 Working Capital Schedule |
| 2.1.1(b) | Seller Tangible Assets |
| 2.1.1(o) | Specific Purchased Assets |
| 2.1.2(q) | Specific Excluded Assets |
| 2.1.5(a) | Desired Contracts |
| 4.5 | Registered Intellectual Property |
| 4.6 | Sellers' Employee Plans |
| 4.7.1 | Real Estate Encumbrances |
| 4.7.3 | Tax Appeals |
| 4.8 | Employee Claims |
| 4.10 | Encumbrances |
| 4.11 | Taxes |
| 4.12 | Compliance with Laws |
| 4.13 | Material Contracts |
| 4.14 | Financial Statements |
| 4.17 | Material Customers |
| 4.18 | Proceedings |

iv

## AMENDED AND RESTATED ASSET PURCHASE AGREEMENT

This AMENDED AND RESTATED ASSET PURCHASE AGREEMENT (this "*Agreement*") as originally made and entered into on of March 26, 2021 by and among Carla's Pasta, Inc., a Connecticut corporation ("*CPI*") and Suri Realty, LLC, a Connecticut limited liability company ("*Suri*", and together with CPI, the "*Sellers*"), and Natural Food Partners, LLC, a Wisconsin limited liability company (the "*Assignor*"), and as amended and restated as of April 19, 2021, by and between Sellers and NFP Real Estate LLC, a Wisconsin limited liability company and Affiliate of Assignor ("*NFP RE*") and CP Foods LLC, a Wisconsin limited liability company and Affiliate of Assignor ("*CP Foods*", together with NFP RE the "*Buyers*"). CPI, Suri, Assignor, NFP RE and CP Foods are each referred to individually as a "*Party*," and collectively as the "*Parties*."

## RECITALS

A.      CPI manufactures and sells private label and branded food products, including pasta sheets, filled pasta, sauces, and appetizers for foodservice providers, retailers, and national restaurant chains (the "*Business*"), operating from an approximately 152,613 square feet facility (the "*Facility*") located on two adjoining pieces of real property totaling approximately 19.85 acres of land, with addresses of (a) 50 Talbot Lane, South Windsor, Connecticut 06610 and (b) 280 Nutmeg Road, South Windsor, Connecticut 06610, each as described on Exhibit A hereto (such real property, together with the Facility, all other buildings, fixtures, structures and improvements situated thereon and all easements, rights-of-way and other rights and privileges appurtenant thereto, collectively, the "*Real Property*").

B.      Suri, a wholly-owned subsidiary of CPI, owns the Real Property.

C.      On October 29, 2020, certain alleged creditors of Suri filed an involuntary bankruptcy petition against Suri (the "*Suri Bankruptcy Case*") in the United States Bankruptcy Court for the District of Connecticut (the "*Bankruptcy Court*") pursuant to Chapter 7 of title 11 of the United States Code (the "*Bankruptcy Code*").

D.      On December 17, 2020, the Bankruptcy Court entered an order converting the Suri Bankruptcy Case to a voluntary case pursuant to Chapter 11 of the Bankruptcy Code.

E.      On February 8, 2021, CPI filed a voluntary bankruptcy petition pursuant to Chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the "*CPI Bankruptcy Case*" and, together with the Suri Bankruptcy Case, the "*Bankruptcy Cases*").

F.      On March 9, 2021, the Bankruptcy Court entered an order (the "*Sale Procedures Order*") authorizing Sellers, among other things, to conduct a sale process for the Business and the Real Property (the "*Sale*"), and approving procedures with respect thereto (the "*Bidding Procedures*").

G.      In accordance with the Sale Procedures Order, Sellers now desire to sell the Purchased Assets (as defined herein) on the terms and conditions contained in this Agreement, including obtaining an order from the Bankruptcy Court pursuant to sections 105, 363, and 365 of the Bankruptcy Code and Rules 4001, 6004, 6606 of the Federal Rules of Bankruptcy Procedures

1

91659665v.5

(the "***Bankruptcy Rules***") authorizing the transactions contemplated hereunder, in form and substance satisfactory to the Buyers (the "***Sale Order***").

NOW THEREFORE, in consideration of the mutual covenants and agreements contained in this Agreement, the Parties hereby covenant and agree as follows:

## I. DEFINITIONS; CERTAIN INTERPRETIVE MATTERS.

1.1     <u>Definitions</u>. For purposes of this Agreement, the following terms have the meanings specified or referenced below.

"***Accrued PTO Liability***" has the meaning set forth in <u>Section 7.1.5</u>.

"***Accounting Principles***" means GAAP as in effect as of the date hereof, and only to the extent consistent with GAAP, the accounting methodologies, principles, policies, definitions, methods, practices, techniques and procedures used by the Sellers in preparing the Financial Statements and the February 2021 Working Capital Schedule.

"***Accounts Receivable***" means any and all accounts, notes, trade and other receivables owed to either Seller (including, without limitation, any recapture amounts with customers), together with all security or collateral therefor and any interest or unpaid financing charges accrued thereon, including all Proceedings pertaining to the collection of amounts that are payable, or that may become payable, to either Seller with respect to products sold or services performed on or prior to the Closing Date.

"***Affiliate***" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person.  The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"***Agreement***" has the meaning set forth in the introductory paragraph.

"***Allocation***" has the meaning set forth in <u>Section 3.5.1</u>.

"***Alternative Transaction***" means a sale of substantially all of the Purchased Assets to a Third Party (and not the Buyers), whether pursuant to the Auction or otherwise; <u>provided</u>, <u>however</u>, that a sale of the Purchased Assets to a Third Party shall not constitute an Alternative Transaction if such sale follows the termination of this Agreement as a result of a Buyers Default Termination.

"***Ancillary Agreements***" means the Master Assignment, the IP Assignment and any other agreement executed in connection with Closing.

"***Applicable Law***" means, with respect to any Person, any transnational, domestic or foreign federal, state, provincial, municipal or local law (statutory, common or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, Order,

injunction, judgment, decree, ruling or other similar requirement enacted, adopted, promulgated, enforced or applied by a Governmental Authority that is binding upon or applicable to such Person or its properties, as amended unless expressly specified otherwise.

"*Assignor*" means Natural Food Partners, LLC, a Wisconsin limited liability company.

"*Assumed Contracts*" means the Contracts that shall be assigned by either Seller to either Buyer pursuant to Section 365 of the Bankruptcy Code, the Sale Order (or other order of the Bankruptcy Court), and Section 2.1.5.

"*Assumed Liabilities*" has the meaning set forth in Section 2.1.3.

"*Assumed Payroll*" means up to $181,000 of Sellers' payroll, employee related expenses for wages, overtime, PTO taken in the most recent week, employer payroll taxes, 401k, 1099 wages, and fees paid to temp agencies accruing prior to the Closing Date, which applicable amounts, applicable payee(s) and applicable payment instructions shall be provided by Sellers to Buyers on or prior to the Closing.

"*Assumed Plan Liabilities*" has the meaning set forth in Section 2.1.3(d).

"*Assumed Plans*" has the meaning set forth in Section 7.1.4.

"*Auction*" has the meaning set forth in the Bidding Procedures.

"*Avoidance Actions*" has the meaning set forth in Section 2.1.1(n).

"*Backup Bidder*" has the meaning set forth in the Bidding Procedures.

"*Bankruptcy Cases*" has the meaning set forth in the Recitals.

"*Bankruptcy Code*" has the meaning set forth in the Recitals.

"*Bankruptcy Court*" has the meaning set forth in the Recitals.

"*Bankruptcy Rules*" has the meaning set forth in the Recitals.

"*Bidding Procedures*" has the meaning set forth in the Recitals.

"*Books and Records*" has the meaning set forth in Section 2.1.1(f).

"*Break-Up Fee*" means $450,000.

"*Business*" has the meaning set forth in the Recitals.

"*Business Day*" means any day other than a Saturday or Sunday or a holiday in the State of Connecticut.

"***Buyers***" has the meaning set forth in the introductory paragraph.

"***Buyers Default Termination***" has the meaning set forth in <u>Section 11.2.4</u>.

"***Cash and Cash Equivalents***" means all cash and cash equivalents (including (i) any cash that is collateralizing any letters of credit issued pursuant to any credit agreement or facility, (ii) marketable securities, (iii) short-term investments and (iv) checks, ACH transactions or other wire transfers or drafts deposited or available for deposit, and net of issued but uncleared checks or drafts written or issued by either Seller.

"***Cash Purchase Price***" has the meaning set forth in <u>Section 2.3.1</u>.

"***Claim***" has the meaning set forth in Section 101(5) of the Bankruptcy Code.

"***Closing***" has the meaning set forth in <u>Section 3.1</u>.

"***Closing Certificate***" has the meaning set forth in <u>Section 2.3.2</u>.

"***Closing Date***" has the meaning set forth in <u>Section 3.1</u>.

"***COBRA***" means the Consolidated Omnibus Budget Reconciliation Act of 1985 (as amended) and Section 4980B of the Code.

"***Code***" means the United States Internal Revenue Code of 1986 (as amended) and the regulations promulgated thereunder.

"***Confidentiality Agreement***" means that certain confidentiality agreement executed by either Seller and Buyer's Representative on October 9, 2020, and the joinder to such Agreement executed by Assignor on October 19, 2020.

"***Contract***" means any agreement, contract, purchase order, lease, deed, license, instrument, commitment, undertaking or obligation (in each case, whether written or oral) that is legally binding, in each case as amended, supplemented, modified, restated, or extended from time to time, an including without limitation all exhibits, schedules, addenda, and other attachments thereto.

"***Copyright***" means any copyright, any copyrightable work, any work of authorship, any moral rights related to any of the foregoing, any registration or recording of any copyright, copyrightable work or work of authorship, and any application in connection therewith, including any such registration, recording, or application in the United States Copyright Office or in any similar office or agency of the United States, any State thereof, or any other jurisdiction, and any renewal of any of the foregoing.

"***CPI***" has the meaning set forth in the introductory paragraph.

"***CPI Bankruptcy Case***" has the meaning set forth in the Recitals.

91659665v.5

"*Cure Amounts*" has the meaning set forth in <u>Section 2.1.5(a)</u>.

"*Cure Amounts Cap*" has the meaning set forth in <u>Section 2.1.5(a)</u>.

"*Deposit*" has the meaning set forth in <u>Section 2.4</u>.

"*Desired Contracts*" has the meaning set forth in <u>Section 2.1.5(a)</u>.

"*Encumbrances*" means any mortgage, deed of trust, hypothecation, assignment, preemptive purchase right, charge,  Judicial Lien, community property interest, right-of-way, easement, covenant, condition, equitable interest, Lien, option, pledge, security interest, instrument, right of first refusal or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

"*Environmental Law*" means any Law relating to pollution, the protection of human health and safety (with respect to exposure to Hazardous Materials), the environment, or natural resources or the release, manufacture, processing, treatment, storage, disposal or handling of, or exposure to, Hazardous Materials.

"*Environmental Liabilities and Obligations*" means all Liabilities arising from any impairment, impact or damage to the environmental, health or safety, or any failure to comply with any Environmental Law.

"*Escrow Agent*" has the meaning set forth in <u>Section 2.4</u>.

"*Escrow Agreement*" has the meaning set forth in <u>Section 2.4</u>.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended.

"*ERISA Affiliate*" means all employers (whether or not incorporated) that would be treated together with any Seller or any of its Affiliates as a "single employer" within the meaning of Section 414 of the Code or Section 4001 of ERISA.

"*Excluded Assets*" has the meaning set forth in <u>Section 2.1.2</u>.

"*Excluded Liabilities*" has the meaning set forth in <u>Section 2.1.4</u>.

"*Excluded Contract*" means all Contracts of either Seller other than the Assumed Contracts.

"*Facility*" has the meaning set forth in the Recitals.

"*February 2021 Working Capital Schedule*" means the calculation of Working Capital as of February 27, 2021 as attached hereto as <u>Schedule 1.1</u>.

"*Final Order*" means an order of any court or tribunal, which has not been stayed, appealed, amended, reversed, modified, or vacated, and the time for which any appeal has expired.

91659665v.5

"**GAAP**" means generally accepted accounting principles in effect from time to time in the United States of America, applied on a consistent basis.

"**Governmental Authority**" means any court or tribunal in any jurisdiction (domestic or foreign) or any federal, tribal, state, parish, county, municipal or other governmental or quasi-governmental, administrative or regulatory body, agency, authority, department, board, commission, bureau, official or other authority or instrumentality.

"**Hazardous Materials**" means any waste, chemical substance or product or other substance (i) that is listed, defined, designated or classified as or otherwise determined to be, hazardous, radioactive, infectious, toxic or a pollutant or contaminant under or pursuant to any environmental Law or (ii) the generation, handling, recycling, use, treatment, storage, transportation, release, disposal or exposure of or to which is subject to regulation under any environmental Law, including any admixture or solution thereof and specifically including petroleum and all derivatives thereof and synthetic substitutes therefore, chlorides, naturally occurring radioactive material or "N.O.R.M." and asbestos or asbestos-containing materials.

"**Indebtedness**" of any Person means, without duplication, (a) the interest in respect of, principal of and premium (if any) in respect of (x) indebtedness of such Person for money borrowed, and (y) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable, (b) all obligations of such Person under leases required to be capitalized in accordance with GAAP, (c) all obligations of such Person for the reimbursement of any obligor on any letter of credits, banker's acceptance or similar credit transactions, and (d) all obligations of the type referred in clauses (a) through (c) of any Person for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations.

"**Information**" has the meaning provided in the Confidentiality Agreement.

"**Insider**" has the meaning set forth in Section 101(31) of the Bankruptcy Code.

"**Intellectual Property**" means any Copyright, Patent, Trademark, trade secret, know-how, software, rights in data and databases, inventions (whether patentable or not), or any other similar type of proprietary right or intellectual property right.

"**Inventory**" has the meaning set forth in <u>Section 2.1.1(c)</u>.

"**IP Assignment**" means mans the Intellectual Property Assignment in the form to be mutually agreed by the Parties prior to the Closing (which mutual agreement shall not be unreasonably withheld, delayed or conditioned).

"**Judicial Lien**" has the meaning set forth in Section 101(36) of the Bankruptcy Code.

"***Knowledge***" means the actual knowledge of Carla Squatrito and Sandro Squatrito, and the knowledge that each such Person would have reasonably obtained after making reasonable inquiry with respect to the particular matter in question.

"***Law***" means any applicable federal, state, county, city, municipal, foreign, or other governmental statute, law, rule, regulation, ordinance, order, code, or requirement (including pursuant to any settlement agreement or consent decree) and any permit or license granted under any of the foregoing, or any requirement under the common law.

"***Liability***" means any and all Claims, debts, Indebtedness, Encumbrances, losses, damages, adverse claims, liabilities, fines, surcharges, penalties, duties, responsibilities, obligations and expenses (including reasonable attorneys' fees and reasonable costs of investigation and defense) of any kind, character, or description, whether known or unknown, direct or indirect, fixed, absolute or contingent, matured or unmatured, accrued or unaccrued, asserted or unasserted, ascertained or ascertainable, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, vested or unvested, executory, determined, determinable, in contract, tort, strict liability, or otherwise, or otherwise due or to become due.

"***Lien***" has the meaning set forth in Section 101(37) of the Bankruptcy Code.

"***Master Assignment***" means mans the Master Assignment, Bill of Sale, Deed, and Conveyance in the form to be mutually agreed by the Parties prior to the Closing (which mutual agreement shall not be unreasonably withheld, delayed or conditioned).

"***Material Adverse Effect***" means any circumstance, condition, occurrence, event that, individually or in the aggregate (i) would be reasonably expected to prevent or materially delay beyond the Outside Date or materially impair any Seller's ability to consummate the transactions contemplated by this Agreement, or (ii) would be reasonably expected to have, a material adverse effect on the Purchased Assets or the Business taken as a whole; provided, however, that in no event shall any circumstance, condition, occurrence, event or change arising out of any of the following, alone or in combination, be deemed to constitute, or be taken into account, in determining whether there has been, or would be, a Material Adverse Effect: (a) changes in the economy, market, financial or capital markets or regulatory or political conditions in general but that do not have a disproportionate effect on Sellers relative to other participants in the industry in which the Sellers conduct the Business; (b) terrorism, war or the outbreak of hostilities or natural disasters; (c) changes that affect generally the industry in which Sellers operate but that do not have a disproportionate effect on Sellers relative to other participants in the industry in which Sellers conduct the Business; (d) any state of facts, circumstance, condition, event, change, development, occurrence, result or effect to the extent directly or indirectly resulting from COVID-19 or any other pandemic; (e) changes in any Applicable Law or GAAP; or (f) the commencement of the Bankruptcy Cases.

"***Material Customers***" has the meaning set forth in Section 4.17.

"***Most Recent Financial Statements***" has the meaning set forth in Section 4.14.

"*OFAC*" has the meaning set forth in <u>Section 4.7.7</u>.

"*OFAC Order*" has the meaning set forth in <u>Section 4.7.7</u>.

"*Offeree*" has the meaning set forth in <u>Section 7.1.1</u>.

"*Order*" means any award, writ, injunction, judgment, stay, temporary restraining order, order, decree or other restraint entered, issued, made or rendered by any Governmental Authority.

"*Outside Date*" has the meaning set forth in Section <u>11.1.2</u>.

"*Party*" or "*Parties*" has the meaning set forth in the introductory paragraph.

"*Patents*" means any letters patent, applications for letters patent, statutory invention registrations, registered designs, and similar or equivalent rights in inventions and designs, and any reissues, divisionals, continuations, continuations-in-part, reissues, re-examinations, renewals, provisional, and extensions thereof, including any patents or patent applications in the United States Patent and Trademark Office, the World Intellectual Property Organization, or any similar office or agency in any other jurisdiction.

"*Permits*" has the meaning set forth in <u>Section 2.1.1(e)</u>.

"*Permitted Encumbrances*" means: (i) statutory Liens for current Property Taxes and assessments not yet due and payable, including, without limitation, liens for ad valorem Taxes and statutory liens not yet due and payable, (ii) discrepancies, conflicts in boundary lines, shortage in area, encroachments, strips, gaps or gores between adjacent lots or parcels and any other state of facts that would be shown on any accurate survey prepared by a professionally licensed land surveyor that, individually and in the aggregate, do not and will not materially interfere with the use and operation of the Real Property or the Business, (iii) any easements, rights of way, covenants and conditions of record that would be shown on any current title report prepared by a professionally licensed title company, including, without limitation, (A) standard, pre-printed exclusions from coverage; (B) such exclusions that would be revealed under such title report, that, individually and in the aggregate, do not and will not materially interfere with the use and operation of the Real Property or the Business; (C) Encumbrances that constitute Assumed Liabilities (including Encumbrances under the Assumed Contracts); (D) landlords', carriers', warehousemens', mechanics', suppliers', materialmens', repairmens' liens or other like Encumbrances arising in the ordinary course of business with respect to amounts not yet overdue and any other Encumbrances that will be irrevocably released in full (of record, as appropriate) on or prior to the Closing; (iv) the Encumbrances arising from the UCC-1 financing statements filed by the following parties: (X) U.S. Bank Equipment Finance (filing #0003204785); (Y) Raymond Leasing Corporation (filing #0003229271); (Z) Wells Fargo Bank, N.A. (filing #s 0003326626, 0003415141); and/or (v) Encumbrances arising by, through or under Buyers' financing for the transactions contemplated hereby, if any. For the avoidance of doubt, the alleged mechanic's liens asserted by The Dennis Engineering Group, LLC and Elm Electrical with respect to the Real Property shall not be, and shall not be deemed to be, Permitted Encumbrances.

8

"***Person***" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, estate, trust, association, organization or other entity or Governmental Authority.

"***Pre-Closing Tax Period***" means any taxable period ending on or before the Closing Date and, with respect to any taxable period beginning before and ending after the Closing Date, the portion of such taxable period ending on and including the Closing Date.

"***Prepayments***" means (i) prepaid expenses held as current assets on Sellers' Books and Records, and (ii) cash in advance paid to Sellers' suppliers which are reflected as payments towards future accounts payable on the Books and Records.

"***Proceeding***" means any Claim, action, arbitration, audit, appeal, petition, inquiry, investigation, complaint, hearing, litigation, suit, or other dispute (whether civil, criminal or administrative) commenced, brought, conducted, or heard by or before any Governmental Authority or arbitrator.

"***Property Taxes***" means all real property Taxes and amounts paid to any governmental authority deemed by agreement to constitute real property Taxes and recapture or reimbursement obligations with respect to any abatement of real property Taxes or other benefit granted by any governmental authority with respect to real property Taxes.

"***Purchase Price***" has the meaning set forth in Section 2.3.1.

"***Purchased Assets***" has the meaning set forth in Section 2.1.1.

"***Real Property***" has the meaning set forth in the Recitals.

"***Representatives***" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"***Sale***" has the meaning set forth in the Recitals.

"***Sale Order***" has the meaning set forth in the Recitals.

"***Sale Procedures Order***" has the meaning set forth in the Recitals.

"***Seller***" or "***Sellers***" has the meaning set forth in the introductory paragraph.

"***Seller Employees***" has the meaning set forth in Section 4.6.

"***Sellers' Employee Plans***" has the meaning set forth in Section 4.6.

"***Seller Marks***" has the meaning set forth in Section 7.2.

"***Seller Tangible Property***" has the meaning set forth in Section 2.1.1(b).

"***Stalking Horse***" has the meaning set forth in <u>Section 6.1.2</u>.

"***Successful Bidder***" has the meaning set forth in the Bidding Procedures.

"***Suri***" has the meaning set forth in the introductory paragraph.

"***Suri Bankruptcy Case***" has the meaning set forth in the Recitals.

"***Tax***" or "***Taxes***" (and with correlative meaning, "***Taxable***", "***Taxation***" "***Taxing***") means all federal, state, local or foreign taxes, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, real property, personal property, unclaimed property and estimated taxes or other tax of any kind whatsoever, including any interest, penalties and additions thereto and recapture or reimbursement obligations with respect to any tax abatement or other tax benefit, whether disputed or not, and including any amounts paid to any governmental entity and deemed by agreement with that entity to constitute taxes and any obligation to indemnify or otherwise assume or succeed to the tax liability of any other Person.

"***Tax Returns***" means any return, declaration, report, estimate, information return and statement filed or required to be filed in respect of any Taxes (including any attachment thereto or amendment thereof).

"***Third Party***" means any Person other than Sellers, Buyers, Assignor, or any of their respective Affiliates.

"***Trademarks***" means any trademark, trade name, corporate name, business name, domain name, trade style, trade dress, service mark, logo, source identifier, business identifier, or design of like nature, and all goodwill associated therewith, any registration of the foregoing, and any application in connection therewith, including any such registration or application in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof, or any other jurisdiction, and all extensions or renewals of any of the foregoing.

"***Transfer Taxes***" has the meaning set forth in <u>Section 3.4</u>.

"***Transferred Employee***" has the meaning set forth in <u>Section 7.1.1</u>.

"***WARN Act***" means the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. (1988) (as amended) and any similar state or local "mass layoff" or "plant closing" laws.

"***Working Capital***" means the Prepayments, Accounts Receivable, and Inventory as of the Closing Date, as calculated in accordance with the Accounting Principles.

1.2    <u>Interpretive Matters</u>.  Unless the context requires otherwise, (i) all references to Sections, Articles, Exhibits, or Schedules are to Sections, Articles, Exhibits, or Schedules of or to

this Agreement, (ii) each accounting term not otherwise defined in this Agreement has the meaning commonly applied to it in accordance with GAAP, (iii) words in the singular include the plural and vice versa, (iv) all references to $ or dollar amounts are to lawful currency of the United States, (v) unless otherwise specified, the term "day" or "days" refers to calendar days, (vi) the pronoun "his" refers to the masculine, feminine, and neuter, (vii) the words "herein," "hereby," "hereof," "hereunder," and other words of similar import refer to this Agreement as a whole and not to any particular Section, Article, or other subdivision, and (viii) the term "including" means "including without limitation."

     1.3   <u>No Presumption Against Drafting Party</u>.  No provision of this Agreement will be interpreted in favor of, or against, any of the Parties by reason of the extent to which any such Party or its counsel participated in the drafting of this Agreement or by reason of the extent to which any such provision is inconsistent with any prior draft of this Agreement or any provision of this Agreement.

## II.  PURCHASE AND SALE.

     2.1   <u>Purchase and Sale of Assets</u>.

     2.1.1   <u>Purchased Assets</u>.  Subject to the terms and conditions set forth in this Agreement, at the Closing, Sellers hereby sell, convey, assign, transfer and deliver to the Buyers, and the respective Buyer identified below hereby accepts, purchases, acquires, assumes and take delivery of, all right, title and interest in and to all rights, properties and assets of Sellers, real, personal or mixed, tangible or intangible, of every kind and description, except for the Excluded Assets (collectively, the "***Purchased Assets***") free and clear of all Claims and Encumbrances (other than Permitted Encumbrances), as set forth herein, including without limitation the following:

     (a)   the Real Property and all improvements thereto (subject to <u>Section 2.2</u>); the Parties understand and agree that that NFP RE shall be the sole buyer of the Real Property, and that, subject to any Desired Contracts to be assumed by NFP RE in accordance with <u>Section 2.1.5</u>, CP Foods shall be the sole buyer of all Purchased Assets other than the Real Property;

     (b)   all furniture, fixtures, equipment, machinery, tools, vehicles, office equipment, supplies, computers, telephones and other tangible personal property (the "***Seller Tangible Property***"), including, without limitation, the Seller Tangible Property set forth on <u>Schedule 2.1.1(b)</u>;

     (c)   all inventory, finished goods, raw materials, work in progress, packaging, supplies, parts and other inventories (collectively, "***Inventory***"), and all open purchase orders with suppliers for such Inventory;

     (d)   all Assumed Contracts (subject to <u>Section 2.1.5</u>);

     (e)   all permits, licenses, registrations, consents, approvals, certificates, variances or other authorizations relating to the Purchased Assets or the Business (the "***Permits***"), to the extent transferrable;

91659665v.5

(f)       all books and records of Sellers, including without limitation books of account, ledgers and general, financial and accounting records, machinery and equipment maintenance files, customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), sales material and records (including pricing history, total sales, terms and conditions of sale, sales and pricing policies and practices), Tax Returns (other than income Tax Returns), strategic plans, internal financial statements, marketing and promotional surveys, material and research and files relating to the Intellectual Property (the "***Books and Records***"); provided, however, that "Books and Records" shall not include the originals of Sellers' minute books, stock books and Tax Returns and Sellers shall retain a copy of the Books and Records for the purposes set forth in Section 7.7;

(g)       the amount of and all rights to any proceeds received by either Seller, including all insurance recoveries and recoveries from other Third Parties, in respect of, in connection with, or arising from (i) the loss, destruction or condemnation of any Purchased Assets or relating to the Purchased Assets or any Transferred Employee, in each case, whether occurring prior to, on or after the Closing or (ii) any Assumed Liabilities;

(h)       all Prepayments;

(i)       all Intellectual Property (including, without limitation, the Registered Intellectual Property), all licenses and sublicenses granted and obtained with respect thereto, and rights thereunder, all income, royalties and payments receivable in respect thereof, all rights to assert, defend, sue, and recover damages for any past, present and future infringement, misuse, misappropriation, impairment, unauthorized use or other violation of any rights in or to any such Intellectual Property and any and all corresponding rights that have been, now or hereafter may be secured throughout the world with respect to any Intellectual Property;

(j)       all phone and telecopy numbers, websites, domain names and email addresses of the Sellers associated with the Purchased Assets or the Business;

(k)       all goodwill and other intangible assets associated with the Purchased Assets and the Business, including all customer relationships, and all information and documents related thereto;

(l)       all rights and assets related to the Assumed Plans, if any;

(m)       all Accounts Receivable;

(n)       all avoidance actions or similar causes of action arising under sections 544 through 553 of the Bankruptcy Code, including any proceeds thereof, related to the Purchased Assets or the Business including, but not limited to, all claims arising under section 547 of the Bankruptcy Code related to payments for goods or services delivered or provided to the Facility (the "***Avoidance Actions***"); and

(o)       any assets identified on Scheduled 2.1.1(o).

2.1.2   <u>Excluded Assets</u>.   The following assets of Sellers (collectively, the "***Excluded Assets***") shall be retained by Sellers, and are not being sold or assigned to Buyers hereunder:

(a)   Sellers' rights under this Agreement, the Ancillary Agreements, and the Confidentiality Agreement;

(b)   any amounts (including the Purchase Price) paid or payable to either Seller pursuant to this Agreement, the Ancillary Agreements, and the Confidentiality Agreement;

(c)   all Cash and Cash Equivalents;

(d)   [Intentionally Omitted]

(e)   all (i) taxpayer and other identification numbers, corporate seals, corporate organizational records, all minute books, stock transfer books and other documents relating to the organization, maintenance, and existence of either Seller as a corporation or a limited liability company, as applicable (ii) original Tax, accounting and financial records which pertain exclusively to the Excluded Assets, and (iii) such other files, books and records which pertain exclusively to the Excluded Assets or to the formation, existence or capitalization of either Seller or of any other Person;

(f)   all personal effects not related to the Business;

(g)   all Contracts that are not Assumed Contracts;

(h)   all set-off rights to claims filed or asserted in the Chapter 11 Case (except to the extent arising in connection with an Assumed Contract which is subject to cure);

(i)   any rights, claims (including warranty claims or indemnities) or causes of action of either Seller, solely to the extent relating to any Excluded Asset or Excluded Liability;

(j)   all insurance policies of Sellers, any prepaid insurance premiums and any rights or claims or proceeds arising from such policies, solely to the extent relating to any Excluded Asset or Excluded Liability;

(k)   all Tax refunds, Tax creditors and other Tax benefits which are related to Sellers' operation of the Business prior to the Closing;

(l)   any records which Sellers are legally required to retain in its possession and any records related to Excluded Assets;

(m)   personnel records for Seller Employees who are not Transferred Employees and, to the extent the transfer of such records (whether directly or by means of the sale of a Seller) to Buyers or their affiliates is prohibited by applicable Law, for Transferred Employees, and all organizational documents and minute books of the Seller;

13

      (n)      all equity interests or securities of any Seller;

      (o)      all Sellers' Employee Plans that are not Assumed Plans;

      (p)      Sellers' attorney-client and work-product privileges; and

      (q)      such other assets of Sellers listed on <u>Schedule 2.1.2(q)</u>.

      2.1.3   <u>Assumed Liabilities</u>.  Subject to the terms and conditions set forth in this Agreement, at the Closing, Buyers hereby assume and agree to pay, perform, fulfill and discharge when due, from and after the Closing Date, only the following liabilities (collectively, the "***Assumed Liabilities***") and no other Liabilities:

      (a)      all liabilities and obligations of either Seller, if any, relating to the Purchased Assets that arise after the Closing Date and solely to the extent that such liabilities and obligations arise in connection with such Buyer's ownership or operation of the Purchased Assets after the Closing Date;

      (b)      all of either Seller's liabilities under the Assumed Contracts to the extent required to be performed from and after the Closing, and all Cure Amounts associated with such Assumed Contracts;

      (c)      the Accrued PTO Liability for the Transferred Employees under <u>Section 7.1</u> and such other obligations set forth in <u>Section 7.1.2</u>;

      (d)      the Assumed Payroll; and

      (e)      all liabilities arising from and after the Closing under the Assumed Plans, if any (the "***Assumed Plan Liabilities***"); <u>provided</u>, <u>however</u>, that, for avoidance of doubt, the Assumed Plan Liabilities shall not include any liabilities or obligations arising with respect to or in connection with the Assumed Plans to the extent such liabilities or obligations arose prior to the Closing Date or with respect to any Seller Employee who does not become a Transferred Employee.

      Notwithstanding the foregoing and for avoidance of doubt, Assumed Liabilities shall not include any Liability that constitutes an Excluded Liability or any Liability relating to or arising out of any violation of any Applicable Law by, or any Claim against, any Seller or any breach, default or violation by any Seller of or under any Assumed Contracts, other than the Cure Amounts. From and after Closing, Sellers shall have no liability or obligation with respect to any of the Assumed Liabilities.

      2.1.4   <u>Excluded Liabilities</u>.  Notwithstanding any provision in this Agreement to the contrary, Buyers shall not assume and shall not be responsible to pay, perform or discharge any Liabilities of any Seller or any of its Affiliate of any kind or nature whatsoever other than the Assumed Liabilities (the "***Excluded Liabilities***"), and Sellers shall be solely and exclusively liable for all such Liabilities, including, without limitation, the following Liabilities (which shall constitute Excluded Liabilities):

(a)      all Liabilities of any Seller arising or incurred in connection with the negotiation, preparation, investigation, performance of this Agreement, the Ancillary Agreements and the transactions contemplated hereby and thereby, including, without limitation, fees and expenses of any and all counsel, accountants, consultants, advisers, investment bankers, brokers, finders or others;

(b)      all Liabilities arising out of relating to otherwise in respect of the Purchased Assets or the Business arising prior to the Closing, other than as expressly identified in Section 2.1.3;

(c)      all Liabilities of Sellers relating to or otherwise arising, whether before, on or after the Closing, out of, or in connection with, any of the Excluded Assets;

(d)      all Liabilities of Sellers for Indebtedness;

(e)      all (i) Liabilities of Sellers for any Taxes (other than Transfer Taxes), (ii) Taxes arising from or in connection with any Excluded Assets, and (iii) Taxes relating to the Business, the Purchased Assets or the Assumed Liabilities for any Pre-Closing Tax Period;

(f)      all Liabilities of Sellers in respect of Contracts to which any Seller is party or is otherwise bound that are not Assigned Contracts;

(g)      except solely for the Assumed Plan Liabilities, if any, and Accrued PTO Liability, all Liabilities with respect to employment or other provision of services, compensation, severance, benefits or payment of nature owed to any current or former employee, officer, director, member, partner or independent contractor of any Seller or any ERISA Affiliate (or any beneficiary or dependent of any such individual) that (i) arises out of or relates to the employment, service provider or other relationship between any Seller or any ERISA Affiliate and any such individual, including, but not limited to, the termination of such relationship, (ii) arises out of or relates to any Sellers' Employee Plan, or (iii) arises out of or relates to events or conditions occurring on or before the Closing Date;

(h)      all Liabilities of any Seller to any of its equity holders with respect to dividends, distributions, redemption of interests, option payments or otherwise; and

(i)      to the maximum extent permitted under Applicable Law, all Environmental Liabilities and Obligations;

(j)      all Liabilities arising out of, in respect of or in connection with failure by any Seller or any of its Affiliates to comply with any Applicable Law or Order; and

(k)      all Liabilities in respect of any pending or threatened Proceeding arising out of, relating to or otherwise in respect of the operation of the Business or the Purchased Assets to the extent such Proceeding relates to such operation on or prior to the Closing Date (including, without limitation, any and all Liabilities arising out of any workplace accident or similar incident occurring prior to the Closing Date).

### 2.1.5    Procedures for Assumption and Assignment of Assumed Contracts.

(a)    Schedule 2.1.5(a) sets forth a complete list as of the date hereof of all Contracts that Buyers intend to assume at the Closing (the "***Desired Contracts***").  One (1) business day prior to the Closing, the Buyers shall identify to Sellers the applicable Buyer that will be assigned each of the Desired Contracts.  Upon Closing, subject to the terms and conditions hereof, the Seller that is party to each such Desired Contract will assign to the applicable Buyer the Desired Contracts it will assume, and such Buyer will assume all Assumed Liabilities thereunder, and at such time as is required by the Bankruptcy Court in the Sale Order, such Buyer shall pay cash or other acceptable consideration to the Third Party (or parties) to the applicable Assumed Contract in order to cure the monetary defaults and satisfy any pecuniary obligations of such Seller (or obtain waivers with respect thereto) or, if applicable, such other lesser amount as may be mutually agreed by such Buyer and the applicable counter-party to such Assumed Contract (the "***Cure Amounts***"); provided, however, that, unless such Buyer agree otherwise, Buyers' total aggregate Cure Amounts shall not exceed $2,099,311.19 (the "***Cure Amounts Cap***").

(b)    At any time prior to entry of the Sale Order, Buyers will have the right to provide written notice to Sellers of Buyers' election to designate a Desired Contract as an Excluded Contract (other than any of the contracts of Sodexo, Foodbuy, or Aramark, which shall not be Excluded Contracts), and upon such designation in writing such Desired Contract will constitute an Excluded Contract and Excluded Asset (and, if applicable, will cease to constitute a Purchased Asset).

(c)    At any time prior to the entry of the Sale Order, Buyers will have the right to provide written notice to Sellers of Buyers' election to designate a Contract as a Desired Contract, and upon such designation in writing, and subject to the requirements of clause (d) below, such Contract will constitute a Purchased Asset and Assumed Contract and will be conveyed to the identified Buyer under this Agreement at Closing (and, if applicable, will cease to constitute an Excluded Asset), so long as (A) such Contract is added to the Assumed Contracts prior to the entry of any Order of the Bankruptcy Court approving the rejection of such Contract, and (B) the assumption and assignment of such Contract has been or is approved by the Bankruptcy Court (including through the Sale Order).

(d)    With respect to each Desired Contract, Buyers have delivered within twenty four (24) hours of being declared by Sellers as the Successful Bidder information Buyers believe to be sufficient to demonstrate Buyers' adequate assurance of the future performance by Buyers of each such Desired Contract as required under Section 365 of the Bankruptcy Code, which information Sellers will be permitted to disseminate to any Third Party that is a party to any Desired Contract.   In the event Buyers cannot demonstrate adequate assurance of future performance with respect to a Desired Contract, such Desired Contract shall become an Excluded Contract, provided, however, that any dispute over the Buyers' satisfaction of the foregoing requirement, to the extent not consensually resolved, will be determined by the Bankruptcy Court.

(e)    If either Buyer exercises its rights in clause (b) or clause (c) above to designate a Contract as an Excluded Contract or a Desired Contract (as the case may be), then the Parties acknowledge and agree that there will be no increase or reduction in the Cash Purchase

Price as a result of such designation or change in designation, nor will there be any delay to the Closing.

(f)     Absent the prior written consent of the Buyers, at no time prior to the Closing (or the earlier undisputed termination of this Agreement, if applicable) shall either Seller assume, reject (or move to assume or reject), amend, modify, restate, or rescind any Desired Contract. Sellers acknowledge and agree that, at any time following the Buyers' designation as the Successful Bidder, Buyers may contact and negotiate with non-Debtor parties to Desired Contracts, and as soon as reasonably practicable after the execution of this Agreement, Sellers shall provide contact information and copies of any applicable Contracts, in order to facilitate such discussions; provided, however, that Sellers shall reasonably cooperate with Buyers, including prior to the Auction, with respect to communications with such non-Debtor parties to Desired Contracts.

2.2     Purchase and Sale of Real Property.

2.2.1   Agreement of Purchase and Sale.  Subject to the terms and conditions hereinafter set forth, Sellers agree to sell and convey, and NFP RE agrees to purchase, the Real Property, together with all rights and appurtenances pertaining to such Real Property, including all of either Seller's right, title and interest in and to the following:

(a)     All rights, privileges and easements appurtenant to the Real Property, all development rights and entitlements relating to the Real Property, all water, wastewater and other utility rights relating to the Real Property, and any and all easements, rights-of-way, adjacent streets, walls, alleys and other appurtenances used in connection with the beneficial use and enjoyment of the Real Property;

(b)     All of either Seller's right, title and interest in and to any and all (i) warranties, guaranties and beneficial indemnities currently in force and effect with respect to the Real Property, (ii) licenses, permits, certificates of occupancy, agreements, utility contracts, or similar documents relating to the Real Property, and (iii) design contracts, plans, drawings, specifications, surveys, engineering reports, environmental reports and other third-party reports pertaining to the physical characteristics of the Real Property; and

(c)     All of either Seller's right, title and interest in and to any insurance proceeds or awards for damages to the Real Property resulting from any taking in eminent domain and/or from any fire or other casualty.

2.2.2   Title Matters.  Sellers will deliver, or cause to be delivered, to Buyers, at or as promptly as practicable but in any event at least fifteen (15) days prior to the Closing, (a) copies of existing surveys, legal descriptions and title policies relating to the Real Property in each case, in any Seller's possession or control, (b) such bills of sale, deeds, endorsements, assignments and other customary instruments of conveyance and transfer, in form and substance reasonably satisfactory to Buyers, as Buyers may reasonably request in order to vest in NFP RE all of the applicable Seller's right, title and interests in, to or under any or all Real Property, in each case, in any Seller's possession or control, and (c) such ordinary and customary documents (including any factually accurate affidavits) as may be reasonably required by any title company or title insurance

17

underwriter selected by Buyers (as applicable, the "***Title Company***") to enable NFP RE to acquire, at Buyers' sole election and sole cost and expense, one or more owner policies of title insurance issued by such Title Company covering any or all of the Real Property.

2.3     Purchase Price.

2.3.1     The purchase price for the Purchased Assets under this Agreement is an amount (the "***Purchase Price***") equal to the sum of (i)  (A) $24,891,123, plus (B) the amount, if any, by which the Working Capital exceeds $12,620,000, minus (C) the amount, if any, by which $9,580,000 exceeds the Working Capital (such total, the "***Cash Purchase Price***"); (ii) the amount of the Accrued PTO Liability for the Transferred Employees; (iii) the Cure Amounts.   The Purchase Price will be delivered by Buyers as set forth in Section 3.2.

2.3.2     On the day immediately preceding the Closing Date, the Sellers shall deliver to the Buyers a statement (the "***Closing Certificate***") setting forth the Working Capital, in the format of the February 2021 Working Capital Schedule, which shall accompanied by a certificate of a duly authorized officer of the Sellers certifying that the Closing Certificate, and the calculation of Working Capital therein was prepared in accordance with the Accounting Principles.   Prior to the Closing, the Sellers shall deliver to the Buyers such supporting documentation as the Buyers may reasonably request in order for the Buyers to confirm the contents and calculation of the Working Capital.

2.4     Deposit.   The Sellers and Assignor (for the benefit of Buyers) have entered into an escrow agreement substantially in the form of Exhibit B (the "***Escrow Agreement***"), with Verdolino & Lowey, P.C.as escrow agent (the "***Escrow Agent***"), and Buyers (or the Assignor) has deposited into a non-interest bearing escrow with the Escrow Agent an amount equal to $1,689,375 (such amount, the "***Deposit***") by wire transfer of immediately available funds pursuant to the terms of the Escrow Agreement.   The Deposit will be credited against the Purchase Price at Closing, and will otherwise be disbursed as provided in this Agreement, the Escrow Agreement and the Sale Order.   The Deposit shall not be subject to any Lien, attachment, trustee process or any other judicial process of any creditor of Sellers or Buyers.   For avoidance of doubt, the Deposit is calculated utilizing the Cure Amounts Cap.

2.4.1     The Deposit shall become payable to Sellers upon the earlier of (a) the Closing, (b) the occurrence of a Buyers Default Termination.

2.4.2     If the Deposit becomes payable to Sellers by reason of a Buyers Default Termination, the Escrow Agent shall, within two (2) Business Days after receiving written notice of such Buyers Default Termination from either Seller (which notice such Seller shall simultaneously deliver to the Buyers), disburse the Deposit to an account designated by Sellers by wire transfer of immediately available funds to be retained by Sellers for their own accounts; provided, however, that no such funds shall be disbursed if Buyers deliver a written objection to the Buyers Default Termination, signed by an officer of Assignor or either Buyer and setting forth in reasonable detail the reasons for such objection, to Sellers and the Escrow Agent within two (2) Business Days of receipt of notice thereof.

2.4.3    If this Agreement is terminated and the Buyers or Assignor is entitled to the return of the Deposit in accordance with Section 11.2.3, Sellers, Buyers, and Assignor shall instruct the Escrow Agent, in writing to, and the Escrow Agent shall, within two (2) Business Days after receipt of such written instruction, return to Buyers or Assignor the Deposit by wire transfer of immediately available funds.  Other than in the event of a Buyers Default Termination, the Escrow Agent's escrow fees and charges shall be paid by Sellers. In the event of a Buyers Default Termination, the Escrow Agent's escrow fees and charges shall be deducted from the Deposit prior to its disbursement pursuant to Section 2.4.2.

## III.  CLOSING.

3.1    Closing Date.  Subject to the satisfaction of the conditions set forth in Article 9, and Article 10 (or the waiver thereof by each Party entitled to waive that condition), the closing of the sale of the Purchased Assets and the assumption of the Assumed Liabilities contemplated hereby (the "**Closing**") will take place remotely via the exchange of electronic documents and signatures by electronic mail (or wet signatures, as required for the Real Property) on the date that is two (2) Business Days after the satisfaction or waiver of the conditions set forth in Article 8, Article 9 and Article 10 (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions) but which Closing shall occur no earlier than April 30, 2021, unless another place, date or time is agreed to in writing by the Sellers and Buyers.  The date and time at which the Closing actually occurs is hereinafter referred to as the "**Closing Date**."

3.2    Payments on the Closing Date.  At the Closing, in addition to such other actions as may be provided for herein, Buyers shall pay to the Sellers, by wire transfer of immediately available funds, an amount equal to the Cash Purchase Price net of the Deposit (which shall be transferred to Sellers by the Escrow Agent).

3.2.1    At the Closing, Buyers shall assume the Assumed Liabilities (which, other than the Cure Amounts shall be in addition to, and not a credit against, the Purchase Price), and with regard to Assumed Contracts shall pay to the applicable counter-party to such Assumed Contract any Cure Amounts, at such time as may be designated by the Bankruptcy Court in the Sale Order or otherwise agreed between Buyers and such applicable counter-party to such Assumed Contract; provided, however, that unless otherwise agreed by Sodexo, Foodbuy, and Aramark, the Cure Amounts related to such counterparties shall be paid on or about the Closing Date.

3.2.2    At the Closing, Buyers shall pay all recording costs or fees to record the Deed.  At the Closing, Buyers and Sellers shall split the Closing escrow fees 50/50.  At the Closing, Buyers shall pay all Transfer Taxes and all recording costs or fees to record any documents to release of record or cure Encumbrances other than Permitted Encumbrances.

3.3    Closing Date Prorations.  Except as otherwise set forth in this Agreement, all utility charges, rents or other payments under the Purchased Assets and all real property, personal property and similar Taxes with respect to the Purchased Assets shall be prorated as of the Closing Date based on the closing customs of the Hartford County Bar Association, except as otherwise expressly provided to the contrary in this Agreement.  All prorations shall be final.  The prorations

and adjustments provided for in this Section shall be made so that Sellers shall receive the income and be charged with the expense of the operation of the Real Property for the Closing Date.  Buyers shall receive a credit for all prorations due from Sellers as of Closing.

3.4    <u>Transfer Taxes</u>.  So long as the allocation of the Purchase Price to Real Property strictly comports with the allocations contained in <u>Section 3.5.1</u>, at Closing, Buyers shall pay all real property conveyance and similar Taxes and fees (for the avoidance of doubt, excluding either Party's income Taxes) ("***Transfer Taxes***").  Buyers will, at their own expense, file all necessary Tax Returns and other documentation with respect to all such Transfer Taxes.

3.5    <u>Allocation of Purchase Price</u>.

3.5.1    The Purchase Price (plus any Assumed Liabilities and other amounts properly taken into account under the Code) shall be allocated among the Purchased Assets based on an allocation schedule prepared by Buyers, which allocation schedule shall be prepared in accordance with Section 1060 of the Code (and any similar provision of state, local or foreign law, as appropriate) (the "***Allocation***"); <u>provided</u>, <u>however</u>, that the Parties agree that $13,000,000 of the Cash Purchase Price shall be allocated to the Real Property and the balance of the Purchase Price shall be allocated to the remaining Purchased Assets in accordance with the Allocation and the Sale Procedures Order.

3.5.2    Each Party will report, act and file Tax Returns (including IRS Form 8594) in all respects and for all purposes consistent with the Allocation.  No Party will take any position (or will allow any of their respective Affiliates to take any position) (whether in audits, Tax Returns, or otherwise) that is inconsistent with the Allocation, except, in each case, to the extent otherwise required by Applicable Law.

## IV.  REPRESENTATIONS AND WARRANTIES OF SELLERS.

On the date hereof and as of the Closing Date (or as of such specific date as may be specified in the applicable representation and warranty or covenant), each Seller, jointly and severally, hereby represent and warrant to Buyers as follows:

4.1    <u>Existence; Power</u>.  Each Seller is an entity duly organized and validly existing under the laws of the State of Connecticut.  Subject to the limitations imposed on each Seller as a result of the Bankruptcy Cases, each Seller has the requisite corporate power and authority and all governmental licenses, authorizations, permits, consents, and approvals required to carry on the Business as conducted.

4.2    <u>Authorization; Enforceability</u>.

4.2.1    Subject to entry of the Sale Order and such other authorization as is required by the Bankruptcy Court, each Seller's execution, delivery, and performance of this Agreement and the Ancillary Agreements, and the consummation of the transactions contemplated hereby and thereby, are within each such Seller's capacity, power and authority and have been duly authorized by all necessary corporate or limited liability company action.

4.2.2   Subject to entry of the Sale Order and such other authorization as is required by the Bankruptcy Court, each Seller has the requisite capacity, power and authority, and have taken all action necessary to execute and deliver this Agreement and each Ancillary Agreement and to consummate the transactions contemplated by this Agreement and each Ancillary Agreement. This Agreement and each Ancillary Agreement has been duly executed and delivered by each Seller, as applicable. Subject to entry of the Sale Order and such other authorization as is required by the Bankruptcy Court, this Agreement and each Ancillary Agreement constitutes a legal, valid and binding agreement of each Seller, enforceable against such Seller in accordance with its and their respective terms.

4.3   Governmental Authorization; No Conflict.

4.3.1   Except for (a) entry of the Sale Order and/or the Sale Procedures Order, and (b) notices, filings and consents required in connection with the Bankruptcy Cases, no Seller is required to give any notice to, make any filing with or obtain any consent from any Person (including any Governmental Authority) in connection with the execution and delivery by such Seller of this Agreement and the other Ancillary Agreements to which it is or will be a party or the consummation or performance by such Seller of any of the transactions contemplated hereby and thereby.

4.3.2   When the consents and other actions described in the preceding Section 4.3.1, including entry of the Sale Order, have been obtained and taken, the execution and delivery by Sellers of this Agreement and the other Ancillary Agreements to which such Seller is or will be a party and the consummation of the transactions provided for herein and therein will not result in the breach or violation of any of the terms and provisions of, or constitute a default under, or conflict with, or cause any acceleration of any obligation of any Seller under (a) the certificate of incorporation, operating agreement, bylaws or other governing documents of such Seller, or (b) any Applicable Law.

4.4   Permits. To the Knowledge of Sellers, Sellers have all Permits which are needed or required by applicable law to operate its business related to or affecting the Business or any ancillary services related thereto as currently conducted.

4.5   Intellectual Property. Schedule 4.5 sets forth an accurate and complete list of all registered Intellectual Property of Sellers used in the Business (the "***Registered Intellectual Property***"). Sellers own all right, title and interest to, or is a licensee with respect to, the Intellectual Property and can and will convey the Intellectual Property free and clear of all Claims and Encumbrances pursuant to the Sale Order. To the Knowledge of Sellers, (i) no Person is engaging in any activity that infringes, misappropriates or violates any Intellectual Property of Sellers, (ii) the operation of the Business (including its products and services) does not infringe, misappropriate or violation any Intellectual Property of any other Person or constitute unfair competition or unfair or deceptive trade practices under any Applicable law, and (iii) no Claim has been asserted or threatened that the use of any Intellectual Property of Sellers or the operation of the Business infringes, misappropriates or violates the Intellectual Property of any third party.

4.6   Plans and Material Documents. Schedule 4.6 sets forth a list of all benefit, retirement, employment, consulting, compensation, incentive, bonus, stock option, restricted

21

stock, stock appreciation right, phantom equity, change in control, severance, vacation, paid time off, welfare and fringe-benefit agreement, plan, policy and program in effect and covering one or more employees of the Business ("*Seller Employee*") or the beneficiaries or dependents of any Seller Employees, and is maintained, sponsored, contributed to, or required to be contributed to by either Seller, or under which either Seller has any material liability for premiums or benefits (each, a "*Sellers' Employee Plan*").  To the Knowledge of Sellers, each Sellers' Employee Plan has been maintained, funded and administered in accordance with the terms of such Sellers' Employee Plan and complies in form and in operation in all material respects with the applicable requirements of ERISA and the Code, except where the failure to comply would not have a material adverse effect on the Business.

      4.7    Real Property.

      4.7.1   Suri has sole, good and marketable fee simple title to the Real Property. Except as set forth on Schedule 4.7.1, to Sellers' Knowledge as of the Closing Date, there are no Encumbrances to the title of the Real Property, and that such Encumbrances individually and in the aggregate, do not materially interfere with the use and operation of the Real Property or the Business.  To Sellers' knowledge, there are no title or ownership disputes with respect to the Real Property.  Sellers are not aware of any claims for rights of passage, easements or other property rights over, on or to the Real Property, nor have Sellers received any written complaints or disputes from adjoining land owners during Suri's ownership of the Real Property.

      4.7.2   The Real Property is not subject to any lease, license, sublease, or other similar agreement granting to any Person any right to use, occupy or enjoy the Real Property or any portion thereof.  No party is in possession of the Real Property other than Sellers.

      4.7.3   Sellers have not received any written notice of (a) violations of building codes and/or zoning ordinances or other governmental or regulatory Laws affecting the Real Property, (b) existing, pending or threatened condemnation proceedings affecting the Real Property, (c) special assessments of any kind that have been levied or threatened against the Real Property, or (d) existing, pending or threatened zoning, building code or other moratorium proceedings, or similar matters which could reasonably be expected to materially and adversely affect the ability to operate the Real Property as currently operated.  The use of the Real Property for the Business is permitted by applicable Laws, including, without limitation, zoning Laws. Neither the whole nor any material portion of any Real Property has been damaged or destroyed by fire or other casualty.  Except as set forth in Schedule 4.7.3, there are no tax appeal or certiorari proceedings pending with respect to the Real Property.

      4.7.4   The Real Property is sufficient for the continued conduct of the Business after the Closing in substantially the same manner as conducted prior to the Closing and constitutes all of the Real Property necessary to conduct the Business as currently conducted.  Each structure and fixture on the Real Property is, to the Knowledge of Sellers, structurally sound with no known structural defects, and in good operating condition and repair (normal wear and tear excepted).

      4.7.5   To the Knowledge of the Sellers, there are no Hazardous Materials on or about the Real Property in violation of Environmental Laws.  To the Knowledge of the Sellers, the

Real Property is not an "establishment", as that term is defined in the Connecticut Property Transfer Act, Conn. Gen. Stat. Section 22a-134 et seq. as amended.

4.7.6    Neither Seller is a "foreign person" as such term is defined in Section 1445(f)(3) of the Internal Revenue Code of 1986, as amended.

4.7.7    Neither Sellers nor any of their affiliates (a) is listed on the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Asset Control, Department of the Treasury ("**OFAC**") pursuant to Executive Order No. 13224, 66 Fed. Reg. 49079 (September 25, 2001) (the "**OFAC Order**"); (b) is listed on any other list of terrorists or terrorist organizations maintained pursuant to the OFAC Order, the rules and regulations of OFAC or any other applicable requirements contained in any enabling legislation or other Executive Orders in respect of the OFAC Order; (c) is engaged in activities prohibited in the OFAC Order; or (d) has been convicted, pleaded nolo contendere, indicted, arraigned or custodial detained on charges involving money laundering or predicate crimes to money laundering.

4.7.8    The Seller Tangible Property constitutes all furniture, fixtures, equipment, machinery, tools, vehicles, office equipment, supplies, computers, telephones and other tangible personal property used in connection with the Real Property and/or Business.

4.8    <u>Employees and Contractors</u>.    Sellers have provided Buyers with a true, complete and correct list of all employees of the Sellers, specifying their position, annual salary, date of hire, and bonus and commission terms. Except as set forth on <u>Schedule 4.8</u>, Sellers have no Knowledge of any complaints before or claims by a Governmental Authority regarding employment discrimination, safety or other employment-related charges or complaints, wage and hour claims, unemployment compensation claims, workers' compensation claims or the like. No Seller (i) is party to or bound by any collective bargaining or similar agreement with any labor organization, and (ii) has no employees that are represented by any labor organization.  To the Knowledge of Sellers, there are no union organizing activities among any employees of any Seller.

4.9    <u>Finders' Fees</u>.    Except for any Person(s) whom Sellers shall be solely responsible for any fees or commissions owing, there is no investment banker, broker, finder or other intermediary that has been retained by or is authorized to act on behalf of Sellers who might be entitled to any fee or commission in connection with the transactions contemplated by this Agreement or any of the Ancillary Agreements.

4.10    <u>Title to and Condition of Assets</u>.    The Sellers have title to, or a valid leasehold interest in, all of the Purchased Assets, free and clear of all Liens or Encumbrances, except as set forth on <u>Schedule 4.10</u>.  Upon consummation of the transactions contemplated hereby and by the Ancillary Agreements, Buyers will acquire title to all of the Purchased Assets, free and clear of all Liens and Encumbrances (except for the Permitted Encumbrances).  The Purchased Assets include, without limitation, all material tangible and intangible assets necessary for the conduct of the Business as it is currently conducted.

4.11    <u>Taxes</u>.    Except as set forth on <u>Schedule 4.11</u>, no Seller (i) has received any outstanding notice of audit, (ii) is undergoing any audit, of Tax Returns relating to the Business and (iii) has ever received any written notice of deficiency or assessment from any taxing authority

with respect to liability for Taxes relating to the Business which has not been fully paid or finally settled. Each Seller has complied in all material respects with all Applicable Laws, rules and regulations relating to the payment and withholding of Taxes and has withheld all amounts required by Applicable Law to be withheld from the wages or salaries of employees and independent contractors of the Business and is not liable for any Taxes with respect to the employees and independent contractors of the Business for failure to comply with such laws, rules and regulations.

4.12    Compliance with Laws.  To the Knowledge of Sellers, each Seller is, and, and to the Knowledge of the Sellers, for the last six (6) years has been, in compliance with all Applicable Laws, except where such failure to comply has been cured without any continuing Liability on the part of a Seller or would not have a Material Adverse Effect.  Except as set forth on Schedule 4.12, no Seller has received any notice from any Governmental Authority regarding any actual or alleged material violation of, any of failure to comply in any material respect with, any Applicable Laws, except where such actual or alleged violation has been cured without any continuing Liability on the part of a Seller or would not have a Material Adverse Effect.

4.13    Certain Material Contracts.  Sellers have delivered to Buyers or Assignor true, accurate and complete copies of the Contracts set forth on Schedule 4.13 (including all amendments thereto).

4.14    Financial Statements.  Schedule 4.14 sets forth the unaudited consolidated financial statements of the Sellers as of January 31, 2021, consisting of the consolidated balance sheet of the Sellers as of January 31, 2021, and the related statements of income, retained earnings, stockholders' equity and cash flow for the month then ended (the "***Most Recent Financial Statements***").  The Most Recent Financial Statements have been prepared in accordance with GAAP or consistent with methodologies historically applied on a consistent basis throughout the period involved, subject to normal and recurring year-end adjustments (the effect of which will not be materially adverse) and the absence of notes.  The Most Recent Financial Statements are based on the books and records of the Business, and, to the Knowledge of Sellers, fairly present in all material respect the financial condition of the Business as of January 31, 2021 and the results of the operation of the Business for the one-month period then ended.

4.15    Inventory.  No Inventory is held on a consignment basis.

4.16    Regulatory Events.  To the Knowledge of the Sellers, within the last two (2) years, none of the Sellers nor any of the products produced or sold by any Seller has experienced or been the subject of any audit (other than any BRC Audit, the use tax audit by the Connecticut department of revenue, and an ongoing review by the Occupational Safety and Health Administration relating to a pre-Closing accident at the Facility), recall, market withdrawal, or safety alerts. To the Knowledge of the Sellers, no product produced or sold by any Seller that has been delivered to any present or former customer of any Seller has been mislabeled or misbranded.  To the Knowledge of the Sellers, all claims and statements made by any Seller, and all Persons acting on behalf of the Sellers, in advertising, labeling and packaging of the products of the Sellers are true and accurate in all material respects and comply with all Applicable Laws.

4.17   Customers.   Schedule 4.17 sets forth a complete and accurate list of (a) each of the top five (5) distributor customers of CPI and the top five (5) national account customers of CPI, based on revenue for the last full fiscal year (collectively, the "***Material Customers***").   No Material Customer, as of or prior to the date of this Agreement, has cancelled, materially curtailed or terminated or, threatened or otherwise indicated in writing its intent to cancel, terminate or materially curtail, its relationship with CPI.

4.18   Proceedings.   Except as set forth on Schedule 4.18, there is no Proceeding pending or, to the Knowledge of the Sellers, threatened in writing against or affecting any Seller or any of the Purchased Assets.

## V.  REPRESENTATIONS AND WARRANTIES OF BUYERS.

As of the Closing Date (or as of such specific date as may be specified in the applicable representation and warranty or covenant), each Buyer and Assignor represents and warrants to Sellers as follows:

5.1   Existence; Power.   Each Buyer and Assignor is duly formed, validly existing, and in good standing as a limited liability company under the laws of the State of Wisconsin.

5.2   Authorization; Enforceability.

5.2.1   Each Buyer and Assignor's execution, delivery, and performance of this Agreement and the Ancillary Agreements, and the consummation of the transactions contemplated hereby and thereby, are within such Buyer's capacity, power and authority and have been duly authorized by all necessary limited liability company action.

5.2.2   Each Buyer and Assignor has the requisite capacity, power and authority, and have taken all action necessary to execute and deliver this Agreement and each Ancillary Agreement and to consummate the transactions contemplated by this Agreement and each Ancillary Agreement.   This Agreement and each Ancillary Agreement has been duly executed and delivered by Buyer.   This Agreement and each Ancillary Agreement constitutes a legal, valid and binding agreement of Buyers and Assignor, enforceable against Buyers and Assignor in accordance with its and their respective terms.

5.3   Governmental Authorization; No Conflict.

5.3.1   Except for the entry of the Sale Order, none of (i) the execution, delivery and performance by each Buyer and Assignor of this Agreement or (ii) the execution, delivery, and performance by a Buyer of each of the Ancillary Agreements to which each such Buyer and Assignor is, as contemplated by this Agreement, to become a party, requires or will require any action by or in respect of, or filing with, any Governmental Authority.

5.3.2   The execution and delivery by Buyers and Assignor of this Agreement and the other Ancillary Agreements to which Buyers and Assignor is or will be a party and the consummation of the transactions provided for herein and therein will not result in the breach or violation of any of the terms and provisions of, or constitute a default under, or conflict with, or cause any acceleration of any obligation of Buyers under (a) the certificate of incorporation,

25

operating agreement, bylaws or other governing documents of such Seller, or (b) any Applicable Law.

5.4     Adequate Funds.  At the Closing, Buyers will have adequate funds available to them in order to consummate the transactions contemplated by this Agreement and the Ancillary Agreements and to perform its obligations hereunder and thereunder.

5.5     Finders' Fees.  Except for Alantra LLC, for whom Buyers shall be solely responsible for any fees or commissions owing, there is no investment banker, broker, finder, or other intermediary that has been retained by or is authorized to act on behalf of Buyers or any Affiliate of either Buyer, who might be entitled to any fee or commission in connection with the transactions contemplated by this Agreement or any of the Ancillary Agreements.

5.6     Bankruptcy.  There are no bankruptcy, reorganization or arrangement Proceedings pending, being contemplated by or, to the Knowledge of each Buyer or Assignor, threatened against either Buyer or against Assignor.

5.7     Condition of Assets: Disclaimers.  Except as expressly provided in this Agreement, each Buyer acknowledges that it has fully inspected or waived the right to inspect the Purchased Assets prior to the execution of this Agreement and does hereby assume all of the risks, including, but not limited to, latent defects in the Real Property.  Sellers shall not be obligated to do any work or alter, restore, repair or develop the Real Property. Any work (including demolition) which may be necessary to adapt the Real Property and any improvements thereon for each Buyer's occupancy or for the operation of Buyers' business shall be the sole responsibility of Buyers and shall be performed by Buyers at its sole cost and expense.

5.7.1    Except as expressly provided in this Agreement, Buyers expressly acknowledges and warrants that Buyers is accepting the Purchased Assets and Real Property as of the Closing in an "AS IS", "WHERE IS", and "WITH ALL FAULTS CONDITION" and all latent or patent defects with regard to all aspects of the Real Property without warranty or representation of any kind by Sellers or any of Sellers' managers, members, officers, directors, employees, partners, agents, representatives, beneficiaries, attorneys, subsidiaries, Affiliates, successors and assigns, including specifically and without limitation, any warranty or representation as to the presence or absence of any Hazardous Materials. Buyers, hereby agree to release, Sellers  with regard to any demand, claim, liability, loss or damage, including reasonable attorneys' fees and costs, arising from (x) any Hazardous Materials currently located or which come to be located upon the Real Property or the release of any Hazardous Materials into, from or through the Real Property (except to the extent the presence or release thereof was directly caused by the affirmative acts of Seller, its employees, agents or contractors from and after the Execution Date) or (y) any Hazardous Materials which have migrated, leached, or traveled onto or off of the Real Property, from any source.

5.7.2    Buyers and Sellers further acknowledge and agree that in entering into this Agreement and closing the transactions hereunder, except as otherwise provided for in the representations and warranties in Article 4 of this Agreement:

91659665v.5

(i)    SELLERS MAKE NO REPRESENTATIONS, WARRANTIES, OR GUARANTEES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO: ANY MATTER RELATED TO THE REAL PROPERTY (INCLUDING, WITHOUT LIMITATION, INCOME TO BE DERIVED FROM OR EXPENSES TO BE INCURRED IN CONNECTION WITH THE REAL PROPERTY; THE PHYSICAL CONDITION OF THE REAL PROPERTY; THE PRESENCE OR ABSENCE OF ANY HAZARDOUS MATERIALS IN, ON OR ABOUT THE REAL PROPERTY OR ANY OTHER MATTER RELATED TO THE ENVIRONMENTAL CONDITION OF THE REAL PROPERTY; THE ZONING OF THE REAL PROPERTY; THE POSSIBILITY OF DEVELOPING OR USING THE REAL PROPERTY IN THE MANNER CONTEMPLATED BY BUYER OR OBTAINING ANY CONSENTS, APPROVALS, PERMITS, AUTHORIZATIONS OR ENTITLEMENTS IN CONNECTION THEREWITH; THE VALUE OF THE REAL PROPERTY; THE FITNESS OF THE REAL PROPERTY, FOR ANY PARTICULAR PURPOSE OR USE; THE ACCURACY, COMPLETENESS, OWNERSHIP OR TRANSFERABILITY OF ANY DOCUMENTS OR OTHER MATERIALS FURNISHED TO BUYERS WITH RESPECT TO THE REAL PROPERTY (OR ANY PORTION THEREOF); OR ANY OTHER MATTER OR THING RELATED TO THE REAL PROPERTY). SELLERS HAS MADE COMMERCIALLY REASONABLE EFFORTS TO LIST ITS PURCHASED ASSETS, BUT DISCLAIMS ANY LIABILITY FOR ANY INACCURACY IN THE DESCRIPTION OF THE PURCHASED ASSETS.; BUYER HAS RELIED ON ITS OWN DUE DILIGENCE AND INVESTIGATION AND IS NOT RELYING ON ANY EXPRESS OR IMPLIED REPRESENTATIONS OR WARRANTIES OF SELLERS, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES OF THE SELLERS SET FORTH HEREIN.

(ii)    BUYERS ACKNOWLEDGE THAT BUYERS HAVE NOT RELIED, AND IS NOT RELYING, UPON ANY INFORMATION, DOCUMENT, SALES BROCHURES OR OTHER LITERATURE, MAPS OR SKETCHES, PROJECTIONS, PRO FORMAS, STATEMENTS, REPRESENTATIONS, GUARANTEES OR WARRANTIES (WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, OR MATERIAL OR IMMATERIAL) THAT MAY HAVE BEEN GIVEN BY OR MADE BY OR ON BEHALF OF SELLERS; BUYERS HAVE RELIED ON ITS OWN DUE DILIGENCE AND INVESTIGATION AND IS NOT RELYING ON ANY EXPRESS OR IMPLIED REPRESENTATIONS OR WARRANTIES OF SELLERS, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES OF THE SELLERS SET FORTH HEREIN.

91659665v.5

## VI.  BANKRUPTCY MATTERS.

6.1     Bankruptcy Court Approval.

6.1.1     Sellers and Buyers each acknowledge that this Agreement and the sale of the Purchased Assets to Buyers and the assumption of the Assumed Liabilities by Buyers are subject to Bankruptcy Court approval.  Buyers acknowledges that (a) to obtain such approval, Sellers must demonstrate that they have taken reasonable steps to obtain the highest and otherwise best offer possible for the Purchased Assets, and that such demonstration will include giving notice of the transactions contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court, and, if necessary, conducting the Auction, and (b) Buyers must provide adequate assurance of future performance as required under the Bankruptcy Code with respect to each Assumed Contract.

6.1.2     Stalking Horse Status.  Sellers confirms that it is critical to the process of arranging an orderly sale of the Purchased Assets to proceed by selecting Buyers as its "stalking horse" (the "Stalking Horse") to enter into this Agreement in order to present the Bankruptcy Court with arrangements for obtaining the highest realizable price for the Purchased Assets and that, without Buyers having committed substantial time and effort to such process, Sellers' estates would have to employ a less orderly process of sale and thereby incur higher costs and risk attracting lower prices. In recognition of the foregoing Sellers agree as follows:

(i)     Sellers acknowledges that Buyers would not have invested the effort in negotiating and documenting the transaction provided for herein and incurring the obligations to pay its outside advisors and legal counsel if Buyers were not paid the Break-Up Fee, in the event that Buyers do not purchase the Purchased Assets due to the termination of this Agreement as a result of an Alternative Transaction;

6.1.3     Sale Order. Buyers agree that they will take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Buyers of the Assumed Contracts, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyers under this Agreement and demonstrating that Buyers are "good faith" purchasers under Section 363(m) of the Bankruptcy Code.

6.2     Bidding Procedures.  Buyers agree and acknowledge that Sellers, including through their respective Representatives, are bound by the Sale Procedures Order, and may continue soliciting inquiries, proposals, or offers from Third Parties for all or any part of the Purchased Assets, and are and may continue discussing and negotiating such inquiries, proposals or offers and providing information to Third Parties in connection therewith, as contemplated by the Bidding Procedures.

6.3     Backup Bidder.  [reserved].

91659665v.5

6.4     <u>Sale Order</u>.     If any conflict arises between the terms of this Agreement or any Ancillary Agreements, on the one hand, and the Sale Order, on the other, the terms of the Sale Order shall control in all respects.

## VII.  ADDITIONAL AGREEMENTS.

7.1     <u>Employee Matters</u>.

7.1.1     Prior to the Closing, Buyers shall offer to employ, in writing, not fewer than 90% of Seller Employees with employment commencing as of the Closing.   For purposes of this Agreement, each Seller Employee who receives such an offer of employment shall be referred to as an "***Offeree***."   Not later than five (5) Business Days prior to the Closing Date, Buyers will provide Sellers with a schedule setting forth a list of the names of all Offerees.  Each Offeree who accepts such offer prior to the Closing shall be referred to herein as a "***Transferred Employee***". Buyers hereby agree that the offer to an Offeree shall include a level of base salary, base wages and benefits eligibility that is substantially comparable in the aggregate to the base salary, base wages and benefit eligibility provided to such Offeree as of immediately prior to the Closing Date, to the extent consistent with the terms and conditions for such Offeree disclosed to the Buyers or Assignor prior to the date hereof.   Buyers acknowledge and agree that the Buyers shall be exclusively liable for any claims related to discrimination that arise solely from Buyers' actions taken in selecting any Offerees.

7.1.2     Buyers shall provide COBRA continuation coverage (within the meaning of Section 4980B of the IRC and the Treasury Regulations thereunder) to all Seller Employees and their respective qualified beneficiaries, in each case, who are M&A Qualified Beneficiaries (within the meaning assigned to such term under Q&A-4 of Treasury Regulation Section 54.4980B-9) with respect to the sale of the Purchased Assets to Buyers.

7.1.3     Sellers shall not take any action that would impede, hinder, interfere or otherwise compete with Buyers' efforts to hire any Transferred Employees.  Sellers hereby consent to the hiring of any Transferred Employees and waive, with respect to the employment by Buyers of such Transferred Employees, any claims or rights the Sellers may have against Buyers, its Affiliates or any such Transferred Employee under any non-competition, confidentiality or employment agreement between any such Seller and any such Transferred Employee.  The Parties acknowledge and agree that the Buyers shall have no responsibility for the payment of any severance, payment or other benefits that become due to any current or former Seller Employee (whether or not such Seller Employee becomes a Transferred Employee), officer, director, member, partner, or independent contractor as a result of the termination of such individual by such Seller and for any periods prior to the Closing Date, except for the Accrued PTO Liability and the Assumed Payroll.

7.1.4     At the Buyers' option, Buyers may agree in writing subsequent to the execution of this Agreement, but prior to the entry of the Sale Order, to assume some or all of the Sellers' Employee Benefit Plans (the "***Assumed Plans***").  In the case of such election, prior to the Closing, Buyers and Sellers will take such actions as are reasonably necessary to cause the Assumed Plan Liabilities to transfer to Buyers and to facilitate Buyers' assumption of such Assumed Plan Liabilities, in each case effective as of the Closing.

29

7.1.5    At the Closing, Buyers shall assume and recognize as Assumed Liabilities with respect to each Transferred Employee any accrued but unused paid time off for periods prior to the Closing Date (collectively, the "***Accrued PTO Liability***") and the Assumed Payroll.

7.1.6    Nothing in this Agreement is intended to confer upon any past, present or future employee of either Seller any rights as a third-party beneficiary or otherwise or any other rights or remedies of any nature or kind whatsoever under or by reason of the transactions contemplated by this Agreement, including, without limitation, any rights of employment, continued employment or any rights under or with respect to any employee benefit, welfare benefit, pension or other fringe benefit plan, fund, program or arrangement.

7.2    Use of Name.  Sellers agree that, upon the Closing, Buyers shall have the sole right to the use of the name "Carla's Pasta" or similar names and any service marks, trademarks, trade names, d/b/a names, fictitious names, identifying symbols, logos, emblems, signs or insignia related thereto or containing or comprising the foregoing, or otherwise used in the Business, including any name or mark confusingly similar thereto (collectively, the "***Seller Marks***"). Following the Closing, the Sellers shall not use such name or any variation or simulation thereof or any of the Seller Marks and, in the case of CPI, shall promptly following the Closing change its corporate name to a name that does not include any of the Seller Marks.  In addition, Sellers shall, within three (3) business days following the Closing, file a motion with the Bankruptcy Court seeking authority to amend the caption in the Bankruptcy Cases to reflect the foregoing name change.

7.3    Open Purchase Orders.  At least three (3) days before Closing, but no more than seven (7) days before Closing, Sellers shall deliver to Buyers a true, complete and accurate detailed list of all open purchase orders with suppliers for any Inventory.

7.4    Collection of Accounts Receivable.  As of the Closing Date, Sellers agree that any monies, checks or negotiable instruments (excluding Cash and Cash Equivalents as of the Closing Date) received or identified by any Party after the Closing Date with respect to Accounts Receivable received by either Seller after the Closing shall be held in trust by such Seller for such Buyer's benefit and accounts, not commingled with other funds of such Seller, and promptly upon receipt by Seller of any such payment, Seller shall pay over to Buyers the amount of such payments without any right of set-off or reimbursement.  As of the Closing Date, Buyers shall have the sole authority to bill and collect Accounts Receivable relating to products sold by Buyers after the Closing.  Notwithstanding the foregoing, Buyers agree that, after the Closing, they will hold and will promptly transfer and deliver to Sellers, from time to time as and when received or identified by either Buyer, any cash, checks with appropriate endorsements, payment of an account, trade, note receivable or other payment or property or assets that either Buyer may receive or identify on or after the Closing which properly belongs to the Sellers as an Excluded Asset.

7.5    Conduct of Business.   Except as otherwise expressly contemplated by this Agreement or with the prior written consent of Buyers, from the date hereof until the Closing Date, unless this Agreement is terminated, each Seller shall use commercially reasonable efforts to preserve intact the Purchased Assets. Without limiting the generality of the foregoing, each Seller will, unless this Agreement has terminated, other than in the ordinary course of business or with either Buyer's prior written consent (which shall not be unreasonably withheld, delayed or

30

conditioned), refrain from doing any of the following in respect of the Purchased Assets: (i) disposing of, or transferring, any Purchased Asset, (ii) transferring any tangible Purchased Asset to any other location to the extent that such other location is not otherwise part of the Purchased Assets, or (iii) except as otherwise provided or required in this Agreement, terminating, amending or modifying the material terms of any of the Assumed Contracts.

7.6     Efforts; Cooperation.

7.6.1     Unless this Agreement has terminated, Sellers shall promptly inform Buyers in writing of the occurrence of any event that has had, or is reasonably expected to have, a Material Adverse Effect or otherwise cause the failure of any of Buyer's conditions to Closing set forth in Article 10.

7.6.2     Subject to the other provisions hereof, and unless this Agreement has terminated, each Party shall use commercially reasonable efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper or advisable under Applicable Laws to cause the transactions contemplated herein to be effected as soon as practicable, but in any event on or prior to the Outside Date, in accordance with the terms hereof and shall cooperate in a commercially reasonable manner with each other Party and its Representatives with any step required to be taken as a part of its obligations hereunder.

7.6.3     Unless this Agreement has terminated, Sellers shall use their best efforts to obtain and deliver to the Buyers, as promptly as possible following the date of this Agreement, a so called Phase I environmental site assessment for the Real Property, prepared by a licensed environmental professional, dated within three (3) months of Closing, certified to Buyers or Assignor, showing no recognized environmental conditions and otherwise in form and substance reasonably acceptable to Buyers or Assignor.

7.6.4     Sellers shall deliver evidence of the successful completion of the BRC Audit to the Buyers; provided, however, that the Parties understand that the Sellers may not receive the results of the BRC Audit until after the Closing Date.

7.7     Access to Information; Reporting.   Prior to and through the date on which the Closing occurs or this Agreement is terminated, each Seller shall cooperate with Buyers and shall give Buyers and their Representatives (including Buyers' accountants, lenders, consultants, counsel and employees), upon reasonable notice and during normal business hours, full access to the properties, contracts, leases, equipment, employees, affairs, books, documents, records and other information of such Seller to the extent relating to the Business, the Purchased Assets, Assumed Liabilities, and any other aspect of this Agreement and shall cause their respective officers, employees, agents and representatives to furnish to Buyers all available documents, records and other information (and copies thereof), to the extent relating to the Business, the Purchased Assets, Assumed Liabilities, and any other aspect of this Agreement, in each case, as Buyers may reasonably request.   Each Wednesday following the date of this Agreement through the Closing Date, the Debtors shall provide the Buyers with a copy of the statement provided to the Sellers' secured lender and creditor committee that compares actual cash receipts with budgeted cash receipts for the immediately prior weekly period and comparing actual expenditures with budgeted expenditures for such weekly period by line item.   Notwithstanding anything herein

to the contrary, Sellers shall retain a copy of all Books and Records solely to facilitate the Sellers' administration of the Bankruptcy Case and wind down of the Business related to the Excluded Assets; provided, however, that Sellers shall not disclose any confidential, proprietary or non-public Books and Records to any Third Party without the prior written consent of either Buyer or further order of the Bankruptcy Court.  Promptly following the date hereof, Sellers shall deliver to Buyers a true, complete and accurate list all material Permits owned or held by or issued to any Seller relating to the ownership or operation of the Business, the Purchased Assets or Real Property.

7.8    Further Assurances.  Following the Closing, each of the Parties shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the Ancillary Documents.

7.9    Avoidance Actions.  Following the Closing, the Buyers shall not pursue or enforce any of the Avoidance Actions.

## VIII.  CLOSING DELIVERABLES.

8.1    Closing Deliverables of Sellers.  Sellers hereby agree to deliver the following documents, or hereby cause the following documents to be delivered, to the applicable Buyer:

8.1.1    a Master Assignment and each other Ancillary Agreement to which a Seller is a party (including letters-in-lieu of transfer orders) duly executed (and acknowledged, where applicable) by each Seller;

8.1.2    such other instruments of assignment or conveyance duly executed by the applicable Seller as shall be reasonably requested or reasonably necessary to transfer the Purchased Assets to the applicable Buyer in accordance with this Agreement;

8.1.3    possession of the Real Property, together with a duly executed, witnessed and acknowledged warranty deed in form and substance reasonably satisfactory to NFP RE and the Title Company, suitable for recording, as applicable for the Real Property, conveying fee simple title in the Real Property to NFP RE, subject only to Permitted Encumbrances (the "**Deed**");

8.1.4    a State of Connecticut Real Estate Conveyance Tax Return (Form OP-236) duly executed by Sellers;

8.1.5    a Foreign Investment in Real Property Tax Act affidavit executed by Seller;

8.1.6    evidence of the existence, organization and authority of Sellers and of the authority of the persons executing documents on behalf of Sellers reasonably satisfactory to Buyers and the underwriter for the Title Company;

8.1.7    possession of the Seller Tangible Property;

8.1.8    all other documents affecting title to or possession of the Real Property and reasonably necessary to transfer or assign the same to NFP RE as provided herein and such other instruments as may be reasonably requested by the selected Title Company to complete the Closing of the sale of the Real Property (including, without limitation, a customary title affidavit);

8.1.9    a copy of the Sale Order, certified by the Bankruptcy Court (for recording purposes);

8.1.10    a certificate pursuant to Treasury Regulations Section 1.1445-2(b) that each Seller is not a foreign person within the meaning of Section 1445 of the Code, in form and substance reasonably acceptance to Buyers, duly executed and delivered by each Seller;

8.1.11    the Closing Certificate; and

8.1.12    such other usual and customary documents, instruments, and certificates as Buyers may reasonably request.

8.2    <u>Closing Deliverables of Buyers</u>.   Buyers hereby agree to deliver the following documents, or hereby cause the following to be delivered, to Sellers:

8.2.1    all payments required to be made pursuant to <u>Section 3.2</u>;

8.2.2    a Master Assignment and each other Ancillary Agreement to which either Buyer is a party (including letters-in-lieu of transfer orders), duly executed (and acknowledged, where applicable) by such Buyer;

8.2.3    an executed certificate of the managers or managing members, as applicable, of both Buyers, in a form reasonably satisfactory to the Sellers, as to (a) the approval of the execution and delivery of this Agreement and the other documents contemplated hereby and the consummation of the transactions contemplated thereby, (b) the certificate of formation of such Buyer, and (c) the incumbency and true signatures of the officers, managers or managing members, as applicable, of such Buyer who executed this Agreement or will execute any other document contemplated hereby on behalf of such Buyer;

8.2.4    in accordance with <u>Section 7.1.1</u>, an offer letter for employment of the requisite number of Seller Employees; and

8.2.5    such other usual and customary documents, instruments, and certificates as Sellers may reasonably request.

## IX.  CONDITIONS PRECEDENT TO SELLERS' OBLIGATION TO CLOSE.

Sellers' obligation to consummate the Closing is subject to the satisfaction or, to the extent permitted by Applicable Law, waiver in writing by the applicable Seller, at or prior to the Closing, of each of the following conditions:

9.1    <u>Accuracy of Representations</u>. The representations and warranties of Buyers contained in Article 5 and any Ancillary Agreement (provided, that any such representation or

warranty that is subject to any materiality, material adverse effect or similar qualification) shall be true and correct in all respects after giving effect to any such qualification), will be true and correct in all material respects at and as of the Closing, as if made at and as of such time, except to the extent expressly made as of an earlier date, in which case as of such earlier date.

9.2     <u>Buyers' Performance</u>. (i) Buyers will have performed, and will not have breached, its covenants that it is required to perform pursuant to this Agreement prior to the Closing, and (ii) Sellers will have received a certificate of each Buyer certifying the satisfaction of the conditions set forth in <u>Section 9.1</u> and the preceding clause (i) of this <u>Section 9.2</u> signed by a duly authorized officer thereof.

9.3     <u>Buyers' Deliveries</u>.   Each of the deliveries required to be made to Sellers pursuant to <u>Section 8.2</u> will have been delivered (or Buyers will make such deliveries at the Closing).

9.4     <u>Government Orders</u>.   There shall not be in effect any order, writ, injunction, judgment or decree entered by a Governmental Authority, or any Law preventing, enjoining, restraining, making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or any Ancillary Agreements.

9.5     <u>No Injunction</u>.   There must not be in effect any Laws or any injunction or other Order that (a) prohibits the sale of the Purchased Assets by Sellers to Buyers and (b) has been adopted or issued, or has otherwise become effective, since the date hereof.

9.6     <u>Entry of Sale Order</u>.   The Sale Order shall have been entered by the Bankruptcy Court and shall have become a Final Order. All conditions contemplated by the Sale Order to consummate the transactions contemplated hereby shall have been satisfied or waived.

## X.  CONDITIONS PRECEDENT TO BUYERS' OBLIGATION TO CLOSE.

Buyers' obligation to consummate the Closing is subject to the satisfaction or, to the extent permitted by Applicable Law, waiver in writing by Buyers, at or prior to the Closing, of each of the following conditions:

10.1     <u>Accuracy of Representations</u>. The representations and warranties of Sellers contained in Article 4 and any Ancillary Agreement (provided, that any such representation or warranty that is subject to any materiality, Material Adverse Effect or similar qualification shall be true and correct in all respects after giving effect to any such qualification), will be true and correct in all material respects at and as of the Closing, as if made at and as of such time, except to the extent expressly made as of an earlier date, in which case as of such earlier date.

10.2     <u>Sellers' Performance</u>. (i) Sellers will have performed, and will not have breached their, covenants that they are required to perform pursuant to this Agreement prior to the Closing, and (ii) Buyers will have received a certificate of Sellers certifying the satisfaction of the conditions set forth in <u>Section 10.1</u> and the preceding clause (i) of this <u>Section 10.2</u> signed by a duly authorized officer thereof.

10.3     <u>Sellers' Deliveries.</u> Each of the deliveries required to be made to Buyers pursuant to <u>Section 8.1</u> will have been delivered (or Sellers will make such deliveries at the Closing).

91659665v.5

10.4     Government Orders.  There shall not be in effect any order, writ, injunction, judgment or decree entered by a Governmental Authority, or any Law preventing, enjoining, restraining, making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or any Ancillary Agreements.

10.5     No Injunction. There must not be in effect any Laws or any injunction or other Order that (i) prohibits the sale of the Purchased Assets by Sellers to Buyers and (ii) has been adopted or issued, or has otherwise become effective, since the date hereof.

10.6     Entry of Sale Order.  The Sale Order shall have been entered by the Bankruptcy Court, shall have become a Final Order, and shall be in full force and effect, and all conditions contemplated by the Sale Order to consummate the transactions contemplated hereby shall have been satisfied or waived.

10.7     Title.  The Title Company is prepared to issue, as of the Closing Date, an Owner's Policy of Title Insurance in a customary form, insuring NFP RE's fee interest in the Real Property subject only to the Permitted Encumbrances upon payment by Buyers of the premium for such policy (it being acknowledged and agreed said premium shall be at Buyers' sole cost and expense).

10.8     Funding of Customer Rebates.  (a) The Sellers shall have delivered evidence to the Buyers of the payment by the Sellers of no less than $150,429 to Sodexo, Foodbuy and Aramark in respect of customer rebate Liabilities of the Sellers for periods prior to March 26, 2021, and (b) following March 26, 2021, but prior to or in connection with Closing (and no later than the Closing Date), the Sellers shall have paid or shall cause to paid in connection with Closing an aggregate amount of $178,354.82 to Sodexo, Foodbuy and Aramark in respect of customer rebate Liabilities of the Sellers for periods prior to the Closing.

10.9     No Material Adverse Effect.  Since the date of this Agreement, there shall have been no Material Adverse Effect.

## XI.  TERMINATION.

11.1     Termination Events.  Notwithstanding anything herein to the contrary, this Agreement may be terminated at any time prior to the Closing:

11.1.1  by written mutual consent of Sellers and Buyers;

11.1.2  by either Buyers or Sellers, if the Closing has not occurred on or prior to 5:00 p.m. (E.T.) on April 30, 2021 (the "*Outside Date*"); provided, however, that if the Closing shall not have occurred on or before the Outside Date due to a breach of any representation, warranty, covenant or agreement contained in this Agreement by Sellers or Buyers, then the breaching Party may not terminate this Agreement pursuant to this Section 11.1.2;

11.1.3  by either Buyers or Sellers, upon written notice to the other Party, if the other Party is in material breach or default of any provision of this Agreement, which breach is not cured within ten (10) Business Days after written notice thereof is received, provided, however, that the terminating Party is not in material breach or default of this Agreement;

35

11.1.4  by either Buyers or Sellers if (i) the sale is disapproved by the Bankruptcy Court, or (ii) to the extent not previously terminated pursuant to another subsection of this Section 11.1, upon the closing of an Alternative Transaction;

11.1.5  by either Buyers or Sellers, if, prior to Closing, the Sale Order, after being entered by the Bankruptcy Court, has subsequently been reversed, revoked, or voided, or amended or modified (or required to be amended or modified) in form and substance no longer satisfactory to the Buyers, by an order of a court of competent jurisdiction; and

11.1.6  by either Buyers or Sellers, if the Bankruptcy Cases are dismissed in whole or in part or converted to Chapter 7 of the Bankruptcy Code for any reason;

11.1.7  by either Buyers or Sellers, upon the conclusion of the Auction, if Buyers are not selected as the Successful Bidder or the Backup Bidder.

11.2    <u>Effect of Termination</u>.

11.2.1 Termination, plus any rights the Parties shall have under this Section regarding the Deposit, any Break-Up Fee, shall be the sole remedy of the Parties for a breach of this Agreement.  If the Closing does not occur in accordance with this Agreement and either Buyer has defaulted under or breached this Agreement, then Buyers and Assignor will be deemed to have forfeited its Deposit as liquidated damages.  If the Closing does not occur in accordance with this Agreement and neither Buyer has defaulted or breached this Agreement, the Deposit will be returned to Buyers or Assignor, and, in the event of an Alternative Transaction, Buyers shall be paid the Break-Up Fee from the proceeds of the Alternative Transaction in complete satisfaction of any and all claims and causes of action arising in and out of any breach or default of this Agreement by Sellers.

11.2.2 The Parties intend that the Deposit constitute compensation, and not a penalty.  The Parties acknowledge and agree that the either Party's harm caused by the other Party's default or breach of this Agreement would be impossible or very difficult to accurately estimate as of the date of this Agreement, and that Deposit (or return of the Deposit, as the case may be, and the Break-Up Fee in circumstances where applicable) is a reasonable estimate of the anticipated or actual harm that might arise from such a default or breach.  The transfer and/or return of the Deposit (and payment of the Break-Up Fee in circumstances where applicable) is each Party's sole liability and entire obligation and the exclusive remedy for the other Party's default or breach of this Agreement.

11.2.3 Immediately upon the occurrence of any termination of this Agreement pursuant to <u>Section 11.1.1</u>, <u>Section 11.1.2</u> (where (i) either Buyer is the terminating Party, unless the failure of the Closing to occur by the Outside Date shall be due to the failure of the either Buyer to comply with any of the covenants or agreements to be performed or complied with it prior to the Closing), or (ii) the Sellers are the terminating Party, and one or more of the closing conditions in Article 10 (other than conditions which, by their nature, are to be satisfied on the Closing Date) were not satisfied by the Outside Date), <u>Section 11.1.3</u> (where either Buyer is the terminating Party), <u>Section 11.1.4</u>, <u>Section 11.1.5</u>, <u>Section 11.1.6</u>, or <u>11.1.7</u>, and provided that either Buyer has not otherwise materially breached this Agreement, Sellers shall promptly refund (including,

within three (3) Business Days of such termination, taking such actions and executing and delivering such joint written instructions to cause the Escrow Agent to disburse) the Deposit to Buyers or Assignor.  If the termination is pursuant to Section 11.1.2 (where (i) either Buyer is the terminating Party, unless the failure of the Closing to occur by the Outside Date shall be due to the failure of either Buyer to comply with any of the covenants or agreements to be performed or complied with it prior to the Closing; or (ii) the Sellers are the terminating Party, and one or more of the closing conditions in Article 10 (other than conditions which, by their nature, are to be satisfied on the Closing Date) were not satisfied by the Outside Date), Section 11.1.3 (where either Buyer is the terminating Party), Section 11.1.4, Section 11.1.5, Section 11.1.6, or 11.1.7, and an Alternative Transaction has occurred, then subject to and in accordance with the terms of the Bidding Procedures Order and provided neither Buyer has materially breached this Agreement, Sellers shall (i) promptly refund (including, within three (3) Business Days of such termination, taking such actions and executing and delivering such joint written instructions to cause the Escrow Agent to disburse) the Deposit to Buyers or Assignor and (ii) pay Buyers the Break-Up Fee from the proceeds of such Alternative Transaction. The obligations of Sellers arising under this Section 11.2.3 shall survive any termination of this Agreement.

11.2.4  Upon the occurrence of a termination by the Sellers pursuant to Section 11.1.2 (except in the case that one or more of the closing conditions in Article 10 (other than conditions which, by their nature, are to be satisfied on the Closing Date)  were not satisfied by the Outside Date, which is addressed in the first sentence of Section 11.2.3 above) or Section 11.1.3 due to a Buyers' breach, and provided the Sellers have not materially breached this Agreement (each, a "*Buyers Default Termination*"), the Deposit shall be forfeited to the Sellers and the Sellers shall be released from all obligations to Buyers and Assignor hereunder.

## XII. MISCELLANEOUS.

12.1    Survival. None of the representations or warranties of the Parties set forth in this Agreement, any Ancillary Agreement, or in any other agreement or certificate executed in connection with, or delivered pursuant to, this Agreement shall survive the Closing.  Other than the requirements of further assurances and actions specifically identified to be taken post-Closing (including without limitation, the satisfaction by Buyers of Assumed Liabilities), all other covenants of the Parties shall expire upon Closing.  This Section 12.1 shall not limit any covenant or agreement of any Party which, by its term, contemplates performance after the Closing, but only to the extent such covenants and agreement are to be performed, or prohibit actions, subsequent to the Closing.

12.2    Notices.  Notices. All notices, consents, waivers and other communications under this Agreement must be in writing and will be deemed to have been duly given (i) when delivered by hand (with written confirmation of receipt), (ii) when sent by email (with read receipt received), (ii) one (1) Business Day following the day sent by overnight courier (with written confirmation of receipt), or (iv) when received by the addressee, if sent by registered or certified mail (postage prepaid, return receipt requested), in each case to the appropriate addresses and Representatives (if applicable) set forth below (or to such other addresses and Representatives as a Party may designate by notice to the other Parties).

### If to either Seller, then to:

Carla's Pasta, Inc.
Attn:  Carla Squatrito, President
50 Talbot Lane
South Windsor, CT 06074
Email: carla@carlaspasta.com

With a copy (which will not constitute notice) to:

Locke Lord LLP
Attn:   Adrienne Walker
111 Huntington Avenue, 9th Floor
Boston, MA 02199-7613
Email: awalker@lockelord.com

**If to Buyers or Assignor, then to**:

NFP Real Estate LLC, CP Foods LLC, or Natural Food Products, LLC
Attn: Brian Durst, President and Chief Executive Officer
2901 Progress Road
Madison, WI 53716
Email:  bdurst@tribe9foods.com

With a copy (which will not constitute notice) to:

Robinson & Cole LLP
Attn:   Patrick M. Birney
280 Trumbull Street
Hartford, CT 06103
Email: pbirney@rc.com

12.3    Amendments and Waivers.

12.3.1  Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by Sellers and Buyers (or by any successor to such Party), or in the case of a waiver, by the Party against whom the waiver is to be effective (except as expressly provided otherwise in this Agreement).

12.3.2  No failure or delay by any Party in exercising any right, power, or privilege under this Agreement will operate as a waiver thereof nor will any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power, or privilege. The rights and remedies provided will be cumulative and not exclusive of any rights or remedies provided for in this Agreement by Law.

12.4    Expenses.

12.4.1 Except as specifically set forth in this Agreement or any Ancillary Agreement, and except for the Break-Up Fee, where applicable, each Party shall bear its own fees

38

and expenses incurred incident to this Agreement and the Ancillary Agreements and in preparing to consummate and consummating the transactions contemplated by this Agreement, including reasonable out-of-pocket costs and expenses (including the out-of-pocket fees, disbursements and other charges of legal counsel, consultants and accountants) and fees and expenses of brokers, finders, financial advisors and investment bankers.

12.4.2  In the event of any litigation brought to enforce or interpret this Agreement, or arising out of its negotiation, performance, or subject matter, the Party who prevails will be entitled to recover its reasonable attorneys' fees, costs and expenses, including those incurred at trial, in any bankruptcy or other proceeding, on appeal, and in enforcing any judgment, as determined by the court.

12.5   Bulk Sales or Transfer Laws.  To the extent permitted by law, Buyers hereby waive compliance by Sellers with the provisions of the bulk sales or transfer laws of all applicable jurisdictions.

12.6   Successors and Assigns.  The provisions of this Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. No Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of each other Party to this Agreement; provided, however, that (i) prior to the Auction, Assignor may, without the prior written consent of the Sellers, but with no less than two (2) business days prior written notice to Sellers, assign all or a portion of its rights under this Agreement to an Affiliate that is not owned or controlled, in whole or in part, by any Insider of either Debtor, and (ii) prior to the Closing, Buyers may, without the prior written consent of the Sellers, assign all or a portion of its rights under this Agreement to a wholly-owned subsidiary of the Buyers, provided that no assignment shall relieve the Buyers from any of its obligations hereunder.  Any attempted or purported assignment in violation of this Section 12.6 will be deemed void *ab initio*.  The Parties understand and agree that, in accordance with this Section 12.6, after March 26, 2021 but prior to April 15, 2021 Assignor assigned (i) to NFP RE all of Assignor's rights and obligations under this Agreement with respect to the purchase of the Real Property, and (ii) to CP Foods all of the Assignor's rights and obligations under this Agreement with respect to the purchase of all of the Purchased Assets other than the Real Property (the "*Assignment*"); provided that all Parties understand and agree that (i) the Assignment shall not relieve NFP from any of the obligations under the Agreement; and (ii) NFP is retaining the power to exercise all other rights under the Agreement that not directly related to the purchase of either the Real Property or the other Purchased Assets, such as the rights relating to termination under Article 11 of the Agreement.

12.7   Entire Agreement.  This Agreement and the Ancillary Agreements (including the Schedules and Exhibits hereto and thereto) constitute the entire agreement among the Parties with respect to the subject matter of this Agreement and such Ancillary Agreements.  This Agreement and the Ancillary Agreements (including the Schedules and Exhibits) supersede all prior agreements and understandings, both oral and written, between the Parties with respect to the subject matter of this Agreement and such Ancillary Agreements.

12.8   Severability.  The provisions of this Agreement will be deemed severable, and the invalidity or unenforceability of any provision will not affect the validity or enforceability of the

91659665v.5

other provisions hereof. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (i) the Parties will negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible and (ii) the remainder of this Agreement and the application of such provision to other Persons or circumstances will not be affected by such invalidity or unenforceability.

12.9    No Third-Party Beneficiaries. This Agreement is for the sole benefit of the Parties and their permitted assigns and nothing herein expressed or implied will give or be construed to give to any Person, other than the Parties and such permitted assigns, any legal or equitable rights under this Agreement.

12.10    Governing Law. Except (i) to the extent the mandatory provisions of the Bankruptcy Code apply and (ii) except for any real or immovable property issues, which will be governed by and construed and enforced in accordance with the internal laws of the State in which such real or immovable property is located (without reference to the choice of law rules of such State), this Agreement will be governed by, and construed in accordance with, the laws of the State of Connecticut applicable to contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of Connecticut applicable hereto.

12.11    Consent to Jurisdiction. Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, each of the Parties agrees that any proceeding brought to enforce the rights or obligations of any Party under this Agreement or any Ancillary Agreement shall be commenced and maintained in the Bankruptcy Court, and the Bankruptcy Court shall have exclusive jurisdiction over any such proceeding. Each of the Parties consents to the exercise of jurisdiction over it and its properties, in accordance with the terms of this Section, with respect to any proceeding arising out of or in connection with this Agreement, any Ancillary Agreement or the transactions contemplated hereby or thereby, or the enforcement of any rights under this Agreement or any Ancillary Agreement.

12.12    WAIVER OF JURY. Each Party hereto expressly waives any right to a trial by jury in any action or proceeding with respect to any action or claim arising out of or any dispute in connection with this Agreement or under any amendment, instrument, document or agreement delivered or which may in the future be delivered in connection with this Agreement or arising from any relationship existing in connection with this Agreement and agrees that any such action or proceeding shall be tried before a court and not before a jury. Each of the parties hereto has reviewed this waiver and knowingly and voluntarily waives its jury trial rights following consultation with legal counsel. In the event of litigation, a copy of this Agreement may be filed as a written consent to a trial by the court.

12.13    Counterparts. This Agreement and any amendment hereto may be executed in one (1) or more counterparts, each of which will be deemed to be an original of this Agreement or such amendment and all of which, when taken together, will constitute one and the same instrument. Notwithstanding anything to the contrary in Section 12.2, delivery of an executed counterpart of a signature page to this Agreement or any amendment hereto by email attachment will be effective

91659665v.5

as delivery of a manually executed counterpart of this Agreement or such amendment, as applicable.

12.14   <u>Time of the Essence</u>.  Time is of the essence for purposes of this Agreement and the rights and obligations of the Parties hereunder.

*[Signature Page Follows]*

41

The Parties have executed this Agreement as of the date first above written.

**BUYER:**                                                    **SELLER:**

NFP REAL ESTATE LLC                                  CARLA'S PASTA, INC.

By: _____                        By: _____
Name:  Brian Durst                                   Name: Carla Squatriro
Its:     Managing Director                            Its:     President


**BUYER:**                                                    **SELLER:**

CP FOODS LLC                                         SURI REALTY, LLC

By: _____                        By: _____
Name:   Brian Durst                                  Name: Carla Squatriro
Its:      Managing Director                           Its:     Manager


**ASSIGNOR:**

NATURAL FOOD PARTNERS, LLC

By: _____
Name:   Brian Durst
Its:      Managing Director

The Parties have executed this Agreement as of the date first above written.

**BUYER:**                                    **SELLER:**

NFP REAL ESTATE LLC                CARLA'S PASTA, INC.

By: _____    By: _____
Name:  Brian Durst                        Name:  Carla M. Squatrito
Its:      Managing Director              Its:      President

**BUYER:**                                    **SELLER:**

CP FOODS LLC                          SURI REALTY, LLC

By: _____    By: _____
Name:  Brian Durst                        Name:  Carla M. Squatrito
Its:      Managing Director              Its:      Manager

**ASSIGNOR:**

NATURAL FOOD PARTNERS, LLC

By: _____
Name:  Brian Durst
Its:      Managing Director

91659665v.5

## EXHIBIT A

**LEGAL DESCRIPTION OF OWNED REAL PROPERTY**

Legal Description

Property known as 260 Nutmeg Road, South Windsor, Connecticut

FIRST PARCEL- NORTHERLY PORTION OF PROPERTY KNOWN AS 75 CONNECTICUT AVENUE

A certain piece or parcel of land situated in the Town of South Windsor, County of Hartford and State of Connecticut, bounded and described as follows:

Beginning at a point being the northwesterly corner of land now or formerly of Hale Realty, LLC, shown on the map hereinafter referenced as Remainder of Lot 8, said point being the northeasterly corner of land now or formerly of Four S, L.L.C.;

Thence running N62°28' 27" E along the easterly property line of land now or formerly of Hale Realty, LLC, being the Second Parcel described herein, a distance of 405.43 feet to a point;

Thence turning and running S65°07' 18" E along the southerly property line of said Second Parcel a distance of 300.00 feet to a point in the westerly boundary line of land shown on said map as being now or formerly of the Town of South Windsor - Recreation Area 16;

Thence turning and running S19°58' 58" W a distance of 322.41 feet along the westerly property line of said land a now or formerly Town of South Windsor - Recreation Area 16, land now or formerly of John & Jill Drenga, land now or formerly of Rui & Amy Costa, and land now or formerly of Matthew J. & Kristina L. Kaminski, in part by each, to a point, said point being the northeast corner of said land now or formerly of Hale Realty, LLC shown on the map hereinafter referenced as Remainder of Lot 8.

Thence turning and running N65°07' 18" W along the northerly property line of said land now or formerly of Hale Realty, LLC shown on the map hereinafter referenced as Remainder of Lot 8, a distance of 574.86 feet to the point and place of beginning.

Reference may be had to a certain map entitled " BOUNDARY & TOPOGRAPHIC SURVEY PREPARED FOR: SURI REALTY, LLC DATE: 6/30/2011 REVISED: 1/28/2015  SCALE: 1" =60'  PAGE 2 OF 2"  Prepared by Design Professionals Inc.

BEING THE SAME AS:

A CERTAIN PIECE OR PARCEL OF LAND SITUATED IN THE TOWN OF SOUTH WINDSOR, COUNTY OF HARTFORD AND STATE OF CONNECTICUT, BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT BEING THE NORTHWESTERLY CORNER OF LAND NOW OR FORMERLY OF HALE REALTY, LLC, SHOWN ON THE MAP HEREINAFTER REFERENCED AS REMAINDER OF LOT 8, SAID POINT BEING THE NORTHEASTERLY CORNER OF LAND NOW OR FORMERLY OF FOUR S, L.L.C.,

THENCE RUNNING N62°28' 27" E ALONG THE EASTERLY PROPERTY LINE OF LAND NOW OR FORMERLY OF HALE REALTY, LLC, BEING THE SECOND PARCEL DESCRIBED HEREIN, A DISTANCE OF 405.43 FEET TO A POINT;

**[LEGAL DESCRIPTION CONTINUES ON NEXT PAGE]**

5865397

THENCE TURNING AND RUNNING S65°07' 18" E ALONG THE SOUTHERLY PROPERTY LINE OF SAID SECOND PARCEL A DISTANCE OF 300.00 FEET TO A POINT IN THE WESTERLY BOUNDARY LINE OF LAND SHOWN ON SAID MAP AS BEING NOW OR FORMERLY OF THE TOWN OF SOUTH WINDSOR - RECREATION AREA 16; THENCE TURNING AND RUNNING S19°58' 58" W A DISTANCE OF 322.41 FEET ALONG THE WESTERLY PROPERTY LINE OF SAID LAND A NOW OR FORMERLY TOWN OF SOUTH WINDSOR - RECREATION AREA 16, LAND NOW OR FORMERLY OF JOHN & JILL DRENGA, LAND NOW OR FORMERLY OF RUI & AMY COSTA, AND LAND NOW OR FORMERLY OF MATTHEW J. & KRISTINA L. KAMINSKI, IN PART BY EACH, TO A POINT, SAID POINT BEING THE NORTHEAST CORNER OF SAID LAND NOW OR FORMERLY OF HALE REALTY, LLC SHOWN ON THE MAP HEREINAFTER REFERENCED AS REMAINDER OF LOT 8;

THENCE TURNING AND RUNNING N65°07' 18" W ALONG THE NORTHERLY PROPERTY LINE OF SAID LAND NOW OR FORMERLY OF HALE REALTY, LLC SHOWN ON THE MAP HEREINAFTER REFERENCED AS REMAINDER OF LOT 8, A DISTANCE OF 574.86 FEET TO THE POINT AND PLACE OF BEGINNING.

REFERENCE MAY BE HAD TO A CERTAIN MAP ENTITLED " BOUNDARY & TOPOGRAPHIC SURVEY PREPARED FOR: SURI REALTY, LLC DATE: 6/30/2011 REVISED: 1/28/2015 8/28/2015 SCALE: 1" =60' PAGE 2 OF 2" PREPARED BY DESIGN PROFESSIONALS INC

SECOND PARCEL - LOT #8, 280 Nutmeg Road, South Windsor, Connecticut

A certain piece or parcel of land situated in the Town of South Windsor, County of Hartford and State of Connecticut, bounded and described as follows

Beginning at a point being the northeasterly corner of land now or formerly of Four S, LLC, said point also being the northwest corner of land now or formerly of Hale Realty, LLC shown on the referenced map as the southwest corner of the First Parcel herein described.

Thence running N65°07' 18" W along the northerly property line of said land now or formerly of Four S, LLC a distance of 156.01 feet to a point;

Thence turning and running N24°52' 42" E along the easterly property line of land now or formerly of Nutmeg Road South, LLC a distance of 531.07 feet to a point;

Thence turning and running N65°07' 18" W along the northerly property line of land now or formerly of Nutmeg Road South, LLC a distance of 248.55 feet to a point in the easterly street line of Nutmeg Road South;

Thence turning and running N16°25' 12" E along the easterly street line of Nutmeg Road South a distance of 100.00 feet to a point being the southwesterly corner of land now or formerly of Hale Realty, LLC;

Thence turning and running S 65°07' 18" E along the southerly property line of land now or formerly of Hale Realty, LLC a distance of 263.26 feet to a point;

Thence turning and running N24°52' 42" E along the easterly property line of land now or formerly of Hale Realty, LLC a distance of 120.02 feet to a point being the southwesterly corner of land now or formerly of Governors Square Associates;

## [LEGAL DESCRIPTION CONTINUES ON NEXT PAGE]

5865397v3

2

VOL 2 6 1 1 PAGE 0 2 4 4

Thence turning and running S65°07' 18" E along the southerly property line of land now or formerly of Governors Square Associates a distance of 108.56 feet to a point being the southwesterly corner of land now or formerly of Suri Realty, LLC;

Thence turning and running S65°07' 18" E along the southerly property line of said land now or formerly of Suri Realty, LLC a distance of 558.07 feet to a point;

Thence turning and running S19°58' 56" W along the westerly property line of said land now or formerly of Suri Realty, LLC and land shown on said map as being now or formerly of the Town of South Windsor - Recreation Area 16, in part by each, a distance of 430.34 feet to a point,

Thence turning and running N65°07' 18" W along the northerly property line of land now or formerly of Hale Realty, LLC a distance of 300.00 feet to a point;

Thence turning and running S62°28' 27" W along the westerly property line of land now or formerly of Hale Realty, LLC a distance of 405.43 feet to the point and place of beginning.

Reference may be had to a certain map entitled " BOUNDARY & TOPOGRAPHIC SURVEY PREPARED FOR: SURI REALTY, LLC DATE: 6/30/2011 REVISED: 1/28/2015 SCALE: 1" =60'  PAGE 2 OF 2"  prepared by Design Professionals Inc.

BEING THE SAME AS:

A CERTAIN PIECE OR PARCEL OF LAND SITUATED IN THE TOWN OF SOUTH WINDSOR, COUNTY OF HARTFORD AND STATE OF CONNECTICUT, BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT BEING THE NORTHEASTERLY CORNER OF LAND NOW OR FORMERLY OF FOUR S, LLC, SAID POINT ALSO BEING THE NORTHWEST CORNER OF LAND NOW OR FORMERLY OF HALE REALTY, LLC SHOWN ON THE REFERENCED MAP AS AND THE SOUTHWEST CORNER OF THE FIRST PARCEL HEREIN DESCRIBED,

THENCE RUNNING N65°07' 18" W ALONG THE NORTHERLY PROPERTY LINE OF SAID LAND NOW OR FORMERLY OF FOUR S, LLC A DISTANCE OF 156.01 FEET TO A POINT;

THENCE TURNING AND RUNNING N24°52' 42" E ALONG THE EASTERLY PROPERTY LINE OF LAND NOW OR FORMERLY OF NUTMEG ROAD SOUTH, LLC A DISTANCE OF 531.07 FEET TO A POINT;

THENCE TURNING AND RUNNING N65°07' 18" W ALONG THE NORTHERLY PROPERTY LINE OF LAND NOW OR FORMERLY OF NUTMEG ROAD SOUTH, LLC A DISTANCE OF 248.55 FEET TO A POINT IN THE EASTERLY STREET LINE OF NUTMEG ROAD SOUTH;

THENCE TURNING AND RUNNING N16°25' 12" E ALONG THE EASTERLY STREET LINE OF NUTMEG ROAD SOUTH A DISTANCE OF 100.00 FEET TO A POINT BEING THE SOUTHWESTERLY CORNER OF LAND NOW OR FORMERLY OF HALE REALTY, LLC.

**[LEGAL DESCRIPTION CONTINUES ON NEXT PAGE]**

5865397v3

THENCE TURNING AND RUNNING S 65°07' 18" E ALONG THE SOUTHERLY PROPERTY LINE OF LAND NOW OR FORMERLY OF HALE REALTY, LLC A DISTANCE OF 263.26 FEET TO A POINT;

THENCE TURNING AND RUNNING N24°52' 42" E ALONG THE EASTERLY PROPERTY LINE OF LAND NOW OR FORMERLY OF HALE REALTY, LLC A DISTANCE OF 120.02 FEET TO A POINT BEING THE SOUTHWESTERLY CORNER OF LAND NOW OR FORMERLY OF GOVERNORS SQUARE ASSOCIATES;

THENCE TURNING AND RUNNING S65°07' 18" E ALONG THE SOUTHERLY PROPERTY LINE OF LAND NOW OR FORMERLY OF GOVERNORS SQUARE ASSOCIATES A DISTANCE OF 108.56 FEET TO A POINT BEING THE SOUTHWESTERLY CORNER OF LAND NOW OR FORMERLY OF SURI REALTY, LLC;

THENCE TURNING AND RUNNING S65°07' 18" E ALONG THE SOUTHERLY PROPERTY LINE OF SAID LAND NOW OR FORMERLY OF SURI REALTY, LLC A DISTANCE OF 558.07 FEET TO A POINT;

THENCE TURNING AND RUNNING S19°58' 58" W ALONG THE WESTERLY PROPERTY LINE OF SAID LAND NOW OR FORMERLY OF SURI REALTY, LLC AND LAND SHOWN ON SAID MAP AS BEING NOW OR FORMERLY OF THE TOWN OF SOUTH WINDSOR - RECREATION AREA 16, IN PART BY EACH, A DISTANCE OF 430.34 FEET TO A POINT;

THENCE TURNING AND RUNNING N65°07' 18" W ALONG THE NORTHERLY PROPERTY LINE OF LAND NOW OR FORMERLY OF HALE REALTY, LLC A DISTANCE OF 300.00 FEET TO A POINT;

THENCE TURNING AND RUNNING S62°28' 27" W ALONG THE WESTERLY PROPERTY LINE OF LAND NOW OR FORMERLY OF HALE REALTY, LLC A DISTANCE OF 405.43 FEET TO THE POINT AND PLACE OF BEGINNING.

REFERENCE MAY BE HAD TO A CERTAIN MAP ENTITLED "BOUNDARY & TOPOGRAPHIC SURVEY PREPARED FOR: SURI REALTY, LLC DATE: 6/30/2011 REVISED: 1/28/2015 8/28/2015 SCALE: 1" =60'  PAGE 2 OF 2" PREPARED BY DESIGN PROFESSIONALS INC.


Property known as 50 Talbot Lane

A certain piece or parcel of land with the improvements thereon situated in the Town of South Windsor, County of Hartford and State of Connecticut and shown as Lot 3 on the following entitled map: Re-Subdivision Plan Re-Subdivision of Lots 2 & 3 'Constitution Landing', Property of Hale Realty, LLC, Talbot Lane (Formerly Connecticut Avenue) South Windsor, Connecticut  Date:  12/00, Scale  1" = 100 FT  Sheet 1 of 6, Messier & Associates, Inc., Surveyors -Engineers, Manchester, CT.  Rev 1, 01-05-01, Rev 2, 05-21-01, Robert R. Messier, L.S."  Said Map is filed as Map No. 2748 in the South Windsor Town Clerk's Office.

BEING THE SAME AS:

THAT CERTAIN PIECE OR PARCEL OF LAND, WITH ANY BUILDINGS THEREON AND APPURTENANCES THERETO, SITUATED IN THE TOWN OF SOUTH WINDSOR, COUNTY OF HARTFORD AND STATE OF CONNECTICUT ON A CERTAIN MAP OR PLAN ENTITLED "CARLA'S PASTA 50 TALBOT LANE SOUTH WINDSOR, CONNECTICUT DATE: 6/30/11 REVISED 7/24/12 SCALE: 1"=60' PREPARED FOR SURI REALTY, LLC 50 TALBOT

### [LEGAL DESCRIPTION CONTINUES ON NEXT PAGE]

4

5865397v3

LANE SOUTH WINDSOR, CT 06074 860-436-4042 BY DESIGN PROFESSIONALS CIVIL & TRAFFIC ENGINEERS/PLANNERS/SURVEYORS 425 SULLIVAN AVENUE, BOX 1167 SOUTH WINDSOR, CT 06074 (860) 291-8755," BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE WESTERLY RIGHT OF WAY LINE OF TALBOT LAND AT THE SOUTHEASTERLY CORNER OF LAND NOW OR FORMERLY HARRIS REAL ESTATE SOUTH WINDSOR, LLC. SAID POINT ALSO BEING THE NORTHEASTERLY CORNER OF THE HEREIN DEFINED PROPERTY;

THENCE S 23° 31' 12" W ALONG THE WESTERLY RIGHT OF WAY LINE OF TALBOT LANE, 95.50 FEET, TO A POINT;

THENCE ALONG THE SOUTHERLY RIGHT OF WAY LINE OF TALBOT LANE, IN A SOUTHERLY AND EASTERLY DIRECTION ALONG A CURVE TO THE LEFT HAVING A DELTA ANGLE OF 179° 56' 08", RADIUS OF 72.00 FEET AND AN ARC LENGTH OF 226.11 FEET, TO A POINT ON THE EASTERLY PROPERTY LINE OF LAND NOW OR FORMERLY HALE REALTY, LLC.

THENCE S 16° 24' 32" E, ALONG THE SOUTHWESTERLY PROPERTY LINE OF LAND NOW OR FORMERLY HALE REALTY, LLC. 264.87 FEET, TO A POINT.

THENCE S 23° 31' 12" W. ALONG THE WESTERLY PROPERTY LINE OF LAND NOW OR FORMERLY HALE REALTY. LLC. 353.12 FEET TO A POINT;

THENCE N 65° 30' 53" W, ALONG THE NORTHERLY PROPERTY LINE OF LAND NOW OR FORMERLY TOWN OF SOUTH WINDSOR, 124.55 FEET. TO A POINT,

THENCE N 19° 58' 58" E, ALONG THE EASTERLY PROPERTY LINE OF LAND NOW OR FORMERLY HALE REALTY. LLC, 137.44 FEET TO A POINT;

THENCE N 65° 07' 18" W, ALONG THE NORTHERLY PROPERTY LINE OF LAND NOW OR FORMERLY OF HALE REALTY, LLC, 558.07 FEET, TO A POINT AT THE SOUTHEASTERLY CORNER OF LAND NOW OR FORMERLY GOVERNORS SQUARE ASSOCIATES;

THENCE N 23° 11' 04" E, ALONG THE EASTERLY PROPERTY LINE OF LAND NOW OR FORMERLY GOVERNORS SQUARE ASSOCIATES, 397.09 FEET. TO A POINT;

THENCE N 66° 48' 56" W, ALONG THE NORTHERLY PROPERTY LINE OF LAND NOW OR FORMERLY GOVERNORS SQUARE ASSOCIATES. 20.00 FEET TO A POINT;

THENCE N 23° 11' 04" E, ALONG THE EASTERLY PROPERTY LINE OF LAND NOW OR FORMERLY GOVERNORS SQUARE ASSOCIATES, 100.00 FEET TO A POINT ON THE SOUTHERLY PROPERTY LINE OF LAND NOW OR FORMERLY HARRIS REAL ESTATE SOUTH WINDSOR, LLC.;

THENCE S 66°48'56" E ALONG THE SOUTHERLY PROPERTY LINE OF LAND NOW OF FORMERLY HARRIS REAL ESTATE SOUTH WINDSOR, LLC. 399.84 FEET. TO THE POINT AND PLACE OF BEGINNING.

[LEGAL DESCRIPTION CONTINUES ON NEXT PAGE]

5

5865397v3

Together with rights and easements contained in a Declaration of Easements and Covenants by Hale Realty, LLC dated and recorded March 8, 2001 in Volume 1192 at Page 237, as amended by First Amended and Restated Declaration of Covenants and Restrictions; First Amendment of Declaration of Easements and Covenants and Declaration of Easements and Covenants dated as of May 31, 2001 and recorded May 31, 2001 in Volume 1217 at Page 171; as further amended by Second Amendment to the Declaration of Covenants and Restrictions, Second Amendment of Declaration of Easements and Covenants; and Declaration of Easements and Covenants dated May 25, 2016 and recorded in Volume 2524, page 208; all in the South Windsor Land Records.

Together with rights, easements and provisions of a certain Sewer Line Easement Permanent and Temporary Construction Easements made by and between Hale Realty, LLC and the Town of South Windsor dated March 8, 2001 and recorded March 9, 2001 in Volume 1192 at Page 241 of the South Windsor Land Records.

Together with rights, easement and provisions of a certain Street Tree Easement made by and between Hale Realty, LLC and the Town of South Windsor dated March 8, 2001 and recorded March 9, 2001 in Volume 1192 at Page 244 of the South Windsor Land Records.

Together with rights, easements and provisions contained in a Conservation Easement to Town of South Windsor dated March 8, 2001 and recorded in Volume 1192 at Page 254 of the South Windsor Land Records.

Together with rights contained in a Declaration of Covenants and Restrictions by Hale Realty, LLC dated and recorded April 27, 2001 in Volume 1206 at Page 257; as amended by First Amended and Restated Declaration of Covenants and Restrictions, First Amendment of Declaration of Easements and Covenants and Declaration of Easements and Covenants dated as of May 31, 2001 and recorded May 31, 2001 in Volume 1217 at Page 171; as further amended by Second Amendment to the Declaration of Covenants and Restrictions, Second Amendment of Declaration of Easements and Covenants; and Declaration of Easements and Covenants dated May 25, 2016 and recorded in Volume 2524, page 208; all in the South Windsor Land Records.

Together with terms, rights, easements, covenants and provisions First Amended and Restated Declaration of Covenants and Restrictions, First Amendment of Declaration of Easements and Covenants and Declaration of Easements and Covenants dated as of May 31, 2001 and recorded May 31, 2001 in Volume 1217 at Page 171; as further amended by Second Amendment to the Declaration of Covenants and Restrictions, Second Amendment of Declaration of Easements and Covenants; and Declaration of Easements and Covenants dated May 25, 2016 and recorded in Volume 2524, page 208; all in the South Windsor Land Records.

Together with a Wetlands Easement as contained in a Warranty Deed from Hale Realty, LLC to Suri Realty, LLC dated June 1, 2001 and recorded in Volume 1218 at page 211 of the South Windsor Land Records

Together with rights, easements and provisions of a certain Drainage Easement Agreement made by and between Suri Realty, LLC and Hale Realty II, LLC dated as of May 25, 2016 and recorded May 26, 2016 in Volume 2524 at Page 211 of the South Windsor Land Records.

Together with rights, easements and provisions of a certain Drainage Easement Agreement made by and between Suri Realty, LLC and Hale Realty, LLC dated as of May 25, 2016 and recorded May 26, 2016 in Volume 2524 at Page 229 of the South Windsor Land Records.

[END OF LEGAL DESCRIPTION]

5865397v3

6

## EXHIBIT B

## FORM OF ESCROW AGREEMENT

ESCROW AGREEMENT

THIS ESCROW AGREEMENT (the "*Agreement*") is made and entered into the 26th day of March, 2021, by and among Carla's Pasta, Inc., a Connecticut corporation ("*CPI*") and Suri Realty, LLC, a Connecticut limited liability company ("*Suri*", and together with CPI, the "*Sellers*"), and _____, a _____ company (the "*Buyer*"), and Verdolino & Lowey, P.C., ("*Escrow Agent*," and along with Sellers and Buyer, collectively the "*Parties*" and each a "*Party*").

W I T N E S S E T H:

WHEREAS, pursuant to Section 2.4 of the Asset Purchase Agreement by and between Buyer and Sellers (as may be amended from time to time), dated March __, 2021 (the "*Asset Purchase Agreement*"), Buyer and Sellers agreed that Buyer would deposit the sum of $1,689,375.00 ("*Escrowed Funds*") into an escrow account of the Escrow Agent and held as an earnest money deposit pursuant to the terms of the Asset Purchase Agreement;

WHEREAS, the Parties mutually agree that Verdolino & Lowey, P.C., shall act as the Escrow Agent with respect to said Escrowed Funds; and

WHEREAS, Escrow Agent agrees to receive, hold and disburse the Escrowed Funds in accordance with this Agreement;

WHEREAS, the Parties acknowledge that the Escrow Agent is not a party to, is not bound by, and has no duties or obligations under, the Asset Purchase Agreement, that all references in this Escrow Agreement to the Asset Purchase Agreement are for convenience, and that the Escrow Agent shall have no implied duties beyond the express duties set forth in this Escrow Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties hereby agree as follows;

1.      The Parties hereby mutually designate and appoint Escrow Agent for the purposes set forth herein, subject to replacement as provided in this Agreement.  Escrow Agent hereby accepts such appointment, upon the terms and conditions provided in this Agreement.

2.      Escrow   Agent   hereby   acknowledges   receipt   from   Buyer   of [_____($_____)] representing the Escrowed Funds.

3.      No interest shall be earned on the Escrowed Funds.

4.      Except as otherwise provided in this Agreement, Escrow Agent shall disburse all or any portion of the Escrowed Funds only as follows:

4.1     <u>Disbursement Upon Joint Written Instruction</u>.  Sellers, on the one hand, and Buyer, on the other hand, shall jointly execute and provide joint written instructions for the release of the Escrow Funds consistent with the provisions of the Asset Purchase Agreement.  At any time that joint written instructions executed jointly by Sellers, on the one hand, and Buyer, on the other hand (the "*Joint Written Instruction*") are provided to the Escrow Agent, the Escrow Agent shall disburse the Escrow Funds to any Party in accordance with such Joint Written Instruction.

4.2    <u>Release Pursuant to Final Determination</u>. In the event of a dispute between Buyer, on the one hand, and either (or both) Seller(s), on the other, with respect to the proper recipient of the Escrow Funds, upon receipt by the Escrow Agent of a copy of a final non appealable order of any court of competent jurisdiction which may be issued, directing the payment of all or any portion of the Escrow Funds together with (A) a certificate of the prevailing Party to the effect that such order is final and non appealable and from a court of competent jurisdiction having proper authority and (B) the written payment instructions of the prevailing Party to effectuate such order (a "***Final Order***"), the Escrow Agent shall on the third (3rd) Business Day following receipt of such determination, disburse as directed, part or all, as the case may be, of the Escrow Funds (but only to the extent funds are available in the applicable Escrow Amount), in accordance with such Final Order. The Escrow Agent will act on such Final Order without further inquiry.

To the extent either Joint Instructions or a Final Order direct disposition of some, but not all, of the Escrowed Funds, Escrow Agent will release the specified amount of Escrowed Funds in accordance with such Joint Instructions or Final Order and continue to hold the remaining Escrow Funds under the terms of this Agreement.

5.    <u>Compensation</u>.  The Escrow Agent shall be entitled to compensation for its services as stated in the fee schedule attached hereto as Exhibit C, which compensation shall be paid by Sellers. The fee agreed upon for the services rendered hereunder is intended as full compensation for the Escrow Agent's services as contemplated by this Escrow Agreement.

6.    <u>Limitation of Liability</u>.  Escrow Agent shall act as a depository only.  Escrow Agent shall have no implied duties or obligations.  Escrow Agent shall be protected in acting upon any written certificate, notice, request, waiver, consent, receipt or other paper or document furnished to it, not only as to its due execution and the validity and effectiveness of its provisions, but also as to the truth and acceptability of any information therein contained which Escrow Agent in good faith reasonably believes to be genuine and what it purports to be.  Escrow Agent shall not be liable for any error of judgment, or for any act done or steps taken or made by it in good faith, or for any things which it may do or refrain from doing in connection herewith, except due to Escrow Agent's own gross negligence, willful misconduct, fraud, or breach of fiduciary duty.  In no event shall Escrow Agent be liable for incidental, indirect, special, consequential or punitive damages, except due to Escrow Agent's own gross negligence, willful misconduct, fraud, or breach of fiduciary duty.  Escrow Agent may consult with and obtain advice from legal counsel in the event of any question as to any of the provisions of this Agreement or its duties hereunder, and Escrow Agent shall incur no liability and shall be fully protected in acting in good faith in accordance with the opinion and instructions of such counsel.  Escrow Agent shall have no duties except those expressly set forth herein, and shall not be bound by any notice of a claim or demand with respect thereto, or any waiver, modification, amendment, termination or rescission of this Agreement, unless in a writing received by it, and, if its duties herein are affected, unless it shall have given its prior written consent thereto.

7.    In the event of any adverse claim or demand being made in connection with the subject matter of this Agreement, or in the event Escrow Agent in good faith shall be in doubt as to what action it should take hereunder, Escrow Agent shall thereupon have the right to (a) refrain from complying with any claims or demands asserted against it as Escrow Agent, or (b) refuse to take any other action hereunder, so long as such disagreement continues or exists, and in either such event, Escrow Agent shall not be or become liable in any way to any person for Escrow Agent's failure to act, and Escrow Agent shall be entitled to continue to refrain from acting, until (i) the rights of all Parties shall have been fully and finally

2

adjudicated by a court of competent jurisdiction, or (ii) all differences shall have been adjusted and all doubts resolved by agreement between Buyer and Sellers, and Escrow Agent shall have been notified thereof by a writing signed by Buyer and Sellers.

8.        Indemnification.  From and at all times after the date of this Agreement, Buyer and Sellers shall (severally and not jointly), to the fullest extent permitted by law, indemnify and hold harmless Escrow Agent and each director, officer, employee and controlling entity of Escrow Agent (collectively, the "*Indemnified Parties*") against any and all actions, claims (whether or not valid), losses, damages, liabilities, costs and expenses (including without limitation reasonable attorneys' fees, costs and expenses) incurred by or asserted against any of the Indemnified Parties from and after the date hereof, relating to or arising from or in connection with any claim, demand, suit, action or proceeding brought or initiated by a third party arising from or in connection with the negotiation, preparation, execution, performance or failure of performance of this Agreement or any transactions contemplated herein; provided, however, that no Indemnified Party shall have the right to be indemnified hereunder for any liability finally determined by a court of competent jurisdiction to have resulted from the gross negligence, willful misconduct, fraud, or breach of fiduciary duty of such Indemnified Party.  If any such action or claim shall be brought or asserted against any Indemnified Party, such Indemnified Party shall promptly notify Buyer and Sellers, and Buyer and Sellers shall assume the defense thereof, including the employment of counsel and the payment of all expenses reasonably incurred by such Indemnified Party.  Such Indemnified Party shall, in its sole discretion, have the right to employ separate counsel in any such action and to participate in the defense thereof, and the reasonable fees and expenses of such counsel shall be paid by such Indemnified Party, except that Buyer and Sellers, severally and not jointly, shall be required to pay such reasonable fees and expenses if: (a) Buyer and Sellers shall fail to assume the defense of such action or proceeding, or shall fail, in the reasonable discretion of such Indemnified Party, to employ counsel reasonably satisfactory to the Indemnified Party in any such action or proceeding; (b) any Party is a plaintiff in any such action or proceeding; or (c) the named parties to any such action or proceeding (including any impleaded parties) include both such Indemnified Party and one or more of the Parties.  Buyer and Sellers, severally and not jointly, shall pay the reasonable fees and expenses of the Indemnified Party's counsel pursuant to the preceding sentence.  In the case of a dispute between Buyer and Sellers arising out of or related to the disbursement of Escrowed Funds, the non-prevailing party shall reimburse Escrow Agent for the reasonable fees and expenses of Escrow Agent's counsel, to the extent Escrow Agent incurs any such fees or expenses of counsel. The obligations of Buyer and Sellers arising under this Section 8 shall survive any termination of this Escrow Agreement and the resignation or removal of Escrow Agent.

9.        Escrow Agent or any successor to it hereafter appointed may at any time resign by giving notice in writing to all Parties, in which event Escrow Agent shall be discharged from its prospective duties hereunder upon delivery of such resignation, save and except the duty to deliver the Escrowed Funds to such recipient as all Parties shall mutually designate in writing. The Parties shall have the joint right to replace Escrow Agent at any time upon written notice to Escrow Agent, in which event Escrow Agent shall be discharged from its prospective duties hereunder upon such termination, save and except the duty to deliver the Escrowed Funds to such recipient as all Parties shall mutually designate in writing.

10.        This Agreement shall be governed by, and interpreted in accordance with, the laws of the Commonwealth of Massachusetts, and shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors, heirs, and permitted assigns.  No Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of each other Party to this Agreement.

11.        No failure or delay on the part of any Party in exercising any power or right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further

exercise thereof or the exercise of any other right or power. The rights and remedies of the Parties hereunder are cumulative and not exclusive of any rights or remedies which they would otherwise have. No modification or waiver of any provision of this Agreement, nor consent to any departure by any Party therefrom, shall in any event be effective unless the same shall be in writing, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice to or demand on any party in any case shall entitle such party to any other or further notice or demand in similar or other circumstances.

12.     The Article and Section captions used herein are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.

13.     Any notice or other communication required or permitted hereunder shall be sufficiently given if delivered in person or sent by telecopy or by registered or certified mail or by recognized overnight courier, postage prepaid, addressed as follows:

*If to Buyer, then to:*          *With copy to:*
==INSERT==                       ==INSERT==

*If to Sellers, then to:*        *With copy to:*
Carla's Pasta, Inc.              Locke Lord LLP
Attn:  Carla Squatrito, President  Attn: Adrienne Walker
50 Talbot Lane                   111 Huntington Avenue, 9th Floor
South Windsor, CT 06074          Boston, MA 02199-7613
Email: carla@carlaspasta.com     Email: awalker@lockelord.com


*If to Escrow Agent, then to:*
Verdolino & Lowey, P.C
124 Washington Street, Suite 101
Foxborough, MA 02035
Email: cjalbert@vlpc.com

or to such other address or number as shall be furnished in writing by any such Party, and such notice or communication shall be deemed to have been given as of the date so delivered, sent by telecopier or mailed.

13.     This Agreement may be executed in multiple counterparts, all of which shall be considered one and the same Agreement and each of which shall be deemed an original.

14.     If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

[Signature Page Follows]

91510273v.3

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above-written.

**BUYER:**

<mark>INSERT</mark>

By: _____
Name:
Its:

**SELLER:**

CARLA'S PASTA, INC.

By: _____
Name:
Its:

**SELLER:**

SURI REALTY, INC.

By: _____
Name:
Its:

**ESCROW AGENT:**

VERDOLINO & LOWEY, PC

By: _____
Name:
Its:

*[Signature Page to Escrow Agreement]*

91510273v.3

# Schedules to Asset Purchase Agreement

| | |
|---|---|
| 1.1 | February 2021 Working Capital Schedule |
| 2.1.1(b) | Seller Tangible Assets |
| 2.1.1(o) | Specific Purchased Assets |
| 2.1.2(q) | Specific Excluded Assets |
| 2.1.5(a) | Desired Contracts |
| 4.5 | Registered Intellectual Property |
| 4.6 | Sellers' Employee Plans |
| 4.7.1 | Real Estate Encumbrances |
| 4.7.3 | Tax Appeals |
| 4.8 | Employee Claims |
| 4.10 | Encumbrances |
| 4.11 | Taxes |
| 4.12 | Compliance with Laws |
| 4.13 | Material Contracts |
| 4.14 | Financial Statements |
| 4.17 | Material Customers |
| 4.18 | Proceedings |

## Schedule 1.1

February 2021 Working Capital Schedule

| Est. February Amounts | | |
|---|---|---|
| Accounts Receivable | $ | 4,772,561 |
| *AR Allowances* | | *(28,529)* |
| Inventory | | 4,652,575 |
| *Inventory Reserve* | | *(539,668)* |
| Other AR (Sysco Recapture) | | 517,339 |
| Prepaid Expenses | | 197,658 |
| Prepaid Business Insurance | | 121,797 |
| Prepaid Suppliers | | 453,182 |
| Prepaid Suppliers as credits in AP | | 385,756 |
| **February Current Assets** | **$** | **10,532,672** |

## **Scheduled 2.1.1(b)**

Seller Tangible Assets

[see attached]

**Description**

PINSATI MACHINE, GRIM & HOPPER
GRINDER AND STAND
FAX MACHINE
STRETCH WRAPPER - SHIPPING
CAVATELLI MACHINE (INCLUDES FREIGHT)
RAVIOLI MACHINE FOR R&D DEPARTMENT
MBFX - 1003 MIXER
SCALE & BAGGER - LINE 2
CROWN MODEL PE4000-60 PALLET TRUCK
SPEED WEIGH SCALE/TOGGLE
ROTARY CUP FILLER - MODEL 12-32 & SEALER
BAGGER LINE
ROTARY CUP FILLER
SPIRAL FREEZER
BAGGER/SCALE - LINE 3
FASTBACK CONVEYOR
FORMING EQUIPMENT - PINSATI/RAVIOLI/GRIMS
REFRIGERATONS SYSTEM - FREEZER
STAINLESS STEEL STACK
FREIGHT ON PT EQUIPMENT
HVAC & VENTILATION IN FREEZER
ELECTRICAL REQUIREMENTS - FREEZER
WORLD CUP INSERTS
ASSEMBLY (HOPPER/AGITATOR FOR WORLD CUP
LABOR AND MATERIALS FOR EQUIPMENT SET-UP
ELECTRICAL REQUIREMENTS - FREEZER
SHANKLIN MACHINE COVERS
WASHDOWN INVERTER
MIXER/BLENDER FOR WAL-MART PROJECT
SAFELINE POWERPHASE METAL DETECTOR
MODULE THERMAL - HAYYSEN
HEAT RESITANCE JASW FOR STEAM BAG
WATER CHILL SYSTEM - EXHAUST SYSTEM
BOLT CHOPPER/MIXING BOWLS
FREIGHT ON BARLIANT AUCTION
EMERY WINSLOW FLOOR SCALE - SHIPPING
WATER CHILL SYSTEM - REFRIGERATIONS
WATER CHILL SYSTEM - ELECTRICAL
WATER CHILL SYSTEM
WATER CHILL SYSTEM
WATER CHILL SYSTEM
WATER CHILL SYSTEM
WATER CHILL SYSTEM
KRAMER GREBE BOWL CUTTER
WATER CHILL SYSTEM
STEAM-BAG SYSTEM
STEAM-BAG SYSTEM
SCISSOR, 32',SKYJACK,285
METAL DETECTOR
TRANSFER PUMP W/ PISTON
PARENT CHILD INFEED CONVEYOR
RAVIOLI MACHINE
OHLSON SCALE

REFURBISH TECHNO-DESIGN RAVIOLI MACHINE
HP COMPAQ PROLIANT  FILE SERVER 50%
STEIN PREDUSTER, BATTER/BREADING LINE WITH BATTER MIXER
TORTELLINI & SACCHATINNI DIE REBUILD AND PARTS
RF DEVICES
AUCTION PURCHASES\BREADING MACHINE/STRING MACHINE
KN550 CORNUCOPIA ENCRUSTING MACHINE WITH OPTIONS
REFRIGERATION COMPRESSOR
NEW FORK TRUCK
MODIFY SUCTION LINE PIPING AND UPGRADE CONTROLS TO THE FES COMPRESSOR
HAYSSEN BAGGING EQUIPMENT
PASTA DIES (RIGATONI, PENNE)
AUTOMATIC CASE ERECTOR
LINE 3 COOKER
EXHAUST HOOD , DUCT & FAN
USED KRAMER BOWL CHOPPER
SLICER, PUMP, COLUMN LIFT
SOLIDS TESTER
STAINLESS EXHAUST FOR COOKER
FORK TRUCK TERMINAL
KETTLE
TORTELLINI MACHINE
AUTOMATIC CASE ERECTOR
AIR COMPRESSOR REFURBISH
VERTICAL CHEESE CUTTER
SHELL MACHINE
SAUCE METERING & PACKAGING
BUCA EQUIPMENT
FRICK COMPRESSOR
PESTO HOLDING TANK
SLICER
VIDEO JET PRINTER & HARDWARE
DOMINO
HAYSSEN
INDUSTRIAL TRUCK
COOKER MOTOR
AIR COMPRESSOR: GA30VSD WITH
PACKING CONVEYORS FOR MANI & SHELL LINES
HORIZONTAL SEALER WITH RACKS
CV-FB ASP FASTBACK CONVEYORS
M-210W-S/50-WP ISHIDA WEIGHER
(2) LX 150 HP BOILERS
PK08S/2.00/S PATTERSON KELLEY
CROWN MODEL RD5220-30 LIFT TRUCK
GRIM, COOLER, CONVEYORS, COOKER AND
PFENING BULK FLOUR SYSTEM, HANDLING
ILASEALING SYSTEM AND INSTALLATION
MIXERS FOR PREP ROOMS
PLASTI-FAB
SERIES 900 BELTS FOR CONVEYORS
FABRICATED DUCTWORK FOR COOKER
SS STEPOVER PLATFORM STAIRS & GUARDS
(2) SPRIAL FREEZERS MODEL 2417-21-100
HAYSSEN ULTIMA ST 12-16 HP VERTICAL
PLATFORM SS STAIRCASE

SPEED WEIGH SCALE
SQ. CAN OPENER - PREP ROOM
CUSTOMS ON PINSATI MACHINE
GO TRANS
HAYSSEN
DISPENSER WITH IMPRINTER
HOPPER FOR DISPENSER
ECONOSEAL SPARTAN
BOCK SPIN DRYER MODEL FP-605A
MIXER
AUTO SCALE WITH CONSOLE
SAFELINE METAL DETECTOR S/N 13032
CASE SEALER WITH INFEED/EXIT CONVEYORS
PINSATA MACHINE & CUSTOMS CHARGES
CUSTOMS/IMPORT CHARGES ON  3 DYES
TORTELLACCI DIES
DIES
SACCHETTINI DIES
FLOW DIVIDERS FOR SHELL EXTRUDER
CONVEYORS & CONVEYOR MODIFICATIONS
JBO SHELL DIE
SPEEDWEIGH SWO6000
ADDITION TO FLOUR SYSTEM
DIES
IMPORT/CUSTOMS FEE
DIES
SHELL PRESS - EXTRUDER
FREIGHT ON SHELL PRESS
IMPORT/CUSTOMS FEE
RIGGING COSTS FOR EXTRUDER
RAVIOLI MACHINE
FORMING & TREATMENT LINES
BAGGING & SCALES
SPIRAL FREEZERS
PACKAGING EQUIPMENT
CONVEYOR SYSTEM
OIL SYSTEM
FLOUR SYSTEM
SCALE PLATFORM
DOMINO PRINTERS
X-RAY MACHINE
PALLETIZER
CHECK WEIGHER
AIR COMPRESSOR
STORAGE TANK
TORTELLOCIO DIE
EGG WASH DOSING SYSTEM
SCISSOR TRUCK
STAINLESS STEEL LADDER
PROCESS CONTROL SERVER
PASTA MACHINE
ADMIXER WITH STAND
BELT SANITIZER CONTROL SYSTEM
METAL DETECTOR
BACKUP FORKLIFT BATTERY

COZZINI AGITATOR
AMONIA SYSTEM
STAINLESS STEEL STACKING VATS
DOUBLE PALLET JACKS
FORMING & TREATMENT LINES
PACKAGING EQUIPMENT
COOKER HOOD FAN - LINE #1
JUMB ROUIND DIE - CARRABBA'S
GFS PLATES - GNOCCHI & RAVIOLI
PT COOKER REFURB
SQUARE RAVIOLI DYE
TORTELLINI DYES
KNEEDING ROLLERS
HOT WATER SYSTEM - COOKER
DOMINO LABEL PRINTERS
DOMINO C6000 PRINTER
PACKAGING MACHINE CATCH PANS
SPIRAL FREEZERS
TORTELLOCIO DIE
FORKLIFT TRUCK REPAIRS
TENNANT MODEL T5 FLOOR SCRUBBER
R&D KITCHEN - CUSTOM EXHAUST HOOD
R&D KITCHEN - 18" GAS FRIER
R&D KITCHEN - 36" GAS RANGE
R&D KITCHEN - UNDERCOUNTER FREEZER
R&D KITCHEN - UNDERCOUNTER REFRIGERATOR
R&D KITCHEN - 10QT ELECTRIC KETTLE
R&D KITCHEN - HOBA-AM15VLT-2 DISHWASHER
R&D KITCHEN - STAINLES STEEL POT SICK & DISPOSER
R&D KITCHEN - PASTA COOKER
R&D KITCHEN - INDUSTRICAL MICROWAVE OVEN
R&D KITCHEN - PRECISION BALANCE PGL 8001 SCALE
R&D KITCHEN - PRECISION BALANCE PGL 303 SCALE
PT PENNE PRESS DIE
PT GIRASOLE HAND DIE
PAVAN 2 WAY MODULATING SANITARY VALVE
PORTABLE UNLOADING STATION
PORTABLE UNLOADING STATION
BACKFLOW PREVENTOR & INSTALLATION
FLEXPACK LEAK DETECTOR
PAVAN SHAKER FRAME REPLACEMENT
PT TORTELLINI DIE
MODEL UT055NRUF6A2S UNIMAC WASHER
MODEL UCN040HNVXUW UNIBAC DRYER
GREAR BOX - SPIRAL FREEZER - AF-SEW KAF107
HAYSSEN - FLAT BOTTOM PACKAGING UPGRADE
STEAM HEAT EXCHANGE - COOKER
KB GENESIS VARIABLE FREQUENCY DRIVE
POWER CHECK 300 METAL DETECTION
RX2-BD160W HITACHI PRINTER
CF25T CASE ERECTOR
FORMING & CUTTING ROLLER 45X45 DIE
CONVEYANCE SYSTEM - POUCH DEPOSITING
CONVEYOR MODIFICATIONS - SHELL PRODUCTION
INLINE PLASTICS - SAFE-T-FRESH CLOSING MACHINE

ROTOSOLVER MODEL 100RS88SS MIXER
PACKAGING ROOM EVAPORATOR
MASSMAN AUTOMATED FILLING MACHINE
HINDS-BOCK P128 TRANSFER PUMP
C6000 PRINTER HEAD
C6000 PRINTER HEAD
SWITCHBACK MODEL 5C-24 HORIZONTAL CARTONER
JUMBO ROUND DIE - CARRABBAS
2P-03S SERVO PUMP FILLER W/30G HOPPER
PT FORMING MACHINE & AUTOMATIC SHEETER
DWS MX-50 SCALE
SHELL DIE - 348X68MM
WASHER EXHAUST FAN & MAKE-UP AIR UNIT
SHELL FILLING DEPOSITOR - PVS-4100 - S/N 1033
SHELL FILLING DEPOSITOR - PVS-4100 - S/N 1034
SHELL FILLING DEPOSITOR - PVS-4100 - S/N 1035
SHELL FILLING DEPOSITOR - PVS-4100 - S/N 1029
SHELL FILLING DEPOSITOR - PVS-4100 - S/N 1030
SHELL FILLING DEPOSITOR - PVS-4100 - S/N 1031
SHELL FILLING DEPOSITOR - PVS-4100 - S/N 1032
COOKER BELT - COOKER # 3 - UPPER
COOKER BELT - COOKER # 3 - LOWER
COOKER BELT - COOKER # 2 - LOWER
LARGE ROUND RAVIOLI DIE - MBC
C6000 LABEL PRINTER S/N CSB_014182
C6000 LABEL PRINTER S/N CSB_014229 W/HEAD KIT S/N CSPH015623
C6000 HEAD KIT S/N CSPH015498
C6000 HEAD KIT S/N CSPH015386
C6000 HEAD KIT S/N CSPH016050
VIDEOJET DATAFLEX PLUS THERMAL PRINTER
TRIANGLE AP-030 GEARBOX & MOTOR SERVO
PAVAN WASTE RETURN FAN GROUP
CONTROL SYSTEM - ROOFTOP AAON UNITS
REFIRGERATION SYSTEM UPDATE & INTEGRITY REPAIRS
AF-SEW GEARBOX KAF107
COZZINI GEARMOTOR 7 H HP 41211
COMPRESSOR LS-1 HD PANEL REPLACEMENT
COMPRESSOR HS-2 HD PANEL REPLACEMENT
TRIANGLE FLAT BOTTOM FORMING TUBE
TRIANGLE FLAT BOTTOM 12 INCH FORMING TUBE
MASSMAN BAG OPENER UPGRADE
SAUCE ROOM - SPLIT REFRIGERATION SYSTEM
100 ROTOSOLVER MIXER
SAUCE ROOM - PIPING/MIXING EQUIPMENT
EPA AMONIA COMPLIANCE - INSULATION
TRIANGLE KROGER BAGGER UPDATE
HAYSSEN KROGER & FLAT BOTTOM BAGGER UPDATE
CAPATELLI DIE REFURBISHMENT
GIRASOLE MINI ROUND RAVIOLI DIE
SAFESYSTEM STEAM WASHER
CAVATAPPIE DIE INSERTS
VMAG ROBOT 500 VACCUME STUFFER
2006 CROWN SC4030-30 LIFT TRUCK
Breddo LORWWSD-200 Mixer
TFS 300 Horiztonal Packaging Machine

Diverting Timing 3UP Hopper System (TFS 300)
Q60 Top & Bottom Labeling System
540 Ravoli Machine BiColor Double Sheet
Sioux Moblel Mode F2.8S150 Safe Steam Cleaner
Sioux Moblel Mode F2.8S150 Safe Steam Cleaner
Sioux Moblel Mode F2.8S150 Safe Steam Cleaner
Sioux Moblel Mode F2.8S150 Safe Steam Cleaner
Sioux Moblel Mode F2.8S150 Safe Steam Cleaner
Sioux Moblel Mode F2.8S150 Safe Steam Cleaner
Sioux Moblel Mode F2.8S150 Safe Steam Cleaner
Reiser Vemag HP20-E Continous Stuffer w/350 Litre Hopper
ColdFront Pellet Freezer System Model U4 660 IMM Freezer
Pavan Press Model FTP130/DE320 w/Control Panel
Penne Die - 348x68mm
Flour Silo - Shick Solutions
Flex Auger Flour Delivery System
Trolly Distribution System Model DIC 1.2
Heat Recovery System
Floor Scale - 708S-33-2-GS
1-1/4" Stainless Steel Rolling Saftey Gate (3)
Stainless Steel Mobile Lift Stand
MAF1 Shanklin Form-Fill-Seal
10HP Condenser Motor
WorldCup Seal Head Assembly
Boiler Room Exhaust Fan
Electric Pressure Washer #1
Electric Pressure Washer #2
200hp Air Compressor
Conveyors for Triangle to Packaging Area
COP Tank (Nestle)
Formed & Welded Pans Lines 4 & 5
FS-40 Shredder Grater
Gear Box Pasta Technologies
Jaws for Packaging Area Side A
Kronen Centrifuge Mdl KS-7 Plus
Pipette Rigati Die #504844
Pipette Rigati Die #504845
Printer SDX60COMB53L
Signature Single Frequency Metal Detector
Smokehouse Alkar 2 Truck
Stainless Steel VATS (17) Units
Type 616L, 2" Sauce Line
Ultra Probe Lead Detector
Vat/Buggy Washer
Reiser Portioner PC878
Pan Fabricated & Installed Line 1
Pan Fabricated & Installed Line 2
Pan Fabricated & Installed Line 4
Pan Fabricated & Installed Line 5
PREST RACK SYSTEM - FREEZER/DRY WHSE
FIRE & ALARM SECURITY SYSTEM
VIDEO CAMERAS - COOLER SECURITY
VIDEO CAMERAS - SECURITY
EFFICIENCY LIGHTING FOR PLANT
SECURITY CAMERAS

TRENCH
SECURITY SYSTEM FOR TALBOT LANE
UNERCOUNTER DISHWASHER
REFRIGERATOR FREEZER
SLICER/DICER FOR RAW MATERIALS
COUNTERTOP STEAMER
STRUCTURAL STEEL FREEZER RACKING SYSTEM
KITTREDGE EQUIPMENT CO.
DRY RACKING FOR DRY WAREHOUSE
KITTREDGE EQUIP. CO.
OUTDOOR FURNITURE & AWNINGS
RACKING SYSTEMS - GUARDRAILS
RACKING SYSTEMS - WIRE CATCH
WAREHOUSE RACKING
QC COMPUTER PROJECT
HP COMPAQ PROLIANT  FILE SERVER 50%
QAD SOFTWARE  50%
COMPUTER UPGRADE 7 NEW PC'S AND 1 NEW NOTEBOOK
QAD LICENCES 20%
MFG/PRO LICENSES
COMPUTER EQUIPMENT
EXCHANGE FILE SERVER
TRADE MANAGEMENT SOFTWARE PROJECT
COMPUTER EQUIPMENT
QAD LICENSES
MAINTENANCE TRACKING SOFTWARE
WEB SITE DESIGN
QAD SOFTWARE  50%
QAD LICENCES 80%
MFG/PRO LICENSES
PROCESS CONTROL SERVER
PROCESS CONTROL INTEGRATION
EDI - QAD INTERFACE PROGRAM
DELL CTO EL PS41005 SAN STORAGE UNIT
VMWARE VSPH 6ESS +KIT 3 HOSTS SOFTWARE
EAGLE WAREHOUSE AUTOMATION SOFTWARE
EDI SOFTWARE INTERFACE - BJS
EDI SOFTWARE INTERFACE - C&S
EDI SOFTWARE INTERFACE - WAKEFERN
EDI SOFTWARE INTERFACE - KROGER
EDI SOFTWARE INTERFACE - FOODCITY/KVAT
EDI SOFTWARE INTERFACE - TOPCO
RF DEVICES - EAGLE SOFTARE PROJECT
WIRELESSS NETWORK - INSTALLATION & HARDWARE
QAD Manufacturing Process Improvments Software Implementation
QAD Process Software Implementation - MRP
QAD Process Software Implementation - DRP
RF Devices - Eagle Software Project
QAD Software EE Upgrade
QAD Software - DRP Module
QAD Software - Licenses
EDI Software Interface - Preferred
EDI Software Interface - Schuncks
EDI Software Interface - Reinhart
Security Cameras

EAM Implementation
QAD Enhancements (Licenses)
QAD Phase II (Kitchen)
FILE CABINETS FOR PRODUCTION (LAURA)
SHOW DISPLAY
POP-UP MIRAGE PLUS EXHIBIT STAND
TRADE SHOW UPGRADE
OFFICE FURNITURE/FIXTURES
OFFICE FURNITURE/FIXTURES
TELEPHONE SYSTEM
1-4000A MAIN SWITCHBOARD
FURNITURE & FIXTURES
FURN & FIXTURES - QC OFFICE
FLEXIROL TRACK SYSTEM - CONFERENCE
LATERAL FILES, PEDESTAL FILES, LABOR &BOOKCASE
1-4000A SWITCHBOARD COMPONENTS
TELEPHONE SYSTEM
OFFICE FURNITURE
WIRING SERVER ROOM
BLINDS
OFFICE FURNITURE/CUBICLE - FINANCE
LED Lighting Replacement
Walnut Conference Room Table
BUILDING EXPANSION
CL&P REBATE
AMONIA SYSTEM
PROCESS ELECTRIC
PROCESS PIPING
EXPANSION FINANCE COSTS
SECURITY SYSTEM
FREEZER INSULATION
WALLS, CEILING - FREEZER & DRY WHSE
SPRINKLER SYSTEM FOR FREEZER
WALLS, CEILING IN FREEZER
CAULKING IN FREEZER & DRY WAREHOUSE
SPRINKLER SYSTEM FOR FREEZER
WALLS, CEILING IN FREEZER
AMP ELECTRICAL
PALLETIZING AREA OF PLANT
BUILDING PERMITS
ENGINEERING FEES
ENGINEERING FEES
ENGINEERING FEES
ENGINEERING FEES
ENGINEERING FEES
FLOORING IN FACILITY & DRY WAREHOUSE
STRUCTURAL STEEL REQUIREMENTS
SITE WORK - FACILTY
SITE WORK
SITE WORK
FLOORING SPEC WORK
PAINTING WORK ON FACILITY ADDITION
ENGINEERING FEES
FLOORING IN FACILITY & DRY WAREHOUSE
STRUCTURAL STEEL REQUIREMENTS

SITE WORK - FACILTY
"HANDYMAN DUTIES IN FREEZER"
ENGINEERING FEES
ENGINEERING FEES
HVAC REQUIREMENTS
STRUCTURAL STEEL REQUIREMENTS
FLOOR COVERING IN KITCHEN/PACKAGING ROOM
OFFICE MODIFICATIONS - G&A/CUSTOMER SVC.
LAND GRADING
TRENCH EXCAVATION (LEASEHOLD)
R&D KITCHEN & CONFERENCE ROOM
R&D KITCHEN - WALK IN FREEZER/COOLER
R&D KITCHEN - TRENCH DRAIN
SAUCE ROOM ELECTRICAL RENOVATIONS
SAUCE/PESTO ROOM CONFIGURATION
SAMPLE ROOM COVERSTION TO KITCHEN
ICS-MEZZANINE JOINT REPAIR
ON-SITE OFFICE TRAILER - ELECTRICAL & INSTALLATION
EXTERNAL STAIRCASE RAILING
EXTERNAL AWNING
Centratlized Sauce Room & Distribution System
Steam Piping System - Steam Cleaners
Steam Trap Upgrades
Steam Pipe Insulation
2018 Roof Repairs
Production Floor Repairs
Wall Painting
Waste Water System NOTCH
Maintenance Annex
2017 Building  Remodel Debox
2 CES Fiberglass doors w/knock down FRP frames
New Waste Water System (Expansion Bldg)
Expansion Building - Production Line 6 - Side C
Building Remodeling - Exisiting Building Debox
LED Lighting Replacement Additional $ Hampden Zimmerman
QAD Cash Application
ASRS Freezer Automation Systore & System Logistics
Mfg QAD Phase 2 Implementation - Production
Sage Fixed Assets 2018.1
Decian - MDF Rack & IDF Enclosures - 4 switches - Expansion Bldg
DNS Server Upgrade
Meraki MX100 Firewall & Licenses
APC Battery backup (Decian)
Commercial Security & CCTV System - New Bldg
Automatic Storage Retrieval System - Freezer Environment (System Logistics
Crown Encore PE4500-80 Pallet Truck
Crown Encore SC5220-35 Sit-down Counterbalanced Truck
SS Platform HJ Norris
Used Kramer & Grebe SM 90 STL Bowl Chopper Serial# 261/1012
Cleanmove Ultra CRM-600 Mod Plastic Belt  MK Draw 5AU.48.001 Serial 21082
Cleanmove Ultra CRM-600 Mod Plastic Belt  MK Draw 5AU.44.001 Serial 21083
Triangle Flat bottom Jaw Assembly w/Gusset Tuckers & Forming Tube
Pavan Plastic Sliding Doors for Transfer Belt
Formed & Welded Pans Lines 4 & 5 (add'l $$) REF# 18201899002
Murzan 2.5" Recovery System (PIG)

Press MOD. FTP175/D450
Cooker MOD CV100/3/6
Flour Storage Silo System
Item LX200SG07 On-Demand Steam Boiler, Low NOx
OctoFrost Freezer Model 7/2
Fastback 90E-G2 Transfer Conveyor
Yamato 0616M Computer Combination Scales
Hinds Boch Servo Motor SP-03S Pump Fillers
Novus 380 V/F/F/S Machines
PowerChek400 2 Lane X-Ray
Beltweigh XE Checkweigher
PowerPhase PRO 2FLS Detector
Incline Conveyors w/Transfers
2 in 1 Combiner
Product Conveyor
Case Packer Model R700 ADABOT-LV MK11
Case Erector Bottom Tape Seal Model CE400
Empty & Full Case Conveyor
Full Case Checkweigh Model PDI
Case Top Closer Tape Sealer Model CS400
Palletizer 3 in 3
Pallet Transfer Cart
Raise in Height
Cognex Barcode Scanner
PE & Process Sensor
Q34 Label Printer
Sauce Room Equipment - Expansion Building
Expansion Building - Furniture & Fixtures
Expansion Building - Site Work & Land Improvements
Building - 50 Talbot Lane
Land Improvements
Building - 7 Year Property
Building - 5 Year Property
Building Cost Addition
Building - 50 Talbot Lane 2
R&D Center
Land - 50 Talbot Lane
Land - 280 Nutmeg Rd S
Land - 280 Nutmeg Rd S - Dirt
Raymand Leasing Corporation - All material handling equipment and associated accessories, including without limitation, lift trucks, pallet trucks, orderpickers, batteries and chargers, in the possession of Debtor Robert Reiser & Co. - One VEMAG Model HP20E Continuous Stuffer with VEMAG Parts Storage Cart One VEMAG Model 500 Continuous Stuffer One VEMAG model BC236 Ball Control

1-128 GBS RAM 1-NICS 2X10GBE 1-ARRAY 6X4 RBS RAID6
Personal Property that was financed financed by U.S. Bank Equipment Finance, a Division of U.S. Bank National Association, and covered by UCC # 3296960, including, but not limited to, copiers, printers and fax machines as further described on the invoices stored in Secured Party's collateral files; wherever location; together with all replacements, parts, repairs, additions, accessions and accessories incorporated therein or affixed or attached thereto and any and all proceeds of the foregoing, including, without limitation, insurance recoveries.  Any receipt of proceeds of the collateral by any other secured party violates the rights of secured
party

1 Pallett truck Model#: PE4500-80 S/N 6A289236 1 Forklift Model #: SC5220-35 S/N 9A183475

Four (4) Crown Rider Pallet Truck Model PE4500-60 SN 10229691, 10229692, 10229693, 10229718

## **Schedule 2.1.1(o)**

Specific Purchased Assets

[None.]

## Schedule 2.1.2(q)

### Specific Excluded Assets

| Asset(s) | Description |
|---|---|
| Automobile | 2015 Fiat Sedan - VIN: 3C3CFFDR2FT504119 |
| Automobile | 2013 Cadillac Escalade - VIN: 1GYS4BEFODR143077 |
| Automobile | 2015 Audi A6 - VIN: WAUFMAFC8FN013125 |
| Automobile | 2014 Buick Enclave - VIN: 5GAKVBKDOEJ193825 |

### Schedule 2.1.5(a)

Desired Contracts

1.  Avendra Supplier Agreement (Sales Through Distribution Only) dated December 28, 2019 between Avendra, LLC, and Carla's Pasta, Inc.

2.  Master Purchasing Agreement dated December 9, 2019 between Gordon Food Service, Inc. and Carla's Pasta Inc. and Exhibit A thereto along with Category Addendum and Private Label Addendum, each dated December 9, 2019.

3.  Supply Agreement dated July 1, 2008 between Sodexo Operations, LLC and Carla's Pasta, Inc., as amended by Amendment Number One to Supply Agreement dated July 1, 2011, Amendment Number Two to Supply Agreement dated February 1, 2013, Amendment Number Three to Supply Agreement dated July 1, 2014, Amendment Number Four to Supply Agreement dated June 30, 2017, Amendment Number Five to Supply Agreement dated January 1, 2020.

4.  Foodbuy Supplier Agreement dated January 1, 2017 between Foodbuy, LLC and Carla's Pasta, as amended by Foodbuy Extension Amendment dated December 30, 2020 between Foodbuy, LLC and Carla's Pasta

5.  Bid Award Purchase Agreement dated August 17, 2018 between Sysco Merchandising and Supply Chain Services, Inc. and Carla's Pasta, Inc. along with Exhibit A thereto

6.  Supply Agreement for BJ's Master Case – Agreement 9 with Specialty Packaging, LLC

7.  Supply Agreement for RSC Box Supply – Agreement 8 with Specialty Packaging, LLC

8.  Supply Agreement for 21.5" film & Slit Micro Steam Film with Specialty Packaging, LLC

9.  Supply Agreement #583654 – Agreement 7 with Specialty Packaging, LLC

10. Supply Agreement for items 8271, 8274, 8261, and 8262 – Agreement 6 with Specialty Packaging, LLC

11. Supply Agreement for items 8263 and 8264 – Agreement 12 with Specialty Packaging, LLC

12. Supply Agreement for item 8068 – Agreement 16 with Specialty Packaging, LLC

13. Supply Agreement for items 8238, 8230, 8233, 8231, 8232, and 8234  - Agreement 11 with Specialty Packaging, LLC

14. Supply Agreement for items 8211, 8212, 8213, 8214 – Agreement 14 with Specialty Packaging, LLC

15. Supply Agreement for item 8217 – Agreement 13 with Specialty Packaging, LLC

16. Supply Agreement for item 8082 – Agreement 1 with Specialty Packaging, LLC

17. Supply Agreement for item 8273 – Agreement 15 with Specialty Packaging, LLC

18. Supply Agreement for items 8000 and 8001 – Agreement 2 with Specialty Packaging, LLC

19. Supply Agreement for item C00064 – Agreement 3 with Specialty Packaging, LLC

20. Supply Agreement for items 8246, 8247, 8248, 8249, 8250, 8251, 8252, 8253, 8254, 8255, 8256, 8257, 8258, 8259 – Agreement 4 with Specialty Packaging, LLC

21. Supply Agreement for item 8260 – Agreement 10 with Specialty Packaging, LLC

22. Supply Agreement for item 8215 – Agreement 17 with Specialty Packaging, LLC

23. Supply Agreement for item 8240, 8239, 3211 and 3217 – Agreement 18 with Specialty Packaging, LLC

24. Supply Agreement for item 2986 and 2987 – Agreement 19 with Specialty Packaging, LLC

25. Supply Agreement for Carrabas Lobster Rav Box - Agreement 5 with Specialty Packaging, LLC

26. Agreement Regarding Real Property Tax Assessment dated as of October 3, 2019, by and between Town of South Windsor and Suri Realty LLC.

27. Distribution Agreement, dated as September 1, 2020, by and between Tree of Life Canada ULC and Carla's Pasta, Inc.

28. Bozzuto's Program, dated as of December 1, 2016, by and between Bozzutos Inc. and Carla's Pasta, Inc.

29. Energy Supply and Services Agreement (50 Talbot Lane), dated as July 3, 2018, by and between Doosan Energy Solutions America, Inc. and Carla's Pasta, Inc.

30. Energy Supply and Services Agreement (280 Nutmeg Road), dated as July 3, 2018, by and between Doosan Energy Solutions America, Inc. and Carla's Pasta, Inc.

31. Lease, dated as of August 2017, by and between Osprey Associates, LLC and Carla's Pasta, Inc.

32. The equipment lease of U.S. Bank Equipment Finance associated with UCC filing # 0003204785.

33. The equipment lease of Raymond Leasing Corporation associated with UCC filing # 0003229271.

34. The equipment lease of Wells Fargo Bank, N.A. associated with UCC filing # 0003326626.

35. The equipment lease of Wells Fargo Bank, N.A. associated with UCC filing # 0003415141.

## Schedule 4.5

Registered Intellectual Property

| General Description |
| --- |
| Trademark - Born in Italy Crafted in America |
| Trademark - Carla's Pasta |
| Trademark - Chicken - Design Mark |
| Trademark - Cucina di Carla |
| Trademark - Design Mark- Cucina Di Carla |
| Trademark - Gocce |
| Trademark - Plant to Plate Simple. Food. - Design Mark |
| Trademark - Plant to Plate-Design |
| Trademark - Plant to Plate-Word |
| Trademark - Sacchettini |

## Schedule 4.6

### Sellers' Employee Plans

| Type | Provider | Group Number |
|------|----------|--------------|
| Employee Health Insurance (Medical) | United Healthcare Insurance Company | 922959 |
| Dental Plan PPO | United Healthcare Insurance Company | 922959 |
| 401(k) Profit Sharing Plan & Trust | Fidelity Investments | N/A |
| Employee Vision | Anthem Blue Cross Blue Shield | AL00006236 |
| Group Life | Anthem Blue Cross Blue Shield | AL00006236 |
| Voluntary | Anthem Blue Cross Blue Shield | AL00006236 |
| Short Term Disability | Anthem Blue Cross Blue Shield | AL00006236 |
| LT Disability | Anthem Blue Cross Blue Shield | AL00006236 |
| Flexible Spending Account | WageWorks | 31891 |
| Workers' Compensation Insurance | Chubb | N/A |
| PTO, Vacation, Sick Pay, Overtime, and Other Employee-Related Policies | *See* Carla's Pasta, Inc. Employee Handbook dated May 1, 2016, last revised January 4, 2021 (in data room)[1] | N/A |

---

[1] The Debtors' employee handbook does not create any rights or obligations (contractual or otherwise) between either Debtor or its employees.  The Debtors and their estates reserve all rights if anyone asserts to the contrary.

**Schedule 4.7.1**

Real Estate Encumbrances

**A.      50 Talbot Lane:**

1.      Agreement regarding real property tax assessment by and between the Town of South Windsor and Sufi Realty LLC, dba Carla's Pasta Inc., dated October 2, 2019 and recorded October 2, 2019 in Volume 2727 at Page 187.

2.      Notice by the State of Connecticut department of transportation dated May 6, 2016 and recorded September Z 2017 in Volume 2608 at Page 13.

3.      Declaration of easements and covenants by Hale Realty, LLC dated and recorded March 8, 2001 in Volume 1192 at Page 237 of the South Windsor Land Records, as amended by second amendment to declaration dated May 25, 2016 and recorded May 26, 2016 in Volume 2524 at Page 208 of the South Windsor Land Records.

4.      Declaration of covenants and restrictions by Hale Realty, LLC dated and recorded April 27 2001 in Volume 1206 at Page 257 as amended by first amendment to declaration dated and recorded May 31, 2001 in Volume 1217 at Page 171, as amended by second amendment to declaration dated April 7 30, 2001 and recorded in Volume 1207 at Page 184 of the South Windsor Land Records.

5.      Sewer line easement granted to the Town of South Windsor dated March 8, 2001 and recorded March 9, 2001 in Volume 1192 at Page 241 of the South Windsor Land Records.

6.      Street tree easement granted to the Town of South Windsor dated March 8, 2001 and recorded March 9, 2001 in Volume 1192 at Page 244 of the South Windsor Land Records.

7.      Conservation easement granted to the Town of South Windsor dated March 8, 2001 and recorded March 9, 2001 in Volume 1192 at Page 254 of the South Windsor Land Records.

8.      Drainage easement agreement by and between Sufi Realty, LLC, and Hale Realty II, LLC, dated May 25, 2016 and recorded May 26, 2016 in Volume 2524 at Page 211 of the South Windsor Land Records.

9.      Drainage easement agreement by and between Sufi Realty, LLC, and Hale Realty, LLC, dated May 25, 2016 and recorded May 26, 2016 in Volume 2524 at Page 229 of the South Windsor Land Records.

10.      Variance by the Town of South Windsor zoning board of appeals dated October 11, 2017 and recorded October 24, 2017 in Volume 2615 at Page 157 of the South Windsor Land Records.

11.      Variance by the Town of South Windsor zoning board of appeals dated September 6, 1988 and recorded September 13, 1988 in Volume 538 at Page 447 of the South Windsor Land Records.

12. Variance by the Town of South Windsor zoning board of appeals dated January 9, 1987 and recorded January 22, 1987 in Volume 465 at Page 109 of the South Windsor Land Records.

13. Easement granted to the Connecticut Light and Power Company dated March 26, 1970 and recorded April 25, 1971 in Volume 136 at Page 222 of the South Windsor Land Records.

**B.    280 Nutmeg:**

1. Declaration of easements and covenants by Hale Realty, LLC dated and recorded March 8, 2001 in Volume 1192 at Page 237 of the South Windsor Land Records, as amended by first amendment to declaration dated and recorded May 31, 2001 in Volume 1217 at Page 171, as amended by second amendment to declaration dated May 25, 2016 and recorded May 26, 2016 in Volume 2524 at Page 208 of the South Windsor Land Records.

2. Declaration of covenants and restrictions by Hale Realty, LLC dated and recorded April 27 2001 in Volume 1206 at Page 257 as amended by first amendment to declaration dated and recorded May 31, 2001 in Volume 1217 at Page 171, as amended by second amendment to declaration dated April 30, 2001 and recorded in Volume 1207 at Page 184 of the South Windsor Land Records.

3. Sewer line easement granted to the Town of South Windsor dated March 8, 2001 and recorded March 9, 2001 in Volume 1192 at Page 241 of the South Windsor Land Records.

4. Street tree easement granted to the Town of South Windsor dated March 8, 2001 and recorded March 9, 2001 in Volume 1192 at Page 244 of the South Windsor Land Records.

5. Conservation easement granted to the Town of South Windsor dated March 8, 2001 and recorded March 9, 2001 in Volume 1192 at Page 254 of the South Windsor Land Records.

6. Drainage easement agreement by and between Sufi Realty, LLC, and Hale Realty II, LLC, dated May 25, 2016 and recorded May 26, 2016 in Volume 2524 at Page 211 of the South Windsor Land Records.

7. Drainage easement agreement by and between Sufi Realty, LLC, and Hale Realty, LLC, dated May 25, 2016 and recorded May 26, 2016 in Volume 2524 at Page 229 of the South Windsor Land Records.

8. Variance by the Town of South Windsor zoning board of appeals dated October 11, 2017 and recorded October 24, 2017 in Volume 2615 at Page 157 of the South Windsor Land Records.

9. Variance by the Town of South Windsor zoning board of appeals dated September 6, 1988 and recorded September 13, 1988 in Volume 538 at Page 447 of the South Windsor Land Records.

10.     Variance by the Town of South Windsor zoning board of appeals dated January 9, 1987 and recorded January 22, 1987 in Volume 465 at Page 109 of the South Windsor Land Records.

11.     Easement granted to the Connecticut Light and Power Company dated March 26, 1970 and recorded April 25, 1971 in Volume 136 at Page 222 of the South Windsor Land Records.

## **Schedule 4.7.3**

Tax Appeals

1.      Town of South  Windsor: dispute regarding terms of Agreement Regarding Real Property Tax Assessment dated as of October 3, 2019, by and between Town of South Windsor and Suri Realty LLC.

## **Schedule 4.8**

Employee Claims

1. *Britz, Alan et Al v Carla's Pasta, Inc. et al.*

- Civil Litigation in Connecticut Superior Court (HHD-CV20-6133385-S)

- Dismissed Pursuant to settlement agreement, but plaintiffs reserved limited rights to file a general unsecured claim against Carla's Pasta in any bankruptcy proceeding

## Schedule 4.10

Encumbrances

| Original File Number | File Date | Expiration Date | Secured Party |
|---|---|---|---|
| 0002144380 | 06/24/02 | 06/24/22 | PEOPLE'S BANK<br>ONE FINANCIAL PLAZA<br>HARTFORD CT 06103-2613 |
| AMENDMENT | 0002438105 | 02/02/07 | - |
| AMENDMENT | 0002702646 | 06/30/09 | |
| AMENDMENT | 0002788810 | 12/15/10 | - |
| AMENDMENT | 0002866648 | 03/26/12 | - |
| AMENDMENT | 0002889415 | 07/31/12 | - |
| AMENDMENT | 0003176095 | 04/26/17 | - |
| AMENDMENT | 0003205564 | 10/04/17 | - |
| AMENDMENT | 0003207764 | 10/05/17 | - |
| Original | 0003204785 | 09/29/17 | U.S. BANK EQUIPMENT FINANCE<br>1310 MADRID STREET<br>MARSHALL MN 56258 |
| Original | 0003229271 | 03/01/18 | RAYMOND LEASING CORPORATION<br>CORPORATE HEADQUARTERS<br>GREENE NY 13778 |
| Original | 0003326626 | 08/28/19 | WELLS FARGO BANK, N.A.<br>800 WALNUT STREET, F0005-044<br>DES MOINES IA 50309 |
| Original | 0003415141 | 12/04/20 | WELLS FARGO BANK, N.A.<br>800 WALNUT STREET, F0005-044<br>DES MOINES IA 50309 |
| Alleged Mechanics' Lien | | | The Dennis Engineering Group, LLC |
| Alleged Mechanics' Lien | | | Elm Electrical, Inc. |

## **Schedule 4.11**

Taxes

1. State of Connecticut Sales and Use Tax Audit (State of Connecticut Department of Revenue Services)

## **Schedule 4.12**

Compliance with Laws

[NONE]

## Schedule 4.13

Material Contracts

1. Avendra Supplier Agreement (Sales Through Distribution Only) dated December 28, 2019 between Avendra, LLC, and Carla's Pasta, Inc.

2. Master Purchasing Agreement dated December 9, 2019 between Gordon Food Service, Inc. and Carla's Pasta Inc. and Exhibit A thereto along with Category Addendum and Private Label Addendum, each dated December 9, 2019.

3. Supply Agreement dated July 1, 2008 between Sodexo Operations, LLC and Carla's Pasta, Inc., as amended by Amendment Number One to Supply Agreement dated July 1, 2011, Amendment Number Two to Supply Agreement dated February 1, 2013, Amendment Number Three to Supply Agreement dated July 1, 2014, Amendment Number Four to Supply Agreement dated June 30, 2017, Amendment Number Five to Supply Agreement dated January 1, 2020.

4. Foodbuy Supplier Agreement dated January 1, 2017 between Foodbuy, LLC and Carla's Pasta, as amended by Foodbuy Extension Amendment dated December 30, 2020 between Foodbuy, LLC and Carla's Pasta

5. Bid Award Purchase Agreement dated August 17, 2018 between Sysco Merchandising and Supply Chain Services, Inc. and Carla's Pasta, Inc. along with Exhibit A thereto

6. Supplier Agreement dated December 30, 2017 between Aramark SCM, Inc. and Carla's Pasta

7. Supply Agreement for BJ's Master Case – Agreement 9 with Specialty Packaging, LLC

8. Supply Agreement for RSC Box Supply – Agreement 8 with Specialty Packaging, LLC

9. Supply Agreement for 21.5" film & Slit Micro Steam Film with Specialty Packaging, LLC

10. Supply Agreement #583654 – Agreement 7 with Specialty Packaging, LLC

11. Supply Agreement for items 8271, 8274, 8261, and 8262 – Agreement 6 with Specialty Packaging, LLC

12. Supply Agreement for items 8263 and 8264 – Agreement 12 with Specialty Packaging, LLC

13. Supply Agreement for item 8068 – Agreement 16 with Specialty Packaging, LLC

14. Supply Agreement for items 8238, 8230, 8233, 8231, 8232, and 8234  - Agreement 11 with

Specialty Packaging, LLC

15. Supply Agreement for items 8211, 8212, 8213, 8214 – Agreement 14 with Specialty Packaging, LLC

16. Supply Agreement for item 8217 – Agreement 13 with Specialty Packaging, LLC

17. Supply Agreement for item 8082 – Agreement 1 with Specialty Packaging, LLC

18. Supply Agreement for item 8273 – Agreement 15 with Specialty Packaging, LLC

19. Supply Agreement for items 8000 and 8001 – Agreement 2 with Specialty Packaging, LLC

20. Supply Agreement for item C00064 – Agreement 3 with Specialty Packaging, LLC

21. Supply Agreement for items 8246, 8247, 8248, 8249, 8250, 8251, 8252, 8253, 8254, 8255, 8256, 8257, 8258, 8259 – Agreement 4 with Specialty Packaging, LLC

22. Supply Agreement for item 8260 – Agreement 10 with Specialty Packaging, LLC

23. Supply Agreement for item 8215 – Agreement 17 with Specialty Packaging, LLC

24. Supply Agreement for item 8240, 8239, 3211 and 3217 – Agreement 18 with Specialty Packaging, LLC

25. Supply Agreement for item 2986 and 2987 – Agreement 19 with Specialty Packaging, LLC.

26. Supply Agreement for Carrabas Lobster Rav Box - Agreement 5 with Specialty Packaging, LLC

27. Agreement Regarding Real Property Tax Assessment dated as of October 3, 2019, by and between Town of South Windsor and Suri Realty LLC.

## **Schedule 4.14**

Financial Statements

[see attached]

**CARLA'S PASTA INC. & SUBSIDIARY**
**PROFIT & LOSS STATEMENT - vs. PRIOR YEAR**
**STANDARD GROSS PROFIT & NET GROSS PROFIT VERSION**

| | FOR THE PERIOD ENDED JANUARY 30, 2021 | | | | | | YEAR TO DATE | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REVENUE | 2021 ACTUAL | % OF SALES | 2020 ACTUAL | % OF SALES | VARIANCE | % VAR | 2021 ACTUAL | % OF SALES | 2020 ACTUAL | % OF SALES | VARIANCE | % VAR |
| FOODSERVICE | 2,410,775 | 70.1% | $ 2,835,068.80 | 58.37 % | (424,294) | -49.5% | 2,410,775 | 70.1% | $ 2,835,068.80 | 58.37 % | (424,294) | -49.5% |
| FOODSERVICE - NESTLE CANADA | - | 0.0% | $ 9,760.00 | 0.20 % | (9,760) | -100.0% | - | 0.0% | $ 9,760.00 | 0.20 % | (9,760) | -100.0% |
| NATIONAL ACCOUNTS | 571,561 | 16.6% | $ 1,510,651.41 | 31.10 % | (939,090) | -51.4% | 571,561 | 16.6% | $ 1,510,651.41 | 31.10 % | (939,090) | -51.4% |
| RETAIL | 427,840 | 12.4% | $ 213,304.70 | 4.39 % | 214,535 | -28.4% | 427,840 | 12.4% | $ 213,304.70 | 4.39 % | 214,535 | -28.4% |
| CLUB | - | 0.0% | $ 153,808.00 | 3.17 % | (153,808) | -99.8% | - | 0.0% | $ 153,808.00 | 3.17 % | (153,808) | -99.8% |
| HMS | 30,857 | 0.9% | $ 56,531.70 | 1.16 % | (25,675) | -62.5% | 30,857 | 0.9% | $ 56,531.70 | 1.16 % | (25,675) | -62.5% |
| INDUSTRIAL | - | 0.0% | $ 77,794.00 | 1.60 % | (77,794) | -72.5% | - | 0.0% | $ 77,794.00 | 1.60 % | (77,794) | -72.5% |
| **TOTAL GROSS SALES** | 3,441,033 | 100.0% | $ 4,856,919 | 100.0% | (3,867,282) | -52.2% | 3,441,033 | 100.0% | $ 4,856,919 | 100.0% | (3,867,282) | -52.2% |
| COST OF GOODS SOLD @ STANDARD | | | | | | | | | | | | |
| MATERIALS @ STANDARD | 1,377,838 | 40.0% | 1,810,111 | 37.3% | (432,273) | -44.4% | 1,377,838 | 40.0% | 1,810,111 | 37.3% | (432,273) | -44.4% |
| PURCHASE PRICE VARIANCE | (71,248) | -2.1% | (26,571) | -0.5% | (44,677) | 647.4% | (71,248) | -2.1% | (26,571) | -0.5% | (44,677) | 647.4% |
| LABOR @ STANDARD | 126,182 | 3.7% | 176,568 | 3.6% | (50,386) | -39.9% | 126,182 | 3.7% | 176,568 | 3.6% | (50,386) | -39.9% |
| MFG O/H @ STANDARD | 1,151,697 | 33.5% | 1,355,525 | 27.9% | (203,828) | -17.8% | 1,151,697 | 33.5% | 1,355,525 | 27.9% | (203,828) | -17.8% |
| TOTAL DIRECT COSTS @ STANDARD | 2,584,468 | 75.1% | 3,315,632 | 68.3% | (1,538,042) | -33.9% | 2,584,468 | 75.1% | 3,315,632 | 68.3% | (1,538,042) | -33.9% |
| *GROSS PROFIT MARGIN @ STANDARD* | 856,565 | 24.9% | 1,541,286 | 31.7% | (2,329,241) | -81.1% | 856,565 | 24.9% | 1,541,286 | 31.7% | (2,329,241) | -81.1% |
| MFG SPEND VARIANCE - CURRENT | | | | | | | | | | | | |
| MATERIAL USAGE & WASTE VARIANCE | 174,812 | 5.1% | 179,108 | 3.7% | (4,296) | -49.9% | 174,812 | 5.1% | 179,108 | 3.7% | (4,296) | -49.9% |
| LABOR SPENDING VARIANCE | 112,067 | 3.3% | 130,438 | 2.7% | (18,372) | 1.7% | 112,067 | 3.3% | 130,438 | 2.7% | (18,372) | 1.7% |
| OVERHEAD SPENDING VARIANCE | 341,330 | 9.9% | 170,742 | 3.5% | 170,587 | -68.3% | 341,330 | 9.9% | 170,742 | 3.5% | 170,587 | -68.3% |
| TOTAL CURRENT MFG SPENDING VARIANCE | 628,208 | 18.3% | 480,289 | 9.9% | (1,125,583) | -59.5% | 628,208 | 18.3% | 480,289 | 9.9% | (1,125,583) | -59.5% |
| MFG SPEND VARIANCE - MANAGED | (122,812) | -3.6% | (15) | 0.0% | (122,797) | -60.6% | (122,812) | -3.6% | (15) | 0.0% | (122,797) | -60.6% |
| **GROSS PROFIT** | 351,170 | 10.2% | 1,061,013 | 21.8% | (709,843) | -66.9% | 351,170 | 10.2% | 1,061,013 | 21.8% | (709,843) | -66.9% |
| GENERAL & ADMINISTRATIVE EXPENSES: | | | | | | | | | | | | |
| ADMINISTRATIVE SALARIES | 53,635 | 1.6% | 128,776 | 2.7% | (75,141) | -58.4% | 53,635 | 1.6% | 128,776 | 2.7% | (75,141) | -58.4% |
| ADMINISTRATIVE OTHER | 48,193 | 1.4% | 49,712 | 1.0% | (1,519) | -3.1% | 48,193 | 1.4% | 49,712 | 1.0% | (1,519) | -3.1% |
| BUSINESS INSURANCE | 37,319 | 1.1% | 46,294 | 1.0% | (8,974) | -19.4% | 37,319 | 1.1% | 46,294 | 1.0% | (8,974) | -19.4% |
| EMPLOYMENT COSTS | 912 | 0.0% | 16,184 | 0.3% | (15,272) | -94.4% | 912 | 0.0% | 16,184 | 0.3% | (15,272) | -94.4% |
| IT EXPENSE | 24,548 | 0.7% | 29,699 | 0.6% | (5,151) | -17.3% | 24,548 | 0.7% | 29,699 | 0.6% | (5,151) | -17.3% |
| PROFESSIONAL FEES | 741,647 | 21.6% | 86,617 | 1.8% | 655,030 | 756.2% | 741,647 | 21.6% | 86,617 | 1.8% | 655,030 | 756.2% |
| TOTAL GENERAL & ADMIN EXPENSES | 906,254 | 26.3% | 357,280 | 7.4% | 548,974 | 153.7% | 906,254 | 26.3% | 357,280 | 7.4% | 548,974 | 153.7% |
| SELLING EXPENSES: | | | | | | | | | | | | |
| SALES SALARIES | 95,393 | 2.8% | 218,236 | 4.5% | (122,843) | -56.3% | 95,393 | 2.8% | 218,236 | 4.5% | (122,843) | -56.3% |
| SALES PERSON EXPENSES | (5,104) | -0.1% | 69,398 | 1.4% | (74,502) | -107.4% | (5,104) | -0.1% | 69,398 | 1.4% | (74,502) | -107.4% |
| EMPLOYMENT COSTS | 6,062 | 0.2% | 28,228 | 0.6% | (22,166) | -78.5% | 6,062 | 0.2% | 28,228 | 0.6% | (22,166) | -78.5% |
| MARKETING PROGRAMS | 244,264 | 7.1% | 314,683 | 6.5% | (70,419) | -22.4% | 244,264 | 7.1% | 314,683 | 6.5% | (70,419) | -22.4% |
| SALES & SERVICE ALLOWANCES | 105,354 | 3.1% | 293,130 | 6.0% | (187,776) | -64.1% | 105,354 | 3.1% | 293,130 | 6.0% | (187,776) | -64.1% |
| PROMOTIONS | 3,820 | 0.1% | 39,648 | 0.8% | (35,828) | -90.4% | 3,820 | 0.1% | 39,648 | 0.8% | (35,828) | -90.4% |
| REBATES | 4,044 | 0.1% | 311,004 | 6.4% | (306,959) | -98.7% | 4,044 | 0.1% | 311,004 | 6.4% | (306,959) | -98.7% |
| BROKER COMMISSIONS | 50,359 | 1.5% | 36,771 | 0.8% | 13,588 | 37.0% | 50,359 | 1.5% | 36,771 | 0.8% | 13,588 | 37.0% |
| DISTRESSED PRODUCT | (22,821) | -0.7% | 2,821 | 0.1% | (25,642) | -909.0% | (22,821) | -0.7% | 2,821 | 0.1% | (25,642) | -909.0% |
| FEDERAL EXPRESS | 4,415 | 0.1% | 17,130 | 0.4% | (12,715) | -74.2% | 4,415 | 0.1% | 17,130 | 0.4% | (12,715) | -74.2% |
| FREIGHT OUTBOUND | 95,953 | 2.8% | 76,379 | 1.6% | 19,574 | 25.6% | 95,953 | 2.8% | 76,379 | 1.6% | 19,574 | 25.6% |
| R&D | 184 | 0.0% | 35,028 | 0.7% | (34,843) | -99.5% | 184 | 0.0% | 35,028 | 0.7% | (34,843) | -99.5% |
| SALES EXP MISC/ADVERTISING | 35,658 | 1.0% | 8,049 | 0.2% | 27,609 | 343.0% | 35,658 | 1.0% | 8,049 | 0.2% | 27,609 | 343.0% |
| SALES EVENTS | 1,905 | 0.1% | 19,431 | 0.4% | (17,527) | -90.2% | 1,905 | 0.1% | 19,431 | 0.4% | (17,527) | -90.2% |
| SALES IT SERVICES | 24,553 | 0.7% | 19,426 | 0.4% | 5,126 | 26.4% | 24,553 | 0.7% | 19,426 | 0.4% | 5,126 | 26.4% |
| SAMPLES | 4,943 | 0.1% | 20,211 | 0.4% | (15,268) | -75.5% | 4,943 | 0.1% | 20,211 | 0.4% | (15,268) | -75.5% |
| SLOTTING FEES | - | 0.0% | 1,903 | 0.0% | (1,903) | -100.0% | - | 0.0% | 1,903 | 0.0% | (1,903) | -100.0% |
| **TOTAL SALES EXPENSES** | 648,982 | 18.9% | 1,511,477 | 31.1% | (862,495) | -57.1% | 648,982 | 18.9% | 1,511,477 | 31.1% | (862,495) | -57.1% |
| INTEREST EXPENSES | 123,061 | 3.6% | 323,750 | 6.7% | (200,690) | -62.0% | 123,061 | 3.6% | 323,750 | 6.7% | (200,690) | -62.0% |
| CASH DISCOUNTS | 43,662 | 1.3% | 78,112 | 1.6% | (34,450) | -44.1% | 43,662 | 1.3% | 78,112 | 1.6% | (34,450) | -44.1% |
| BAD DEBT EXPENSE | - | 0.0% | - | 0.0% | - | | - | 0.0% | - | 0.0% | - | |
| OTHER CORPORATE TAX | - | 0.0% | 2,479 | 0.1% | (2,479) | -100.0% | - | 0.0% | 2,479 | 0.1% | (2,479) | -100.0% |
| OTHER EXPENSES | (51) | 0.0% | (14,041) | -0.3% | 13,989 | -99.6% | (51) | 0.0% | (14,041) | -0.3% | 13,989 | -99.6% |
| ROYALTY INCOME | - | 0.0% | (1,020) | 0.0% | 1,020 | -100.0% | - | 0.0% | (1,020) | 0.0% | 1,020 | -100.0% |
| OTHER INCOME | - | 0.0% | - | 0.0% | - | | - | 0.0% | - | 0.0% | - | |
| AMORIZATION DEBT ISSUANCE | 6,801 | 0.2% | 6,801 | 0.1% | - | 0.0% | 6,801 | 0.2% | 6,801 | 0.1% | - | 0.0% |
| **TOTAL OTHER EXPENSES** | 173,472 | 5.0% | 396,082 | 8.2% | (222,610) | -56.2% | 173,472 | 5.0% | 396,082 | 8.2% | (222,610) | -56.2% |
| **NET INCOME BEFORE TAX** | (1,377,539) | -40.0% | (1,203,826) | -24.8% | (173,712) | 14.4% | (1,377,539) | -40.0% | (1,203,826) | -24.8% | (173,712) | 14.4% |
| FEDERAL & STATE INCOME TAX | - | 0.0% | - | 0.0% | | | - | 0.0% | - | 0.0% | | |
| **NET INCOME AFTER TAXES** | (1,377,539) | -40.0% | (1,203,826) | -24.8% | (173,712) | 14.4% | (1,377,539) | -40.0% | (1,203,826) | -24.8% | (173,712) | 14.4% |
| **EBITDA** | (756,835) | -22.0% | (268,927) | -5.5% | (487,908) | 181.4% | (756,835) | -22.0% | (268,927) | -5.5% | (487,908) | 181.4% |
| EBITDA Adjustments: | | | | | | | | | | | | |
| Professional fees | 697,439 | | 89,794 | | 607,645 | | 697,439 | | 89,794 | | 607,645 | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| **ADJUSTED EBITDA** | (59,396) | | (179,133) | | 119,737 | | (59,396) | | (179,133) | | 119,737 | |

**Carla's Pasta, Inc. & Subsidiary**
**Balance Sheet**
**For the Period Ending January 30, 2021**

| Assets | 1/30/2021 | 12/31/2020 | Movement | 12/31/2020 | Movement |
|---|---|---|---|---|---|
| Cash | $ 977,480 | $ 1,169,128 | $ (191,648) | $ 1,169,128 | $ (191,648) |
| Accounts Receivable | 3,680,043 | 3,445,497 | 234,546 | 3,445,497 | 234,546 |
| Inventory | 4,825,599 | 4,600,138 | 225,461 | 4,600,138 | 225,461 |
| Other Receivables | 512,617 | 324,488 | 188,129 | 324,488 | 188,129 |
| Prepaid expenses and other current assets | 807,881 | 1,202,289 | (394,408) | 1,202,289 | (394,408) |
| Total Current Assets | $ 10,803,620 | $ 10,741,541 | $ 62,079 | $ 10,741,541 | $ 62,079 |
| Land & Land Improvements | 6,000,365 | 6,000,365 | | 6,000,365 | |
| Property & Equipment | 49,656,497 | 50,103,728 | (447,231) | 50,103,728 | (447,231) |
| Investment in Subsidiary | - | - | - | - | - |
| CIP - Expansion Proj (Building and Equip) | 386,217 | 386,217 | - | 386,217 | - |
| Other Assets | 305,874 | 305,874 | - | 305,874 | - |
| Total Assets | $ 67,152,573 | $ 67,537,725 | $ (385,152) | $ 67,537,725 | $ (385,152) |
| **Liabilities** | | | | | |
| Current Installment on Long Term Debt | 1,857,143 | 1,857,143 | - | 1,857,143 | - |
| Line of Credit | 6,012,000 | 5,312,000 | 700,000 | 5,312,000 | 700,000 |
| Accounts Payable | 8,376,435 | 8,114,039 | 262,396 | 8,114,039 | 262,396 |
| Income Taxes Payable(Prepaid) | (5,075) | (5,075) | - | (5,075) | - |
| Deferred Tax Liability | (883,979) | (883,979) | - | (883,979) | - |
| Accrued Construction Liability | 15,292,264 | 15,292,264 | | 15,292,264 | |
| Accrued Expenses | 2,813,595 | 2,859,718 | (46,123) | 2,859,718 | (46,123) |
| Accrued Payroll | 159,113 | 89,800 | 69,313 | 89,800 | 69,313 |
| Total Current Liabilities | $ 33,621,495 | $ 32,635,910 | $ 985,585 | $ 32,635,910 | $ 985,585 |
| Long Term Debt | 29,872,784 | 29,872,784 | | 29,872,784 | |
| CARES Act PPP Loan | 2,753,192 | 2,753,192 | - | 2,753,192 | - |
| NPV Interest Rate Swap | (232,963) | (232,963) | - | (232,963) | - |
| Debt Issuance Costs | (136,024) | (142,825) | 6,801 | (142,825) | 6,801 |
| Deferred Revenue | $ 1,301,364.56 | 1,301,365 | - | 1,301,365 | - |
| Note Payable - CS | 1,180,700 | 1,180,700 | - | 1,180,700 | - |
| Stockholder Loan | 2,285,564 | 2,285,564 | - | 2,285,564 | - |
| Total Liabilities | $ 70,646,113 | $ 69,653,726 | $ 992,387 | $ 69,653,726 | $ 992,387 |
| **Stockholders Equity** | | | | | |
| Stock | 519,750 | 519,750 | - | 519,750 | - |
| Additional Paid in Capital | 157,280 | 157,280 | - | 157,280 | - |
| Membership Interest | - | - | | - | |
| Other Comprehensive Income(Loss) | 173,723 | 173,723 | - | 173,723 | - |
| Retained Earnings | (2,966,754) | (2,966,754) | | (2,966,754) | |
| Current Year Retained Earnings | (1,377,539) | - | (1,377,539) | - | (1,377,539) |
| Total Stockholders Equity | $ (3,493,540) | $ (2,116,001) | $ (1,377,539) | $ (2,116,001) | $ (1,377,539) |
| Total Liabilities & Stockholders Equity | $ 67,152,573 | $ 67,537,725 | $ (385,152) | $ 67,537,725 | $ (385,152) |
| | (0) | (0) | 0 | 0 | - |

**Carla's Pasta Inc. & Subsidiary**
**Statement of Cash Flows**
**For the Period Ending January 31, 2021**

| Cash Flows from Operating Activities: | Current Month | | Year to Date | |
|---|---|---|---|---|
| Net Income (Loss) | $ | (1,377,539) | $ | (1,377,539) |
| Adjustments to reconcile net income to net cash | | | | |
| Amortization of Deferred Revenue | | - | | 6,801 |
| Amortization of Debt Issuance Costs | | 6,801 | | - |
| Non-Cash Debt Forgivness | | - | | - |
| Disposal of Fixed Asset | | - | | - |
| Change in Deferred Taxes | | - | | - |
| Depreciation Expense | | 447,231 | | 447,231 |
| Net cash provided from operating activities | $ | (923,506) | $ | (923,506) |
| | | | | |
| Changes in operating assets and liabilities: | | | | |
| Accounts Receivable | | (234,546) | | (234,546) |
| Inventories | | (225,461) | | (225,461) |
| Prepaid expenses and other current assets | | 394,408 | | 394,408 |
| Accounts Payable | | 262,396 | | 262,396 |
| Accrued expenses | | 69,313 | | 69,313 |
| Accrued Construction Liability | | (46,123) | | (46,123) |
| Other Receivables | | (188,129) | | (188,129) |
| Change in Income Tax Accrual | | - | | - |
| Net cash provided by operating activities | $ | 31,858 | $ | 31,858 |
| | | | | |
| Investment activities: | | | | |
| Energy Rebate | | - | | - |
| New Construction Investment | | - | | - |
| Capital equipment | | - | | - |
| Net cash used in investment activities | $ | - | $ | - |
| | | | | |
| Financing activities: | | | | |
| Payment/ Increase of stockholders loans | | - | | - |
| CARES PPP Loan | | - | | - |
| Invesment in Subsidiary | | - | | - |
| Changes in debt | | 700,000 | | 700,000 |
| Net Change in Line of Credit | | | $ | (1,400,000) |
| Borrowings | $ | - | $ | - |
| Principal payments | $ | - | $ | (3,178,937) |
| Change in dividends paid | $ | - | $ | - |
| Net cash provided by (used in) financing activities | $ | 700,000 | $ | 700,000 |
| | | | | |
| Net increase (decrease) in cash and cash equivalents | $ | (191,648) | $ | (191,648) |
| | | | | |
| Cash and cash equivalents, beginning of period/year | | 1,169,128 | | 1,169,128 |
| | | | | |
| Cash and cash equivalents, end of period | $ | 977,480 | $ | 977,480 |
| | $ | (0) | $ | (0) |

Carla's Pasta Inc. -Income Statement, Balance Sheet & Cashflow - as of 01-30-2021

**Schedule 4.17**

Material Customers

A.  Material Distributor Customers

    1.  Sysco
    2.  Gordon Food Service
    3.  Performance Food Group
    4.  US Foods
    5.  Dot Foods

B.  Material National Accounts Customers

    1.  Buffalo Wild Wings (sold through 3PL, Kinexo)
    2.  Buca di Beppo
    3.  Carrabba's Italian Grill (sold through 3PL, Armada Foods)
    4.  Outback Steakhouse (sold through 3PL, Armada Foods)
    5.  Bertucci's

**Schedule 4.18**

Proceedings

| Case Title | Case # | Nature of Case | Court or Agency's Name |
|---|---|---|---|
| Total Quality Logistics LLC v. Carla's Pasta, Inc. | 2020 CVH 00855 | Civil | Court of Common Pleas, Clermont County, Ohio |
| The Dennis Group, LLC v. Suri Realty, LLC & Carla's Pasta, Inc. | HHD-CV20-6127365-S | Civil | State of Connecticut Superior Court |
| Nemco Food Trading v. Carla's Pasta | HHD-CV-20-6133942-S | Civil | State of Connecticut Superior Court |
| Sardilli Produce & Dairy Co., Inc. v. Carla's Pasta, Inc. | HHD-CV21-5066624-S | Civil | State of Connecticut Superior Court |
| The Dennis Group, LLC v. Suri Realty, LLC & Carla's Pasta, Inc. | HHD-CV20-6128121-S | Civil | State of Connecticut Superior Court |
| Turri's Italian Foods, Inc. v. Carla's Pasta, Inc. | FST-CV20-6048408-S | Civil | State of Connecticut Superior Court |
| Hoosier Logistics, Inc. v. Carla's Pasta, Inc. | 49D07-2012-PL-042784 | Civil | State of Indiana, Marion Superior Court |
| Pride Group Logistics v. VersaCold Logistics Services and Carla's Pasta, Inc. (Third Party) | CV-20-00646546-00A1 | Civil | Ontario Superior Court of Justics, Canada |

## **Exhibit B**

Sodexo Letter Agreement

# NATURAL FOOD PARTNERS, LLC

April 19, 2021

Sodexo
c/o David Kourie, SVP/CPO
  Supply Management North America

RE:      In re: Carla's Pasta, Inc.

Dave:

Sodexo Operations, LLC and Carla's Pasta, Inc. ("Carla's," and together with Suri Realty, LLC, the "Debtors") are parties to that certain Supply Agreement originally effective as of July 1, 2008, as amended, pursuant to which Carla's supplies certain products for purchase by Sodexo ("Supply Agreement").  The most recent amendment to the Supply Agreement, Amendment number 5 was made effective as of January 1, 2020.  Pursuant to that certain Asset Purchase Agreement, dated as of March 26, 2021 (as amended on April 18, 2021) (the "Asset Purchase Agreement"), by and among the Debtors, CP Foods LLC, a Wisconsin limited liability company ("CP Foods") and NFP Real Estate LLC, a Wisconsin limited liability company ("NFP Real Estate" and together with CP Foods, collectively, the "Purchasers" as assignees of Natural Food Partners, LLC), the Debtors have agreed, subject to approval by the Bankruptcy Court for the District of Connecticut (the "Bankruptcy Court") to sell, convey and assign to the Purchasers substantially all of their assets (the "Sale"), and in connection therewith, to assume the Supply Agreement and assign it to the Purchasers pursuant to 11 U.S.C. §365 subject to closing of the Sale.

The Debtor filed with the Bankruptcy Court its Amended Notice to Counterparties to Potentially Assumed Executory Contracts and Unexpired Leases Regarding Cure Amounts and Possible Assignment to Successful Bidder at Auction [Docket No. 353] (the "Notice of Cure Costs"), which listed a proposed Cure Amount (as defined in the Asset Purchase Agreement) to be paid to Sodexo to cure existing defaults under the Supply Agreement and compensate Sodexo as required by 11 U.S.C. §365(b) as a condition of the assumption and assignment of the Supply Agreement to the Purchasers.  On April 15, 2021, Sodexo filed with the Bankruptcy Court an Objection to the Notice of Cure Costs [Docket No. 408].  In resolution of Sodexo's Cure Objection, this letter shall confirm the Cure Amount and terms and conditions thereof to be paid to Sodexo at the closing of the Sale and the terms and conditions of invoicing and payments pursuant to the parties' go-forward relationship under the Supply Agreement.

The Cure Amount to be paid to Sodexo at the closing of the Sale by the Purchasers shall be **$830,744.93**, comprised of (i) $573,123.66 of outstanding invoices (as outlined on the Cure Objection), plus (ii) $105,000 of annual allowance payments for Q1 and Q2 of 2021 (as outlined on the Cure Objection), plus (iii) $152,621.27, which is an estimated amount for allowances for March purchases.  In addition, the Purchasers agree that Sodexo can and will invoice in the

ordinary course of business all sums for historical periods prior to the closing of the Sale and for periods from and after the closing of the Sale, and that the Purchasers will pay such sums in the ordinary course of business after invoicing; provided, however, that Sodexo agrees not to invoice the Purchasers for any historical periods prior to January 1, 2021.

If Sodexo is in agreement with the foregoing, please confirm with your signature below. The Purchasers look forward to a successful relationship with Sodexo after the closing of the Sale.

Very truly yours,

Accepted and agreed this ____ day of April, 2021:

Sodexo Operations, LLC

By: _____
Name: David Kourie
Title: SVP/CPO