UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
HARTFORD DIVISION

| | |
|---|---|
| IN RE: ) | CASE No.        21-20111 (JJT) |
| ) | |
| CARLA'S PASTA, INC., *et al.*, ) | Jointly Administered |
| Debtors.[1] ) | |
| ) | CHAPTER        11 |
| CP Foods LLC and NFP Real Estate LLC, ) | |
| Movants ) | RE: ECF Nos.   28, 247, 313, 486, 873 |
| V. ) | 923, 924 |
| ) | |
| Carla's Pasta, Inc. and Suri Realty, LLC, ) | |
| Respondents. ) | |
| ) | |

## RULING AND ORDER ON MOTION TO COMPEL

I.    INTRODUCTION

CP Foods LLC and NFP Real Estate LLC (the "Purchasers" or "Movants") acquired substantially all of the Debtors' assets on April 30, 2021, pursuant to an Amended and Restated Asset Purchase Agreement (*see* Ex. A to ECF No. 486, "APA") and this Court's Order Approving the Sale of the Debtors' Assets (ECF No. 486, "Sale Order").[2] Through the instant Motion to Compel (ECF No. 873, the "Motion"), the Purchasers are seeking, among other things, an order compelling the Debtors to comply with the APA and the Sale Order, and, in accordance therewith, to pay to the Purchasers certain prepaid insurance premiums ("Insurance Premiums") that the Purchasers contend were encompassed in the universe of assets purchased.[3] Both the

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Carla's Pasta, Inc. (5847) and Suri Realty, LLC (5847). The Debtors' corporate headquarters and service address is 50 Talbot Lane, South Windsor, Connecticut 06074.
[2] Capitalized terms used but not defined herein are intended to have the meanings ascribed to them in the APA and the Sale Order.
[3] Pursuant to the Sale Order, the Court retained jurisdiction "to enforce and implement the terms and provisions of [the Sale] Order and the Asset Purchase Agreement . . . including, but not limited to, retaining jurisdiction to (i)

Debtors and their lender, People's United Bank ("PUB"), have responded with reasoned objections to the Motion. *See* ECF Nos. 923 and 924, respectively.[4]

In support of the Motion, the Purchasers raise two principal arguments: (1) that the APA "unequivocally and unambiguously included 'Prepayments' as 'Purchased Assets' . . . [including] approximately $156,000 attributable to [the Insurance Premiums] issued and reimbursable by one or more of the Debtors' insurance carriers, under policies that were not assumed in the sale"; and (2) that the Debtors conceded that the Insurance Premiums were a Purchased Asset when they included the Insurance Premiums as a component of the Working Capital adjustment in the Sellers' Closing Certificate. Through the Motion, the Purchasers would also seek to introduce extrinsic evidence (*i.e.*, the Declaration of Brian Durst and correspondence between the parties) to demonstrate what the Purchasers thought they were buying, or what they intended to buy, when they agreed to the terms and conditions of the APA and negotiated the Working Capital adjustment.[5]

In their Response to the Motion (ECF No. 923, "Response"), the Debtors argue that the plain language of the APA is dispositive—the Insurance Premiums at the center of this dispute were Excluded Assets as defined in the APA, and accordingly, were retained by the Debtors and were not sold or assigned to the Purchasers. This construction and interpretation is urged as consistent with the relief authorized by the Court's Sale Order. *See* Sale Order, at ¶ T ("[T]he Purchasers are not purchasing any of the Excluded Assets . . .").[6] Further, because the terms and

---

compel delivery of the Purchased Assets to the Purchasers . . . [and to] (iii) resolve any disputes arising under or related to the Asset Purchase Agreement . . ." *See* Sale Order, at ¶ 38.

[4] Specifically, PUB filed an Objection and Joinder in the Debtors' Response (*see* ECF No. 924, collectively, with the Debtors' Response, the "Objections to the Motion").

[5] Consistent with the Court's direction at the Hearing, further evidentiary proceedings urged by the Purchasers would not be entertained by the Court if the plain language of the APA and the Sale Order were found to be dispositive of this contest.

[6] *See* FN 2 of the Sale Order (adopting the definitions set forth in the APA).

the language of the APA are clear and unambiguous, the Debtors argue that the Court should not consider any of the extrinsic evidence advanced by the Purchasers.

The parties advanced their respective positions at a hearing on the Motion held on July 28, 2021 (ECF No. 1029, "Hearing"). At the conclusion of the Hearing, and after all parties were fully heard, the Court took the matter under advisement. For the reasons stated herein, the Purchasers' Motion to Compel is hereby DENIED and the Objections to the Motion are hereby SUSTAINED. The Court reserves decision on any award of legal fees and expenses to the prevailing party pending further application and proceedings on the issue.[7]

## II.    JURISDICTION AND VENUE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and derives its authority to hear and determine this matter on reference from the District Court pursuant to 28 U.S.C. §§ 157(a) and (b)(1). This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## III.   DISCUSSION

Under Connecticut law, "[w]here the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity. . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms." *Tallmadge Bros. v. Iroquois Gas Transmission Sys., L.P.*, 252 Conn. 479, 498 (2000) (*citing Lawson v. Whitey's Frame Shop*, 241 Conn. 678,

---

[7] Section 12.4.2 of the APA provides: "In the event of any litigation brought to enforce or interpret this Agreement, or arising out of its negotiation, performance, or subject matter, the Party who prevails will be entitled to recover its reasonable attorneys' fees, costs and expenses, including those incurred at trial, in any bankruptcy or other proceeding, on appeal, and in enforcing any judgment, as determined by the court." Both the Purchasers and the Debtors are seeking an order awarding the reasonable fees and expenses incurred in connection with this matter.

686 (1997)). "Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [w]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law. . . ." *Id*., at 495 (citations omitted). What's more, "in the majority of the cases considering contract interpretation a matter of law, the disputed agreement was a commercial contract between sophisticated commercial parties with relatively equal bargaining power" – all factors that raise a presumption of definitiveness. *Id*., at 496.

Pursuant to the APA, the Debtors sold, conveyed, assigned, transferred and delivered to the Purchasers the Purchased Assets, which are defined as all "assets of Sellers . . . of every kind and description, *except for the Excluded Assets . . .*" See APA § 2.1.1 (emphasis added). One category of Purchased Assets includes Prepayments, defined under the APA as "(i) prepaid expenses held as current assets on Sellers' Books and Records, and (ii) cash in advance paid to Sellers' suppliers which are reflected as payments towards future accounts payable on the Books and Records." *See* APA § 1.1 and § 2.1.1(h). The Excluded Assets, in turn, are defined as those assets that "shall be retained by Sellers, and are not being sold or assigned to [Purchasers] . . ." *See* APA § 2.1.2. Among the Excluded Assets expressly enumerated in the APA are "all insurance policies of Sellers, *any prepaid insurance premiums* and any rights or claims or proceeds arising from such policies, solely to the extent relating to any Excluded Asset or Excluded Liability."  *See* APA § 2.1.2(j) (emphasis added).

The Purchasers contend that the Insurance Premiums constitute a Prepayment, and thus, are included in the Purchased Assets acquired on the Closing Date. The Debtors, on the other hand, argue that, notwithstanding the APA's inclusion of Prepayments within the definition of Purchased Assets, "the general category of 'Prepayments' has exceptions, including the

4

Insurance [Premiums] specifically identified in section 2.1.2(j) as Excluded Assets." This Court agrees with the Debtors. "[I]t has been well settled that 'the particular language of a contract must prevail over the general.'" *Grogan v. Penza*, 194 Conn. App. 72, 81, 220 A.3d 147 (2019) (*quoting Issler v. Issler*, 250 Conn. 226, 237 n.12 (1999)); *see also Bead Chain Mfg. Co. v. Saxton Products, Inc.,* 183 Conn. 266, 273 (1981). Here, the more specific language in section 2.1.2(j) excepting the Insurance Premiums from the Purchased Assets, controls over the more general language in section 2.1.1(h) identifying Prepayments as a subcategory of Purchased Assets.

Further, the terms and the language of the APA are clear, unambiguous, and definitive—the Debtors sold the Purchasers all of the Debtors' assets, *except for* the Excluded Assets, and the universe of Excluded Assets expressly includes "all insurance policies of Sellers, *any prepaid insurance premiums* and any rights or claims or proceeds arising from such policies . . ." (emphasis added). The Purchasers acknowledge this fact (s*ee* Motion, at ¶ 28), and the Sale Order underscores not only this agreement, but also the Court's intentions in approving the sale and the terms set forth in the APA. *See* Sale Order, at ¶ T ("Pursuant to the Asset Purchase Agreement, the Purchasers are not purchasing all of the Debtors' assets in that *the Purchasers are not purchasing any of the Excluded Assets* or assuming the Excluded Liabilities, and thus shall have no liability for the Excluded Liabilities.") (emphasis added). Accordingly, the Court finds that the prepaid Insurance Premiums are specifically excepted from the broad category of Prepayments, and thus, from the Purchased Assets, pursuant to section 2.1.2(j) of the APA.

Even including the Insurance Premiums in the calculation of the Working Capital adjustment did not change the fact the Insurance Premiums are an expressly Excluded Asset.[8]

---

[8] The purchase price under the APA was subject to a Working Capital adjustment. Under the APA, Working Capital included "the Prepayments, Accounts Receivable, and Inventory as of the Closing Date, as calculated in accordance

The Purchasers argue that because Prepayments fell within the definition of Working Capital, and because $156,818.05 worth of "Prepaid Business Insurance" was used in the Working Capital calculation, the inclusion of the Insurance Premiums in determining the Working Capital adjustment provides meaning to the APA's definition of Prepayment, and that the Court should order the turnover of the Insurance Premiums to the Purchasers because they "have paid for the benefit of any recovery of the Insurance [Premiums]." Fatal to this argument, as the Debtors' Response underscores, is that nothing in the APA ties the Working Capital to the definitions of either the Purchased Assets or Excluded Assets (nor does Working Capital modify those definitions); the Purchasers did not assume any of the insurance contracts that generated the Insurance Premiums; and the inclusion of the Insurance Premiums in the Working Capital adjustment made no difference in the ultimate amount of the purchase price.[9]

Because the APA is clear and unambiguous in designating the Insurance Premiums as an Excluded Asset, and because the Working Capital adjustment (and the Insurance Premiums' inclusion therein) did not otherwise modify the universe of Purchased or Excluded Assets under the APA or result in a change in the purchase price, the Court rejects the Purchasers' argument that they are entitled to the Insurance Premiums. Accordingly, as previously articulated herein, the Court conclusively finds that the Insurance Premiums were expressly designated as an Excluded Asset under the APA and, as such, were retained by the Debtors and not sold or assigned to the Purchasers.

---

with [GAAP]." For every dollar of Working Capital that exceeded $12,620,000 at Closing, the purchase price would be adjusted upward on a dollar-for-dollar basis, whereas if the amount of Working Capital at Closing was less than $9,580,000, the purchase price would be adjusted downward on a dollar-for-dollar basis. If the Working Capital at Closing was within the range of $9,580,000 and $12,620,000, there would be no adjustment to the purchase price.
[9] The Sellers' Closing Certificate set forth a final Working Capital amount of $9,893,281.68. If the $156,818.05 in Insurance Premiums at issue were omitted from the Working Capital amount, the resulting Working Capital would have totaled $9,736,463.63–an amount that would have had no effect on the ultimate purchase price. *See* FN 8 of this Ruling.

Lastly, the Purchasers seek to rely on proposed extrinsic evidence—specifically, the Declaration of their principal and correspondence between the parties—to support their interpretation of the APA's terms based on the various iterations of the APA that were negotiated. According to the Purchasers, the inclusion of the Insurance Premiums in the Working Capital calculation supports their argument that there is ambiguity in the terms and language of the APA, and that "they would not have agreed to include the Insurance [Premiums] in the calculation of Working Capital if it was not included as a Purchased Asset in the sale."

Under Connecticut law, the parole evidence rule does not of itself forbid the presentation of "evidence outside the four corners of the contract concerning matters governed by an integrated contract, but forbids only the use of such evidence to vary or contradict the terms of such a contract." *In re Standard Beef Co.*, 2011 WL 2014331, at *6 (Bankr. D. Conn. 2011) (*quoting Palozie v. Palozie*, 283 Conn. 538, 548 n. 8 (2007)). Extrinsic evidence offered solely to contradict terms of an integrated writing is inadmissible as irrelevant, unless used "to explain an ambiguity appearing in the instrument." *Id.* In Connecticut, "whether a contract is ambiguous is a question of law for the court." *Enviro Express, Inc. v. AIU Ins. Co.*, 279 Conn. 194, 200 (2006).

> Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its term. . . . [T]he mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous. If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous. By contrast, language is unambiguous when it has a definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion. . . . When only one interpretation of a contract is possible, the court need not look outside the four corners of the contract. . . .

*Standard Beef, supra,* at *7 (*citing Poole v. City of Waterbury*, 266 Conn. 68, 88–89 (2003)).

The terms and language of the APA are not ambiguous. The Insurance Premiums are expressly designated as Excluded Assets, which by definition, were "retained by Sellers, and are

not being sold or assigned to [Purchasers] . . ." And while the Purchasers seek to introduce evidence surrounding the negotiations of the terms and certain language "carried over from the Debtors' original Form APA" to the final, binding APA to prove their belief of what they intended to purchase, nothing in the Declaration or the other correspondence can modify or contradict the clear and unambiguous language excepting the Excluded Assets, and more specifically, the Insurance Premiums, from the sale. *See Retrofit Partners I, L.P. v. Lucas Industries, Inc.,* 201 F.3d 155, 161 (2d Cir. 2000) (When contract language is not ambiguous, "[t]he circumstances surrounding the making of the contract, the purposes which the parties sought to accomplish and their motives cannot prove an intent contrary to the plain meaning of the language used." (citations omitted)). Accordingly, the Court finds that any evidence of what the Purchasers might have thought was encompassed within the Purchased Assets is irrelevant, and therefore inadmissible, based on the clear and unambiguous language of the APA.

What's more, the Purchasers' proposed extrinsic evidence is also precluded by the existence of the APA's merger clause. *See* APA § 12.7. Specifically, the merger clause provides that the APA and the ancillary agreements, including the schedules and exhibits thereto, "constitute the entire agreement among the Parties with respect to the subject matter of the [APA] . . . [and] supersede[s] all prior agreements and understandings, both oral and written, between the Parties with respect to the subject matter of" the APA. *Id.* Absent an exception to the rule, such as ambiguous terms, courts in Connecticut, including this Court, "adhere to the general principle that the unambiguous terms of a written contract containing a merger clause may not be varied or contradicted by extrinsic evidence." *Tallmadge, supra,* 252 Conn. at 503.

Accordingly, the lack of ambiguity in the APA and the inclusion of the merger clause both preclude consideration of the proposed extrinsic evidence that the Purchasers seek to

introduce into evidence. *See Id.,* at 502 ("[W]hen the parties have deliberately put their engagements into writing, in such terms as import a legal obligation, without any uncertainty as to the object or extent of such engagement, it is conclusively presumed, that the whole engagement of the parties, and the extent and manner of their understanding, was reduced to writing. After this, to permit oral testimony, or prior or contemporaneous conversations, or circumstances, or usages [etc.], in order to learn what was intended, or to contradict what is written, would be dangerous and unjust in the extreme." (citations omitted)). Finally, the construction advanced herein by the Debtors is simply consistent with this Court's intentions and deliberations with regard to its approval of the Sale Order.

IV.     CONCLUSION AND ORDER

The plain language of the APA is clear and unambiguous—the Purchasers acquired all of the Debtors' assets except for the expressly Excluded Assets, including the Insurance Premiums. The Working Capital calculation was not tied to the definitions of Purchased Assets or Excluded Assets under the APA, and the Insurance Premiums' inclusion in the calculation did not somehow modify those definitions. Any evidence of what the Purchasers thought they might be buying, or what they intended to buy, is irrelevant and precluded upon the Court's finding of the clear and unambiguous terms of the APA. The Purchasers are held to the deal they agreed to in writing. Accordingly, it is hereby ORDERED, DECREED, and ADJUDGED that:

1. The Motion to Compel at ECF No. 873 is DENIED.
2. The Objections to the Motion at ECF Nos. 923 and 924 are SUSTAINED.
3. The Insurance Premiums, including the $156,818.05 in dispute here, belong to the Debtors' estates.

4.	The Purchasers are directed to turnover to the Debtors any Insurance Premiums in their possession within 10 days of the entry of this Ruling and Order.

5.	In accordance with section 12.4.2 of the APA, the Court has set herein further proceedings on the award of legal fees and expenses claimed by the prevailing party. The Debtors are directed to file upon the docket and serve a supporting application and affidavits referencing appropriate time and expense records detailing such amounts within 15 days hereof. Any objection thereto shall be filed within 20 days of the service of such application. Any further briefing on this issue is limited to 10 pages each, which briefs shall be filed and exchanged within 10 days thereafter. The Court shall hold a Zoom hearing on the award of attorneys' fees and expenses on October 20, 2021 at 11:00 AM.

**IT IS SO ORDERED** at Hartford, Connecticut this 31st day of August 2021.

*James J. Tancredi*
United States Bankruptcy Judge
District of Connecticut